## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**Case No. _____**

IRA MARC FLADELL, SARAH CROUCH,
and THELMA STEPHENS,
on behalf of themselves and all others
similarly situated,

        Plaintiffs,

                                    **CLASS ACTION**
v.                                     **JURY DEMAND**

WELLS FARGO BANK, N.A.; WELLS
FARGO INSURANCE, INC.; ASSURANT, INC.;
and AMERICAN SECURITY INSURANCE
COMPANY;

        Defendants.
_____/

## CLASS ACTION COMPLAINT

Plaintiffs IRA MARC FLADELL, SARAH CROUCH, and THELMA STEPHENS file this class action complaint on behalf of themselves and all others similarly situated against WELLS FARGO BANK, N.A. ("WFB" or "Wells Fargo Bank"); WELLS FARGO INSURANCE, INC. ("WFI" or "Wells Fargo Insurance")[1]; ASSURANT, INC. ("Assurant"); and AMERICAN SECURITY INSURANCE COMPANY ("American Security" or "ASIC").

## INTRODUCTION

1.      Through this class action, Plaintiffs seek relief on behalf of millions of homeowners whose mortgage loans are owned or serviced by Wells Fargo Bank. WFB purchases hundreds of millions of dollars in force-placed insurance coverage annually from Assurant, one of two force-placed insurers that together control approximately 99.7% of the

---

[1] WFB and WFI shall be referenced together as the "Wells Fargo Defendants." Similarly, Assurant and ASIC may be referenced together as the "Assurant Defendants."

American force-placed insurance market, and passes the premiums for the coverage in their entirety on to borrowers whose voluntary homeowners' policies have lapsed. The premiums that WFB elects to pass on to its borrowers, however, cover more than the cost of insurance necessary to cover the WFB's interest in the collateral for the borrowers' mortgage loans. The premiums are artificially inflated by WFB and the Assurant Defendants to include the cost of unearned "commissions" (kickbacks) that are paid to WFB's affiliate, WFI, as well as bundled administrative costs not properly charged to the borrower. WFB also passes on charges for unnecessary or "excess" coverage that is not required by law or the terms of the borrowers' mortgage loans. Plaintiffs here challenge Defendants' manipulation of the market for force-placed insurance to maximize their own profits, and seek to recover these improper charges for WFB borrowers nationwide through their claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, breach of fiduciary duty, tortious interference with a contract or advantageous business relationship, and violations of the federal Truth in Lending Act ("TILA"), Bank Holding Company Act ("BHCA"), and Racketeer Influenced and Corrupt Organizations Act ("RICO").

**<u>The Force-Placed Insurance Industry</u>**

2.     On November 10, 2010, *American Banker* published an article describing major mortgage lenders' and servicers' questionable and often illegal practices related to force-placed insurance. The article revealed for the first time the exceptionally profitable exclusive relationships, collusive activities, and circular arrangements among the mortgage lenders and servicers, their affiliates, and their cooperating insurers.

3.     Lenders and servicers force place insurance when a borrower fails to obtain or maintain proper hazard or flood insurance coverage on property that secures a loan. Under the

typical mortgage agreement, if the homeowner's "voluntary" insurance policy lapses or provides insufficient coverage, the lender has the right to "force place" a new policy on the property and then charge the premiums to the borrower.

4.     The practices described in *American Banker* yield hundreds of millions of dollars in profits to the banks and insurers who implement them.   There are just two insurance companies that control the nationwide market for forced-placed insurance —Assurant and QBE. These companies and their affiliates enter into exclusive relationships with the major mortgage lenders and servicers to provide the policies.   To maintain their exclusive relationships with these lenders, the insurers pay them unearned "kickbacks" of a percentage of the force-placed premiums ultimately charged to the borrower, offer them subsidized administrative services, and/or enter into lucrative captive reinsurance deals with them.

5.     The money to finance these forced-place insurance schemes comes from unsuspecting borrowers who are charged inflated force-placed insurance premiums by lenders and servicers.   In many instances, borrowers are required to pay for backdated insurance coverage that covers periods during which no claims were made, or coverage that exceeds legal and contractual requirements, and are charged additional improper fees.

6.     The major lenders' force-placed insurance schemes take advantage of the broad discretion afforded the lenders and/or servicers in standard form mortgage agreements.   The agreements typically require the borrower to carry hazard insurance sufficient to cover the lender's interest in the property against fire and other perils.   Some mortgage agreements also require borrowers to maintain flood insurance on their properties sufficient to cover the lender's risk from flood damage.   If a homeowner's hazard or flood policy lapses, the mortgage agreement allows the lender to "force place" a new policy on the property at the borrower's

expense.

7.      Although force-placed insurance is designed to protect the lender's interest in the property that secures the loan and thus should not exceed that interest, lenders often purchase coverage from their exclusive insurers in excess of that required to cover their own risk.  And, as a matter of practice, the major lenders and servicers collude with the two major force-placed insurers to manipulate the force-placed insurance market and artificially inflate the premiums charged consumers, resulting in premiums up to ***ten times*** greater than those available to the consumer in the open market.  *American Banker* reported that "[t]hough part of the extra expense can be explained by the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry— even after accounting for the generous commissions and other payments that servicers demand." *See* J. Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*, AM. BANKER (Nov. 10, 2010), *available at* http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html.   Lenders, servicers, and force-placed insurers reap these unconscionable profits entirely at the expense of the unsuspecting borrower.

8.      At a recent hearing on force-placed insurance held by the National Association of Insurance Commissioners ("NAIC"), Birny Birnbaum, the foremost expert on the force-placed insurance market, illustrated the staggering growth in profits that Defendants' schemes have reaped in recent years:[2]

---

[2] The following graph is taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The presentation is available at:
http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance_presentation_birnbaum.pdf

## LPI Premiums Have Quadrupled Since 2004

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|---|---|---|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004-2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC                   13                                        August 9, 2012

9.      As shown below, Assurant, a named defendant in this action, held 58.6% of the nationwide market share for force-placed insurance in 2011.[3]  Together, Assurant and QBE/Balboa controlled 99.7% of the market in the same year, and held no less than 96.1% of the market between 2004 and 2011.

---

[3] This graph is taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The presentation is available at:
http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance_presentation_birnbaum.pdf

5

**Assurant and QBE Are the Market for LPI:**
**Countrywide Market Share**

| Year | Assurant | QBE/Balboa | Assurant + QBE/Balboa |
|------|----------|------------|-----------------------|
| 2004 | 68.2% | 29.8% | 98.0% |
| 2005 | 69.7% | 26.4% | 96.1% |
| 2006 | 79.2% | 19.5% | 98.7% |
| 2007 | 74.0% | 25.4% | 99.4% |
| 2008 | 74.2% | 25.5% | 99.7% |
| 2009 | 57.2% | 42.4% | 99.7% |
| 2010 | 56.2% | 43.5% | 99.7% |
| 2011 | 58.6% | 41.1% | 99.7% |

CEJ LPI Presentation to NAIC                                    18                                    August 9, 2012

10.     Unsurprisingly, these practices have come under increased scrutiny in recent years by the government and regulators. For example:[4]

- On March 21, 2013, the New York Department of Financial Services' ("NYDFS"), investigation into force-placed insurance practices "produced a major settlement with the country's largest 'force-placed' insurer, Assurant, Inc. . . . [The settlement] includes restitution for homeowners who were harmed, a $14 million penalty paid to the State of New York, and industry-leading reforms that will save homeowners, taxpayers, and investors millions of dollars going forward through lower rates."[5]  Further, under the Consent Order entered, Assurant and its subsidiaries (including ASIC), are prohibited from paying commissions to any servicers or entity affiliated with a servicer on force-placed insurance policies obtained by the servicer.  *See* Assurant & NYDFS Consent Order, Mar. 21, 2013, at 9.

- The NYDFS held hearings on May 17, 2012 related to the force-placed

---

[4] The Defendants' practices have also come under increased scrutiny by the courts.  This court has already certified a Florida class against two of the Defendants here – WFB and WFI  – on the same practices described herein.  *See Williams v. Wells Fargo Bank, N.A.*, Case No. 11-cv-21233 (S.D. Fla.) [D.E. 211].

[5] *See Cuomo Administration Settles with Country's Largest Force-Placed Insurer, Leading Nationwide Reform Effort and Saving Homeowners, Taxpayers, and Investors Millions of Dollars*, Dep't of Fin. Servs., Mar. 21, 2013, *available at,* http://www.dfs.ny.gov/about/press2013/pr1303211.htm.

insurance market.   In his opening statement, the Superintendent of Financial Services Benjamin Lawsky stated that the Department's initial inquiry uncovered "serious concerns and red flags" which included: (1) exponentially higher premiums; (2) extraordinarily low loss ratios; (3) lack of competition in the market; and (4) tight relationships between the banks, their subsidiaries, and insurers.  He went on to state:

> "In sum when you combine [the] close and intricate web of relationships between the banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions…"

- After August 2012 NAIC hearings, the state regulator from Louisiana, James Donelon, referred to the force-placed insurance market as a "monopoly" and stated that stricter regulations may be needed.[6]

11.     Florida has now become the epicenter for these force-placed insurance schemes. In his presentation to the NAIC, Mr. Birnbaum illustrated the astounding rise in force-placed insurance policies in Florida:[7]

---

6 See Zachary Tracer and David Beasley, *U.S. Regulators to Examine Force-Placed Insurance*, BLOOMBERG BUSINESSWEEK, Aug. 10, 2012 *available at*: http://www.businessweek.com/news/2012-08-10/u-dot-s-dot-regulators-to-examine-forced-place-insurance.

[7] This graph is taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The presentation is available at: http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance_presentation_birnbaum.pdf

## LPI Premium by State:  Florida Has Become Ground Zero

|     | 2004   | 2005   | 2006   | 2007   | 2008   | 2009   | 2010   | 2011   |
|-----|--------|--------|--------|--------|--------|--------|--------|--------|
| FL  | 10.6%  | 10.8%  | 13.3%  | 17.9%  | 22.9%  | 34.3%  | 36.7%  | 35.1%  |
| CA  | 20.8%  | 19.3%  | 21.2%  | 23.5%  | 24.3%  | 14.0%  | 11.1%  | 10.2%  |
| TX  | 10.6%  | 10.7%  | 8.8%   | 8.7%   | 7.0%   | 5.6%   | 5.6%   | 6.1%   |
| NY  | 3.6%   | 3.6%   | 4.5%   | 4.4%   | 4.3%   | 4.7%   | 5.4%   | 5.6%   |
| IL  | 3.0%   | 3.3%   | 3.9%   | 3.7%   | 3.9%   | 4.4%   | 4.1%   | 4.6%   |
| NJ  | 2.9%   | 2.7%   | 2.9%   | 2.7%   | 2.7%   | 2.9%   | 3.4%   | 4.0%   |
| MI  | 4.2%   | 4.4%   | 4.4%   | 5.8%   | 3.6%   | 2.7%   | 2.2%   | 2.0%   |
| OH  | 3.6%   | 3.8%   | 3.5%   | 2.7%   | 2.4%   | 2.2%   | 2.3%   | 2.9%   |
| GA  | 3.4%   | 3.2%   | 3.2%   | 2.4%   | 2.3%   | 2.3%   | 2.3%   | 2.3%   |
| PA  | 2.6%   | 2.6%   | 2.7%   | 1.8%   | 1.8%   | 1.8%   | 1.7%   | 1.8%   |

CEJ LPI Presentation to NAIC                                  15                                  August 9, 2012

12.     Defendants' self-dealing and collusion in the force-placed insurance market has caused substantial harm to the named Plaintiffs and the putative class they represent.  This class action seeks to redress that harm on behalf of this class of consumers and to recover all improper costs they have incurred related to the forced placement of hazard and flood insurance by WFB, Assurant, and ASIC.

**PARTIES**

**Plaintiffs**

13.     Plaintiff IRA MARC FLADELL is a citizen of the State of Florida.  He is a natural person over the age of 21 and otherwise *sui juris*.

14.     Plaintiff SARAH CROUCH is a citizen of the State of Florida.  She is a natural person over the age of 21 and otherwise *sui juris*.

15.     Plaintiff THELMA STEPHENS is a citizen of the State of Louisiana.  She is a natural person over the age of 21 and is otherwise *sui juris*.

**Defendants**

16.     Defendant WELLS FARGO BANK, N.A. is a national bank registered to do business in the State of Florida with its principal address in San Francisco, California.  As the result of a 2004 merger, WFB is the successor to Wells Fargo Home Mortgage, Inc., which is now a division of WFB.  WFB sometimes does business under the name Well Fargo Home Mortgage.  It is WFB's practice, when it acquires another bank, lender, or mortgage servicer, to become the successor in interest or assign of that bank or lender's home mortgages including those mortgages within the acquired entity's servicing portfolio.  For example, in 2008, WFB acquired Wachovia Bank, N.A. ("Wachovia") and is the successor in interest and/or assign of Wachovia as to all of Wachovia's home mortgages.

17.     Defendant WELLS FARGO INSURANCE, INC. is an affiliate of WFB registered to do business in the State of Florida with its principal address in Minnesota.  WFI is an insurance agency that sells a variety of personal insurance products to consumers, including customers of WFB.  WFI also provides broker services only for WFB and its affiliates and consequently is the captive insurance broker for WFB.  Upon information and belief, WFI performs no functions related to the procurement of force-placed insurance coverage for individual borrowers, and yet collects a "commission" tied to a percentage of the cost of each force-placed insurance premium.

18.     Defendant ASSURANT, INC. is a Delaware corporation with its principal office in New York, New York.  Assurant participates in the force-placed insurance market through its trade name, Assurant Specialty Property, and its business strategy "is to pursue long term growth in lender placed homeowner's insurance []."  Assurant Form 10-K for the fiscal year ending December 31, 2011 at 5.  "The largest product line within Assurant Specialty Property is

homeowners insurance consisting principally of fire and dwelling hazard insurance offered through (Assurant Specialty Property's) lender placed program." *Id.*

19.     Upon information and belief, Assurant allows its subsidiaries, including ASIC, to operate their force-placed business under the trade name "Assurant Specialty Property."

20.     Defendant AMERICAN SECURITY INSURANCE COMPANY is a Delaware corporation and an indirect subsidiary of Assurant, Inc., writing force-placed insurance policies in all fifty states and the District of Columbia with its principal address in Atlanta, Georgia. American Security often operates under the trade name Assurant Specialty Property.  American Security contracts with the lenders whereby it acts as a force-placed insurance vendor.  Its duties include, but are not limited to, tracking loans in their mortgage portfolio, handling all customer service duties related to force-placed insurance, and securing force-placed insurance policies on properties when a borrower's insurance has lapsed.

21.     Upon information and belief, American Security passes much of its profits from force-placed insurance to its corporate parent Assurant.

## JURISDICTION AND VENUE

22.      This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

23.      Plaintiffs are citizens of the states of Florida and Louisiana.  Defendants are citizens of various other states but are registered to do business in the aforementioned states. The amount in controversy exceeds $5,000,000 and there are at least one hundred members of the putative class.

24.      This Court has subject-matter jurisdiction over Plaintiffs' claims arising under

the BHCA, 12 U.S.C. § 1972, *et seq.*, according to the statute's jurisdictional statement, 12 U.S.C. § 1975.

25.     This Court further has subject-matter jurisdiction over those of Plaintiffs' claims that arise under RICO, 18 U.S.C. § 1962(d) according to the statute's jurisdictional statement, 18 U.S.C. § 1964.

26.     This Court has jurisdiction over Defendants because they are foreign corporations authorized to conduct business in Florida, are doing business in Florida and have registered with the Florida Secretary of State, or do sufficient business in Florida, have sufficient minimum contacts with Florida, or otherwise intentionally avail themselves of the Florida consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in Florida.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

27.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between the Plaintiffs and the Defendants.  28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

28.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District.  Venue is also proper here because at all times relevant hereto, most Plaintiffs resided in the Southern District of Florida and a substantial portion of the practices complained of herein occurred in the Southern District of Florida.

29.     All conditions precedent to this action have occurred, been performed, or have

been waived.

## FACTUAL ALLEGATIONS

30.     Permitting a lender to forcibly place insurance on a mortgaged property and charge the borrower the full cost of the premium is neither a new concept nor a term undisclosed to borrowers in mortgage agreements.  The standard form mortgage agreements used by WFB include a provision requiring the borrower to maintain hazard insurance coverage—and flood insurance coverage if the property is located in a Special Flood Hazard Area as determined by the Federal Emergency Management Agency—on the property securing the loan, and in the event the insurance lapses, permit the lender to obtain force-placed coverage and charge the premiums to the borrower rather than declare the borrow in default.

31.     The Assurant Defendants have an exclusive arrangement with WFB to monitor its mortgage portfolio and provide force-placed insurance.[8]   In addition to subsidized mortgage services received from the Assurant Defendants, a percentage of borrowers' force-placed premiums are "kicked back" and paid directly to WFI, which in turn compensates WFB in the form of "soft-dollar" credits.

32.      The scheme works as follows.  WFB purchases master or "umbrella" insurance policies from the Assurant Defendants that cover the majority of its portfolio of mortgage loans (the remainder is covered by QBE).  In exchange, the Assurant Defendants are given the exclusive right to force insurance on property securing loans within the portfolio when a borrower's insurance lapses or WFB determines that a borrower's existing insurance is

---

[8] Until just this year, the Wells Fargo Defendants had used both of the major force-placed insurers – Assurant and QBE – for its portfolio.  Assurant was historically responsible or approximately 80% of the portfolio.  However, Assurant has recently become the exclusive force-placed insurance provider for Wells Fargo.

inadequate.  The Assurant Defendants monitor WFB's loan portfolio for lapses in borrowers' insurance coverage.  Once a lapse is identified, Assurant, through ASIC, sends notice to the borrower that insurance *will be* "purchased" and force placed if the voluntary coverage is not continued.  If a lapse continues, the insurer notifies the borrower that insurance is being force-placed at his or her expense.

33.     No individualized underwriting ever takes place for the force-placed coverage. Insurance is automatically placed on the property and the premium charged to the borrower.  In many instances, the insurance lapse is not discovered for months or even years after the fact. Despite the absence of any claim or damage to the property during the period of lapse, retroactive coverage is placed on the property and the past premiums charged to the borrower.

34.     Once coverage is forced on the property, WFB charges the borrower for the insurance premiums.  WFB, through the Assurant Defendants, automatically deducts the amount from the borrower's mortgage escrow account, or adds it to the balance of the borrower's loan.[9]

35.      WFB then pays the premium to the insurer who then kicks back a set percentage of the premium to WFI as a "commission."  WFI then passes a percentage of that payment to WFB in the form of "soft-dollar" credits.

36.     The money passed to WFI is not compensation paid in exchange for services provided by WFI; it is simply grease paid to keep the force-placed machine moving.  In fact, WFI does no work to procure force-placed coverage for WFB's borrowers.  In an attempt to mask these kickbacks as legitimate, the Assurant Defendants send notices to WFB's borrowers disclosing that WFI may receive a "commission" or "compensation" for helping WFB to procure a force-placed policy to cover the borrower's property.  This disclosure is misleading—a master

---

[9] On some occasions when a borrower does not have an escrow account, the lender creates an escrow account with a negative balance and charges the borrower to bring the balance to zero.

policy covering the property is already in place by the time it the notice is sent, and WFI does no work to procure insurance for the individual borrower.

37.    Under this highly profitable force-placed insurance scheme, WFB is incentivized to purchase and force place insurance policies with artificially inflated premiums because the higher the cost of the insurance policy, the higher the kickback to WFI.

38.    The Assurant Defendants also enter into agreements to provide servicing activities to WFB for its entire loan portfolio at below cost.  The servicing costs are added into the force-placed premiums which are then passed on to the borrower.  The insurers are able to provide these services at below cost because of the enormous profits they reap from the hyper-inflated premiums charged for force-placed insurance.  However, because insurance-lapsed mortgaged property comprises only 1-2% of the lenders' total mortgage portfolio, the borrowers who pay these premiums unfairly bear the entire cost to service the entire loan portfolio.

39.    WFB may also overcharge borrowers by disregarding the Standard Mortgage Clause or the Lender's Loss Payable Endorsement ("LLPE") in the standard form mortgage agreement.  These clauses typically protect the lender for a period of at least ten days after the termination of the homeowner's voluntary insurance policy.  Force-placed policies, however, take effect on the date of termination, and "double-cover" the property unnecessarily during the period covered by the LLPE or Standard Mortgage Clause.  This means the borrower is charged for coverage for periods during which WFB has no exposure.

40.    Ultimately it is the unsuspecting borrower who suffers the consequences of these unconscionable practices.[10]

---

[10] Furthermore, when the cost of the high-priced premium is added by the Defendants to a homeowner's mortgage balance, it thereby increases the interest paid over the life of the loan by the homeowner to the lender.

## The Plaintiffs

41.     The actions and practices described above are unconscionable and undertaken in bad faith with the sole objective to maximize profits.  Borrowers who have stopped paying for insurance for whatever reason, or who are underinsured on mortgaged property, are charged hyper-inflated and illegitimate noncompetitive "premiums" for force-placed insurance that include undisclosed kickbacks to WFI (which, as described above, performs little to no work related to the forced placement of the individual policies), as well as the cost of certain administrative services.

42.     Plaintiffs here do not challenge WFB's right to force place insurance in the first instance.  They challenge Defendants' manipulation of the force-placed insurance market with an eye toward artificially inflating premiums and placing unnecessary coverage, which WFB purchases from the Assurant Defendants and then chooses to pass on to the borrower.  Plaintiffs seek to put an end to Defendants' exclusive, collusive, and uncompetitive arrangements, to ensure that they implement their force-placed insurance programs in good faith, and to recover for Plaintiffs the excess amounts charged to them beyond the true cost of insurance coverage.

### A.  Plaintiff Ira Marc Fladell

43.     On January 8, 2007, Plaintiff Ira Marc Fladell obtained a loan in the amount of $191,000 from World Savings Bank, FSB, secured by a mortgage on real property in Pompano Beach, Florida.  World Savings Bank, FSB later became known as Wachovia Mortgage, FSB, and Wachovia Mortgage, FSB later became WFB.

44.     Mr. Fladell's mortgage agreement includes provisions that state as follows:

### 5.  Borrower's Obligation to Maintain Insurance

At my sole cost and expense, I will obtain and maintain hazard insurance to cover all buildings and other improvements that are now or in the future will be located

on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which the lender requires coverage . . . .

**7. Lender's Right to Protect Its Rights in the Property**

If … I do not keep my promises and agreements made in this Security instrument … then Lender may do and pay for whatever it deems reasonable or appropriate to protect the Lender's rights in the Property. Lender's actions may, without limitation, include appearing in court, paying reasonable attorneys' fees, purchasing insurance required under Paragraph 5 above (such insurance may cost more and provide less coverage than the insurance I might purchase), and entering on the Property to make repairs. Lender must give me notice before Lender takes any of these actions. Although Lender may take action under this Paragraph 7 Lender does not have to do so. Any action taken by Lender under this Paragraph 7 will not release me from my obligations under this Security instrument.

45.     From the inception of the mortgage, Mr. Fladell maintained in full force and effect the hazard insurance required by the mortgage contract. He also maintained the flood insurance required by the mortgage through a policy with Fidelity National Indemnity Insurance Company.

46.     October 4, 2007, Mr. Fladell began receiving form notices, purportedly from WFB, indicating that it did not have current proof of the Mr. Fladell's insurance. The notices stated that the lender would purchase insurance for Mr. Fladell's property, charge his mortgage account for the premiums, and increase his monthly mortgage payments. Finally, WFB threatened to charge a premium of $2,561.29 for force-placed insurance. When Mr. Fladell submitted proof that he had maintained the proper insurance, the force-placed policy was cancelled and the notices ceased.

47.     In late 2008, Mr. Fladell began receiving similar notices, purportedly from WFB, despite the fact that he had continued to maintain the insurance required by the mortgage.

48.     One year later, beginning on September 10, 2009, Mr. Fladell received yet another series of notices threatening to force insurance on his home. On or around December 31,

2009, WFB force-placed a hazard insurance policy through ASIC with a $2,542.59 premium on Mr. Fladell's home.  This force-placed policy was backdated to August 24, 2009 and covered a one-year period, through August 24, 2010.

49.    In addition, despite the fact that Mr. Fladell had continued to maintain the necessary flood insurance through a condominium policy with Fidelity National Indemnity Insurance Company, in April 2009, he began receiving notices, purportedly from WFB, that he did not have sufficient flood insurance as required by his mortgage.  On March 23, 2012, Mr. Fladell received a notice, purportedly from WFB, indicating that a sixty-day flood insurance binder had been force-placed on his home.  This force-placed policy was backdated to February 11, 2012 and covered the sixty-day period ending on April 11, 2012.  The indicated premium for this policy was $2,301.75.

50.    WFB never disclosed that the premium's excessive price included costs for kickbacks and unearned commissions, or administrative costs performed by the vendor.

51.    There are no material differences between these Defendants' actions and practices directed to Mr. Fladell and their actions and practices directed to the Class.

**B.    Plaintiff Sarah Crouch**

52.    WFB holds a mortgage on a parcel of real property in Florida owned by Plaintiff Sarah Crouch.  The mortgage secures the repayment of a loan by WFB to Ms. Crouch.

53.    Ms. Crouch's mortgage agreement includes a provision that states as follows:

> **5.  Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. The insurance shall be maintained in the amounts … and for the periods that Lender requires.
>
> ***
>
> If Borrower fails to maintain any of the coverages described above, Lender may

17

obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability, and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of the Borrower secured by this Security Instrument ….

54.     In compliance with the terms of her mortgage, Ms. Crouch purchased property insurance through Frontline Homeowners Insurance ("Frontline"). The term of the policy commenced in April of one year and expired in April of the following year. The cost of her property insurance policy averaged approximately $1,500 for that annual period. Prior to 2011, Ms. Crouch's property insurance premium had always been timely paid in April of every year by WFB, as Ms. Crouch's mortgage servicer, from her insurance escrow reserve mandated by the terms of WFB's mortgage.

55.     In or about February 2011, Ms. Crouch refinanced her mortgage loan with WFB. During the course of the refinance, WFB represented to Ms. Crouch that her new loan would continue to include an insurance escrow reserve for the payment of her property insurance premium.

56.     On February 15, 2011, after the closing of the refinancing, WFB sent Ms. Crouch an "Initial Escrow Account Disclosure and Notice of New Mortgage Payment." This document indicated that a payment of $1,646.00 would be paid out of her insurance escrow reserve for property insurance to cover the period of April 2011 to April 2012.

57.     Despite Ms. Crouch's timely payments of all amounts due under her mortgage with WFB, including a portion of her payment deposited into her insurance escrow account, WFB, upon information and belief, failed to pay Ms. Crouch's property insurance for the annual period commencing on April 18, 2011 and ending April 18, 2012.

58.     Ms. Crouch subsequently began to receive renewal reminders from Frontline to pay her property insurance premium (with an annual premium cost of $1,321) for that period of April 2011 to April 2012.  After receiving the reminders, Ms. Crouch spoke to a Frontline representative who informed her that she did not have a current property insurance policy in effect.

59.     Ms. Crouch then called a representative at WFB about the status of her property insurance policy and was informed by WFB that Frontline was incorrect and that she did have a current property insurance policy in effect.

60.     On several more occasions throughout the year, Ms. Crouch spoke with WFB representatives who continually reassured her that she had a current property insurance policy in place.

61.     However, in or around April of 2012, after Ms. Crouch was again advised by Frontline that she did not have a current property insurance policy in effect, a representative from WFB finally admitted to her that there had never been a homeowner's insurance policy in place for the April 2011 to April 2012 period and that WFB had allowed the preexisting Frontline policy to lapse.

62.     No one at WFB or its affiliate, WFI, explained to Ms. Crouch why WFB had failed to pay her insurance premium to Frontline, as WFB represented and agreed that it would do.

63.     Immediately thereafter, Ms. Crouch purchased a new homeowner's insurance policy through Federated National Insurance Company with an annual premium of $2,310.00. This premium included a surcharge of approximately $115.00 for failing to have a valid insurance policy in effect for the prior year because of WFB's failure to make timely insurance

payments.

64.    On May 18, 2012, approximately one month after WFB admitted that it had not paid her insurance premium for the April 2011 to April 2012 policy period, WFB sent a letter informing Ms. Crouch that it had purchased a force-placed insurance policy issued by American Security for the period April 18, 2011 to April 18, 2012—the twelve-month period that had just passed.  WFB, therefore, had purchased a force-placed insurance policy through its exclusive arrangement with American Security for a period that already passed.  The premium for this worthless insurance policy was $4,671.61 and the amount was charged to Ms. Crouch.

65.    Moreover, WFB's May 18, 2012 letter states that American Security would refund to Ms. Crouch all or a portion of the cost of the force-placed insurance premium that she was charged if she was able to purchase a property insurance policy for the previous twelve-month period, even though Plaintiff no longer needed insurance for the previous twelve-month period and WFB was aware that it would be impossible for Plaintiff to purchase property insurance on a retroactive basis.

66.    Neither WFB's May 18, 2012 letter nor the force-placed insurance policy issued by American Security disclosed that the inflated policy premium charged to Ms. Crouch included costs for kickbacks and unearned commissions payable to WFI and or that the premium offset American Security's administrative expenses to monitor WFB's loan portfolio for insurance lapses.

67.    There is no material difference between these Defendants' actions and practices directed to Ms. Crouch and their actions and practices directed to the Class.

**Plaintiff Thelma Stephens**

68.    Plaintiff Thelma Stephens owned a home in Springhill, Louisiana.

69.    On August 29, 2007, Ms. Stephens obtained a $60,412 loan from Iberiabank, secured by a standard Federal Housing Administration (FHA) mortgage. WFB services this loan.

70.    Ms. Stephens' mortgage is a standard, uniform FHA mortgage.  It contains the following language relevant to Ms. Stephens' claims.

> **4.    Fire, Flood and Other Hazard Insurance**. Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

> **7.    Charges to Borrower and Protection of Lender's Rights in the Property.** . . . . If Borrower fails to . . . perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the property, including payment of taxes, hazard insurance and other items mentioned in paragraph 2.

> Any amounts disbursed by Lender under this paragraph shall become an additional debt of Borrower and be secured by this Security Instrument. These amounts shall bear interest from the date of disbursement at the Note rate, and at the option of Lender shall be immediately due and payable.

71.    Nowhere does Ms. Stephens' mortgage explicitly authorize WFB to force place insurance for Ms. Stephens' home, or provide any guidance on how WFB could be authorized to act with respect to purchasing insurance on Ms. Stephens's behalf.  Instead, Section 7, quoted above, reserves to WFB the right to "do and pay whatever is necessary to protect the value of the Property and Lender's rights in the property, including payment of taxes, hazard insurance and other items . . ." and to "collect fees and charges authorized by the Secretary" of Housing and Urban Development.

72.     Because the contract is silent with respect to force-placed insurance, Ms. Stephens brings numerous tort and statutory claims against WFB based on Wells Fargo Bank's receipt of kickbacks in the purchase of force-placed insurance for her home, as outlined below. The gravamen of Ms. Stephens' contractual claims is that it is not "necessary," as quoted from her mortgage above, for Wells Fargo to receive a kickback for purchasing force-placed insurance for Ms. Stephens' home from ASIC, nor are  WFB's kickbacks "fees or charges authorized by the Secretary" of Housing and Urban Development.

73.     Wells Fargo Bank force-placed both hazard and flood insurance on Ms. Stephens' home in at least March of 2011 and July of 2010.  WFB also force-placed hazard and flood insurance on Ms. Stephens' property in 2008 and 2009, but, absent discovery, Plaintiff is unable to state additional specific facts relating to these force-placed insurance policies.

74.     In July of 2010, WFB charged $567 to Ms. Stephens' escrow account to pay for force-placed hazard insurance procured from ASIC.

75.     In July of 2010, WFB charged $2,640 to Ms. Stephens' escrow account to pay for force-placed flood insurance procured from ASIC.

76.     In March of 2011, WFB charged $1056 to Ms. Stephens' escrow account to pay for force-placed hazard insurance procured from ASIC.

77.     In March of 2011, WFB charged $747 to Ms. Stephens' escrow account to pay for force-placed hazard insurance procured from ASIC.

78.     Wells Fargo Bank or one of its affiliates retained a portion of these force-placed insurance premiums as a "commission."  The rest was paid to ASIC.

79.     A portion of these force-placed insurance premiums was returned to WFB or one of its affiliates as a premium for reinsurance.

80.     Ms. Stephens paid these force-placed insurance premiums with her monthly mortgage payments.   However, the increase in her monthly mortgage payments was so substantial that she was not able to continue making her payments. WFB foreclosed on her home in late 2010 or the first half of 2011. Through the foreclosure process, WFB recouped any previously unpaid kickbacks and reinsurance premiums it deemed owed to it and its affiliates.

81.     There is no material difference between Defendants' actions and practices directed to Ms. Stephens and their actions and practices directed to the Class.

## CLASS ALLEGATIONS

### A.     Class Definitions

82.     Plaintiffs bring this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated. Plaintiffs seek to represent the following class:

> All borrowers who, within the applicable statutes of limitation, were charged for a force-placed insurance policy placed on property through the Wells Fargo Defendants and/or these companies' affiliates, entities, or subsidiaries.  Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

83.     Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

84.     Defendants subjected Plaintiffs and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

### B.      Numerosity

85.     The proposed class is so numerous that joinder of all members would be impracticable.  Defendants sell and service millions of mortgage loans and insurance policies in the states of Florida and Louisiana, as well as nationwide.  The individual class members are

23

ascertainable, as the names and addresses of all class members can be identified in the business records maintained by Defendants.  The precise number of class members for each class numbers at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.  Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

**C.      Commonality**

86.      There are questions of law and fact that are common to all Plaintiffs' and class members' claims.  These common questions predominate over any questions that go particularly to any individual member of the class.  Among such common questions of law and fact are the following:

  a.  Whether Defendants charged borrowers for unnecessary insurance coverage including, but not limited to, insurance coverage that exceeded the amount required by law or the borrowers' mortgages and/or backdated coverage that covered periods of time for which Defendants had no risk of loss;

  b.  Whether WFB breached the mortgage contracts with Plaintiffs and the Class by charging them for force-placed insurance that included illegal kickbacks (including unearned commissions) and by charging Plaintiffs and the Class for servicing their loans;

  c.  Whether Defendants have been unjustly enriched at the expense of the Plaintiffs and the Class;

  d.  Whether WFB breached the implied covenant of good faith and fair dealing by entering into exclusive arrangements with the Assurant Defendants, which resulted in inflated insurance premiums being charged to Plaintiffs and the Class;

  e.  Whether the Defendants manipulated forced-placed mortgage purchases in order to maximize their profits to the detriment to Plaintiffs and the Class;

  f.  Whether WFI performs any work or services in exchange for the "commissions" or other "compensation" it collects;

g.  Whether the premiums charged are inflated to include kickbacks and unwarranted "commissions;"

h.  Whether the premiums charged are inflated to include charges for bundled administrative services that the vendors provide to the lenders or mortgage servicers, and which are not chargeable to Plaintiffs and the Class under the terms of their mortgages;

i.  Whether WFB violated TILA by conditioning the extension of credit on the purchase of insurance through an affiliate, in direct contravention of the anti-coercion disclosures included in borrowers' mortgages;

j.  Whether WFB violated TILA by failing to disclose kickbacks charged to class members in their mortgages;

k.  Whether WFB violated the anti-tying provisions of the BHCA by tying its agreement to purchase insurance on behalf of class members, and the continuing extension of credit, to class members' agreement that they could purchase insurance through their affiliate;

l.  Whether Assurant and/or ASIC intentionally and unjustifiably interfered with the Plaintiffs' and the Class's rights under the mortgage contracts by paying kickbacks to WFI  and by charging borrowers for the administration the loan portfolio;

m.  Whether WFB, Assurant, and ASIC violated the federal RICO statute by including material misrepresentations in notices and other documents mailed to borrowers; and

n.  Whether Plaintiffs and the Class Members are entitled to damages and/or injunctive relief as a result of Defendants' conduct.

**D.    Typicality**

87.    Each Plaintiff is a member the Class he or she seeks to represent.  Plaintiffs' claims are typical of the class's claims because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct.  Each class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

E.      **Adequacy of Representation**

88.      Each Plaintiff is an adequate representative of the class he or she seeks to represent and will fairly and adequately protect the interests of that class.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them.  There is no hostility between Plaintiffs and the unnamed class members.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

89.      To prosecute this case, Plaintiffs have chosen the undersigned law firms, which are experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

F.      **Requirements of Fed. R. Civ. P. 23(b)(3)**

90.      The questions of law or fact common to Plaintiffs' and each Class Member's claims predominate over any questions of law or fact affecting only individual members of the class.  All claims by Plaintiffs and the unnamed class members are based on the force-placed insurance policies that Defendants unlawfully secured and their deceptive and egregious actions involved in securing the force-placed policy.

91.      Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

92.      As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

**G.**     **Superiority**

93.     A class action is superior to individual actions in part because of the non-

exhaustive factors listed below:

>    (a) Joinder of all class members would create extreme hardship and
>    inconvenience for the affected customers as they reside all across the
>    states;
>
>    (b) Individual claims by class members are impractical because the costs
>    to pursue individual claims exceed the value of what any one class
>    member has at stake.  As a result, individual class members have no
>    interest in prosecuting and controlling separate actions;
>
>    (c) There are no known individual class members who are interested in
>    individually controlling the prosecution of separate actions;
>
>    (d) The interests of justice will be well served by resolving the common
>    disputes of potential class members in one forum;
>
>    (e) Individual suits would not be cost effective or economically
>    maintainable as individual actions; and
>
>    (f) The action is manageable as a class action.

**H.**     **Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

94.     Prosecuting separate actions by or against individual class members would create

a risk of inconsistent or varying adjudications with respect to individual class members that

would establish incompatible standards of conduct for the party opposing the class.

95.     Defendants have acted or failed to act in a manner generally applicable to the

class, thereby making appropriate final injunctive relief or corresponding declaratory relief with

respect to the Class as a whole.

**COUNT I**

**BREACH OF CONTRACT**
**(All Plaintiffs against WFB)**

96.     Plaintiffs Sarah Crouch, Thelma Stephens, and Ira Marc Fladell re-allege and

incorporate paragraphs 1-95 above as if fully set forth herein and further allege as follows.

97.     Plaintiffs and all class members similarly situated have mortgages that are owned and/or serviced by WFB.

98.     Plaintiffs' and these class members' mortgages are written on uniform mortgage forms and contain substantially similar force-placed insurance provisions.   The pertinent language of those mortgage provisions is set forth above in paragraphs 44, 53, and 70.

99.     Plaintiffs' mortgages require that they maintain homeowner's insurance on their properties and provide that if they fail to do so, then WFB may obtain insurance coverage to cover its risk and protect its rights in the property, "force place" the coverage, and charge the borrower its cost.

100.     WFB charges borrowers premiums that include unearned "commissions" or kickbacks to WFI and other bundled administrative costs.  These costs are not costs of coverage, and are not applied to protecting WFB's risk or rights in the collateral for borrowers' mortgage loans.  WFB breached the mortgage contract by, among other things, charging Plaintiffs these amounts beyond the actual cost of force-placed coverage.

101.     WFB has also breached its mortgage contracts by charging Plaintiffs and the Class for excess and unnecessary force-placed insurance, including retroactive coverage, as such coverage does not protect WFB's rights in its collateral or cover its risk.

102.     Plaintiffs and the Class members have suffered damages as a result of WFB's breaches of contract.

**WHEREFORE**, Plaintiffs Fladell, Stephens, and Crouch on behalf of themselves and all similarly situated Class members, seek compensatory damages resulting from WFB's breaches of contract, as well as injunctive relief preventing it from further violating the terms of the

mortgages.   Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT II

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (All Plaintiffs against WFB)

103.    Plaintiffs Crouch, Stephens, and Fladell re-allege and incorporate paragraphs 1-95 above as if fully set forth herein and further allege as follows.

104.    A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance.  Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

105.    Where an agreement affords a contracting party substantial discretion to make a decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

106.    The mortgage agreements afford WFB substantial discretion in force placing insurance coverage, without defined standards.  WFB is permitted to unilaterally choose the company from which it purchases force-placed insurance, and to purchase coverage in any amount and at any price.  WFB has an obligation to exercise the substantial discretion afforded it in good faith, and not capriciously or in bad faith.

107.    Plaintiffs do not seek to vary the express terms of the mortgage contract, but only to insure that the WFB exercises its discretion in good faith.

108.    WFB breached the covenant of good faith and fair dealing implied in its mortgage agreements by, among other things:

(a)  Manipulating the force-placed insurance market by selecting insurers (here, the Assurant Defendants) that will artificially inflate premiums to include kickbacks to WFI and issue excess insurance coverage not necessary to cover WFB's risk, and by failing to seek competitive bids on the open market and instead contracting to create

"back room" deals whereby insurance coverage is routinely purchased from Assurant and its affiliates without seeking a competitive price;

(b)  Exercising its discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting force-placed insurance policies with artificially inflated premiums to maximize its own profits;

(c)  Assessing inflated and unnecessary insurance policy premiums against Plaintiffs and the Class and misrepresenting the reason for the cost of the policies;

(d)  Allowing WFI to collect a percentage of the premiums charged to Plaintiffs and the Class as a kickback and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

(e)  Charging Plaintiffs and the Class for "commissions" when the insurance is prearranged and no commission is due;

(f)  Charging Plaintiffs and the Class for having the vendor perform its obligation of administering its mortgage portfolio which is not chargeable to Plaintiffs or the Class;

(g)  Force placing insurance coverage in excess of what is required by law or borrowers' mortgage agreements; and

(h)  Force placing insurance coverage in excess of that required to cover the lender's interest in the property, or the balance owed on the loan.

109.  As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class have suffered damages.

**WHEREFORE**, Plaintiffs Crouch, Stephens, and Fladell on behalf of themselves and similarly situated Class members, seek a judicial declaration determining that the premiums charged and the terms of the force-placed insurance policies violate the duties of good faith and fair dealing.  Plaintiffs also seek compensatory damages resulting from WFB's breaches of its duties.  Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT III

### UNJUST ENRICHMENT
### (All Plaintiffs against the Wells Fargo Defendants)[11]

110.    Plaintiffs re-allege and incorporate paragraphs 1-95 above as if fully set forth herein and further allege as follows.

111.    The Wells Fargo Defendants received benefits from Plaintiffs and Class members in the form of inflated insurance premiums related to force-placed insurance policies, unwarranted kickbacks and commissions, and subsidized loan servicing costs.

112.    These Defendants entered into an agreement whereby the insurance vendor— here, American Security—would provide force-placed insurance policies to the Wells Fargo Defendants for the portfolio of loans monitored on behalf of the Wells Fargo Defendants.  The Wells Fargo Defendants would then charge Plaintiffs and the Class premiums that had been artificially inflated to include costs not properly chargeable to the borrower.  The force-placed policies imposed on borrowers were therefore far more expensive than those available to borrowers in the open market that provide even more coverage.

113.    These Defendants also collected premiums on force-placed policies that provided coverage in excess of that required by law or the borrowers' mortgage agreement, and in excess of that required to protect the lender's interest in its collateral.

114.    The Assurant Defendants paid and collected significant monies in premiums, kickbacks, and commissions tied directly to the cost of the force-placed insurance premium (as a percentage).  Commissions or kickbacks were paid directly to the Wells Fargo Defendants in order to be able to exclusively provide force-placed insurance policies.  Assurant and/or ASIC were mere conduits for the delivery of the kickbacks, "commissions," and other charges to the

---

[11] Plaintiffs plead their unjust enrichment claim against WFB in the alternative to their contractual claims against the bank.

Wells Fargo Defendants.

115.    These payments directly benefitted the Wells Fargo Defendants and were taken to the detriment of the borrower.   The kickbacks, commissions, and subsidized costs were subsumed into the price of the insurance premium and ultimately paid by the borrower. Therefore, these Defendants had the incentive to charge and collect unreasonably inflated prices for the force-placed policies.

116.    Further, the Wells Fargo Defendants received financial benefits in the form of increased interest income, duplicative insurance based upon the Lender Loss Payable Endorsement or the Standard Mortgage Clause, and/or "soft-dollar" credits.

117.    As a result, Plaintiffs and the Class have conferred a benefit on the Wells Fargo Defendants.

118.    These Defendants had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them.

119.    These Defendants will be unjustly enriched if they are allowed to retain the aforementioned benefits, and each class member is entitled to recover the amount by which these Defendants were unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class Members, demand an award against the Wells Fargo Defendants in the amounts by which these Defendants have been unjustly enriched at Plaintiffs' and the Class Members' expense, and such other relief as this Court deems just and proper.

## COUNT IV

### UNJUST ENRICHMENT
### (All Plaintiffs against Assurant and American Security)

120.    Plaintiffs re-allege and incorporate paragraphs 1-95 above as if fully set forth

herein and further alleges as follows.

121.    The Assurant Defendants received from Plaintiffs and Class members benefits in the form of insurance premiums related to force-placed insurance policies.

122.    The Assurant Defendants paid significant monies to the Wells Fargo Defendants in kickbacks, commissions, and other costs tied directly to the cost of the force-placed insurance premium (as a percentage).  Commissions or kickbacks were paid directly to the Wells Fargo Defendants in order to be able to exclusively provide force-placed insurance policies and receive the corresponding insurance premiums.

123.    The Assurant Defendants also collected premiums on force-placed policies that provided coverage in excess of that required by law or the borrowers' mortgage agreement, and in excess of that required to protect the lender's interest in its collateral.

124.    On information and belief, the Assurant Defendants deducted the excess premiums directly from borrowers' escrow accounts.   In the alternative, the Wells Fargo Defendants were mere conduits for the delivery of insurance premiums to the Assurant Defendants.

125.    As a result, Plaintiffs and the Class have conferred a benefit on the Assurant Defendants.

126.    These Defendants had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them.

127.    These Defendants will be unjustly enriched if they are allowed to retain the aforementioned benefits, and each class member is entitled to recover the amount by which these Defendants were unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class

Members, demands an award against the Wells Fargo Defendants in the amounts by which these Defendants have been unjustly enriched at Plaintiffs' and the Class Members' expense, and such other relief as this Court deems just and proper.

## COUNT V

### VIOLATIONS OF THE TRUTH IN LENDING ACT 15 U.S.C. § 1601 *et seq.*
### (All Plaintiffs against WFB)

128.     Plaintiffs Fladell, Crouch, and Stephens re-allege and incorporate paragraphs 1-95 above as if fully set forth herein and further allege as follows.

129.     Plaintiffs' and the class members' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of TILA, 15 U.S.C. § 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

130.     WFB is a "creditor" as defined by TILA because it owned Plaintiffs' mortgages and changed the terms of the mortgages so as to create a new mortgage obligation, of which WFB was the creditor.

131.     Pursuant to TILA, WFB was required to accurately and fully disclose the terms of the legal obligations between the parties. 12 C.F.R. § 226.17(c).

132.     WFB violated TILA, specifically 12 C.F.R. § 226.17(c), when it (i) added force-placed insurance to Plaintiffs' mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickback, discount loan monitoring, and/or other profiteering involving WFB and/or its affiliates as a result of the purchase of force-placed insurance.

133.     When WFB changed the terms of Plaintiffs' mortgages to allow previously unauthorized kickbacks and insurance amounts in excess of WFB's interests in the property, it

changed the finance charge and the total amount of indebtedness, extended new and additional credit through force-placed insurance premiums, and thus created a new debt obligation. Under TILA, WFB was then required to provide a new set of disclosures showing the amount of the insurance premiums (i.e. finance charges) and all components thereof.   On information and belief, WFB increased the principal amount under Plaintiffs' mortgages when it force-placed the insurance, which was a new debt obligation for which new disclosures were required.

134.    WFB adversely changed the terms of Plaintiffs' loans after origination in order to allow WFI to receive a kickback on force-placed insurance premiums.  These kickbacks are not authorized in the mortgage in any clear and unambiguous way. WFB has never disclosed to its borrowers the amount of the "commissions" or other unearned profits paid to its affiliate.

135.    WFB also violated TILA by adversely changing the terms of Plaintiffs' loans after origination by requiring and threatening to force-place more insurance than necessary to protect its interest in the property securing the mortgages.

136.    With respect to Plaintiffs Fladell and Stephens, and all force-placed flood insurance Class members, WFB also violated TILA when it (i) misrepresented in its insurance notices that Plaintiffs were obligated by federal law to maintain flood insurance in amounts greater than required by federal law, and/or greater than necessary to protect its interest in the property securing the mortgages; and (ii) failed to correct the original disclosures when the prior disclosures clearly differ from WFB's current insurance requirements.

137.    Acts constituting violations of TILA occurred within one year prior to the filing of this Complaint, or are subject to equitable tolling because WFB's kickback and other unearned revenue-generating scheme was the subject of secret agreements among WFB and its affiliates and was concealed from borrowers.

138.    Plaintiffs and Class Members have been injured and have suffered a monetary loss arising from WFB's violations of TILA.

139.    As a result of WFB's TILA violations, Plaintiffs and Class Members are entitled to recover actual damages and a penalty of $500,000.00 or 1% of WFB's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

140.    Plaintiffs and Class Members are also entitled to recovery of attorneys' fees and costs to be paid by WFB, as provided by 15 U.S.C. § 1640(a)(3).

**WHEREFORE**, Plaintiffs Fladell, Crouch, and Stephens, and all Class members similarly situated, seek a judgment in their favor against WFB awarding actual damages and a penalty of $500,000.00 or 1% of WFB's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2), as well as of attorneys' fees and costs to be paid by WFB, as provided by 15 U.S.C. § 1640(a)(3).

## COUNT VI

### TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (All Plaintiffs against Assurant and American Security)

141.    Plaintiffs Crouch, Stephens, and Fladell re-allege and incorporate paragraphs 1-95 above as if fully set forth herein and further allege as follows.

142.    The above-named Plaintiffs and the Class members have advantageous business and contractual relationships with WFB pursuant to the mortgage contracts. Plaintiffs and the Class have legal rights under these mortgage contracts. For example, Plaintiffs and the Class have a right not to be charged artificially inflated premiums in bad faith for forced-place insurance.

143.    Assurant and its subsidiary American Security have knowledge of the mortgage contracts and the advantageous business and contractual relationship between Plaintiffs and WFB. Assurant and American Security are not parties to the mortgage contracts, nor are they

third-party beneficiaries of the mortgage contracts.  Further, Assurant and American Security do not have any beneficial or economic interest in the mortgage contracts.

144.    Assurant and American Security intentionally and unjustifiably interfered with Plaintiffs' and the Class's rights under the mortgage contracts by, *inter alia*, entering into an exclusive relationship with WFB and its affiliate, WFI, whereby they would provide compensation (kickbacks, low cost services, etc.) to WFB and WFI in exchange for the exclusive right to force place inflated and unnecessary premiums which are purposefully and knowingly charged to Plaintiffs and the Class.

145.    Plaintiffs and the Class have been damaged as a result of Assurant's and American Security's interference with their mortgage contracts by being charged bad faith, inflated, and illegal charges for force-placed insurance in contravention of their rights under the mortgages.

**WHEREFORE,** Plaintiffs Fladell, Stephens, Crouch and all Class members similarly situated seek a judgment in their favor against Assurant and American Security for the actual damages suffered by them as a result of their tortious interference.  Plaintiffs also seek all costs of litigating this action including attorney's fees.

## COUNT VII

### BREACH OF FIDUCIARY DUTY
### (Plaintiffs Sarah Crouch and Ira Marc Fladell against WFB)

146.    Plaintiffs Crouch and Fladell re-allege and incorporate paragraphs 1-95 above as if fully set forth herein and further allege as follows.

147.    WFB holds funds in escrow on behalf of borrowers whose mortgages it services. These funds are designated for the purpose of paying insurance premiums when due, and any excess funds are to be returned to the above-named Plaintiffs and members of the Class under the

terms of the mortgage agreements.

148.    WFB is in a fiduciary relationship with Plaintiffs and receives a greater economic benefit from these escrow transactions than it would from a typical escrow transaction. Specifically, the debtor-creditor relationship transformed into a fiduciary relationship when WFB took it upon itself to manage borrowers' escrow accounts and withdrew money from borrowers' escrow accounts to pay artificially inflated force-placed insurance premiums.  WFB breached its fiduciary duty when it collected unlawful kickbacks or other compensation under the kickback scheme, as well as premiums for excess and unnecessary insurance coverage, which is clearly a greater economic benefit than what was contemplated under the mortgage.

149.    WFB breached its fiduciary duties to Plaintiffs and other members of the proposed class by (1) not acting in their best interest when it profited from force-placed insurance policies that were purchased using escrow funds it held for the benefit of these Plaintiffs and Class members at the expense of these Plaintiffs and Class members, and (2) not disclosing the kickback scheme to these Plaintiffs and Class Members.

150.    These actions were undertaken by WFB in bad faith for its own benefit and were not intended to benefit these Plaintiffs or other proposed class members.

151.    As a direct result of WFB's actions, Plaintiffs and all others similarly situated have suffered injury in the form of unnecessary and inflated escrow charges and a loss of funds from their escrow accounts.

**WHEREFORE**, Plaintiffs Crouch and Fladell and the proposed class are entitled to damages for WFB's breach of its fiduciary obligations and misappropriation of escrow funds.  In addition, Plaintiffs and the proposed class are entitled to punitive damages because WFB acted in

bad faith in deliberate or reckless disregard of their rights and its obligation to hold their escrow funds in trust.

## COUNT VIII

### VIOLATION OF THE ANTI-TYING PROVISIONS OF THE BANK HOLDING COMPANY ACT, 12 U.S.C. §1972 *et seq.* (All Plaintiffs against WFB)

152.   Plaintiffs Crouch, Fladell, and Stephens re-allege and incorporate paragraphs 1-95 above as if fully set forth herein and further allege as follows.

153.   WFB's kickback scheme violates the anti-tying provisions of the BHCA, 12 U.S.C. § 1972, *et seq.*

154.   The BHCA, 12 U.S.C. § 1972(b), states that "a bank shall not in any manner extend credit, lease, or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement . . . (B) that the customer shall obtain some additional credit, property, or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company."

155.   WFI is an affiliate of WFB.

156.   WFB's purchase of insurance on borrowers' behalf is a service that WFB offers to its borrowers.  To accept this service, borrowers must agree to pay commissions to WFI for unidentified services.

157.   Upon information and belief, WFB, WFI, and Assurant entered into contractual arrangements under which WFI would act as the "broker" or "agent" for 100% of force-placed insurance policies purchased on behalf of WFB's borrowers. Under these agreements WFI received a guaranteed commission for every force-placed insurance policy procured on behalf of WFB's borrowers equal to a set percentage of the premium for each policy.

158.    WFI does not engage in any insurance broker or agent services.  For example, it does not seek out competitive insurance policies from different insurance providers, but refers all force-placed insurance business to Assurant.

159.    This is an unusual banking practice.  WFB's exclusive agreement with Assurant obviates any opportunity for WFI to earn a commission.

160.    These practices are anti-competitive:

a.    WFB refers all force-placed insurance business to WFI and guarantees WFI's commissions. The commissions paid are based on contracts between WFB and Assurant, not on any services actually provided by WFI. WFI has no competitive incentive to provide any services for borrowers.

b.    WFB sets the commission amount that WFI will receive. The substantial revenue that Assurant receives in premiums from WFB borrowers gives it an incentive to agree to any commission rate that WFB demands.

c.    WFB's tying arrangement results in unreasonably high commissions. The commissions are a percentage of Assurant's premiums.  Assurant provides more limited insurance policies than borrowers can obtain on the market but these policies cost significantly more than other policies the borrowers would obtain on the open market.  WFB's agreements allow WFI to receive more than twice the commission any other insurance agent could receive for procuring more limited insurance than any other insurance agent would procure.

d.    Unlike regular insurance agency arrangements, WFB utilizes its power as borrowers' mortgage lender and/or servicer to guarantee payment of commissions.  WFB withdraws insurance premiums and commissions directly from borrowers' escrow accounts to pay commissions to its subsidiary, WFI.  If borrowers refuse to make increased payments to their escrow account, WFB coerces them into doing so with negative credit reporting and, potentially, foreclosing on their homes.  Thus, WFB uses its power as borrowers' bank to steer commissions to itself through WFI.

e.    WFB's force-placed insurance arrangement usurps market share from other insurance agencies in favor of its own subsidiary WFI. Force-placed insurance may be a more costly option than purchasing insurance on the open market, but it is a significantly easier and less demanding option. Hundreds of thousands of homeowners in the United States have allowed WFB to purchase force-placed insurance for their property since 2008

alone, resulting in tens of millions of dollars in commissions being paid to WFI.

f.   WFB's exclusive purchase arrangement and kickback scheme artificially inflates the price of force-placed insurance and artificially increases commissions paid to WFB's captive insurance agent. The artificially inflated premiums associated with Assurant's force-placed insurance are made possible because WFB now refers 100% of its force-placed insurance business to Assurant.  As one of the nation's largest mortgagees and mortgage servicers, WFB's exclusive force-placed insurance referrals can and do substantially affect competitive incentives to reduce prices. This guarantees distorted commissions to WFI, whose commissions are a percentage of Assurant's inflated premiums.

161.   The "tied product" in this arrangement is WFI's "service" of acting as an insurance agent for force-placed insurance.

162.   The "tying product" is WFB's purchase of force-placed insurance for borrowers. WFB also ties its continued extension of credit to Plaintiffs' agreement to pay WFI's commissions.   WFB would foreclose on Plaintiffs' homes if they refused to pay WFI's commissions after WFB charged them to Plaintiffs' escrow accounts.

163.   WFB ties the procurement of insurance on borrowers' behalf to WFI's "service" as alleged above.

164.   WFB benefits directly and indirectly from this tying arrangement. WFB's own subsidiary, WFI, receives commissions on all force-placed insurance.  WFI remits its profits to WFB, whether through direct money transfers, indirect money transfers through WFB's holding company, or "soft dollar" transfers

165.   Plaintiffs and all others similarly situated have been damaged by WFB's anti-competitive tying arrangement in that they have paid excessive commissions to WFB through its subsidiary WFI.

**WHEREFORE**, Plaintiffs and the proposed class are entitled to three times the amount of damages sustained, and the cost of suit, including a reasonable attorney's fee pursuant to 12 U.S.C. § 1975.  Plaintiffs and the proposed class are further entitled to an injunction barring WFB from continuing their unlawful conduct, including their exclusive purchasing arrangement with Assurant and the kickback scheme with Assurant.

## COUNT IX

### Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) (Plaintiffs Sarah Crouch and Ira Marc Fladell against WFB and American Security)

166.     Plaintiffs Crouch and Fladell re-allege and incorporate 1-95 above.

167.     At all relevant times, WFB and American Security were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).

168.     The RICO enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included WFB, Assurant, WFI, and American Security.

169.     The members of the RICO enterprise all had a common purpose: to increase and maximize the revenues of Wells Fargo and American Security by forcing Plaintiffs Crouch and Fladell and members of the class to pay artificially inflated premiums for hazard insurance through a scheme that manipulated the premiums to cover kickbacks and expenses associated with monitoring Wells Fargo's entire loan portfolio.  WFB, WFI, and American Security shared the bounty of their enterprise, i.e., by sharing the premiums generated by the joint scheme.

170.    The RICO enterprise functioned over a period of years as a continuing unit and had and maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

171.    WFB and American Security conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that lasted more than one year, at a minimum, and that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

172.    As part and in furtherance of the scheme to defraud, WFB and American Security made numerous material omissions and misrepresentations to the above-named Plaintiffs and members of the class with the intent to defraud and deceive these Plaintiffs and members of the class.

173.    On December 31, 2009, American Security, with the approval of Wells Fargo Bank, drafted and sent Plaintiff Fladell a letter on Wells Fargo letterhead, stating that WFB had purchased a fire insurance policy to protect its interest in Mr. Fladell's property, the annual premium for the coverage was $2,542.59, and the premium had been advanced on Plaintiff Fladell's behalf "as provided in your loan documents." The letter also stated that the cost of the insurance policy may have included compensation to the insurer and Wells Fargo for tracking loan customers' compliance with WFB's insurance requirements. In making these statements, WFB and American Security knowingly and intentionally fostered the mistaken impression that the premium Plaintiff Fladell was to be charged for the insurance policy was for the cost of the policy and possibly the cost of tracking customers' insurance coverage, when in fact the premium also included a kickback to WFB or WFI. WFB had a duty to correct this mistaken

impression. This omission was material, as it gave WFB and American Security a colorable reason to charge Plaintiff Fladell unreasonably high premiums and would have influenced Plaintiff Fladell's decision whether to pay the premiums or contest them.

174.   In stating that its actions were "as provided in your insurance contract," the December 31, 2009 letter to Plaintiff Fladell also misrepresented that the loan documents gave WFB the right to charge Plaintiff for the cost of insurance tracking and for kickbacks to the Wells Fargo Defendants. WFB and American Security knew that the loan documents did not give WFB that authority. This misrepresentation was material, as it gave WFB and American Security a colorable reason to charge Plaintiff Fladell unreasonably high premiums and would have influenced Plaintiff Fladell's decision whether to pay the premiums or contest them.

175.   On May 18, 2012, American Security, with the approval of WFB, drafted and sent Plaintiff Crouch a letter on Wells Fargo letterhead. The letter stated that WFB had obtained a hazard insurance policy on behalf of Plaintiff Crouch "in accordance with the terms of your mortgage," and enclosed a copy of the policy. The policy stated that the premium for the coverage was $4,518. In making these statements, WFB and American Security knowingly and intentionally fostered the mistaken impression that the premium was for the cost of the policy, when in fact the premium also included kickbacks to WFB or WFI and compensation for the cost of insurance tracking. WFB had a duty to correct this mistaken impression. This omission was material, as it gave WFB and American Security a colorable reason to charge Plaintiff Crouch unreasonably high premiums and would have influenced Plaintiff Crouch's decision whether to pay the premiums or contest them.

176.   In stating that its actions were "in accordance with the terms of your mortgage," the May 18, 2012 letter to Plaintiff Crouch also misrepresented that the loan documents gave

WFB the right to charge Plaintiff for the cost of insurance tracking and for kickbacks to WFB. WFB and American Security knew that the loan documents did not give WFB that authority. This misrepresentation was material, as it gave WFB and American Security a colorable reason to charge Plaintiff Crouch unreasonably high premiums and would have influenced Plaintiff Crouch's decision whether to pay the premiums or contest them.

177.    American Security, with the approval of WFB and on Wells Fargo letterhead, also sent Plaintiffs Fladell and Crouch notices of temporary insurance before annual coverage was placed, informing them that temporary coverage had been placed on their properties, and that a one-year policy would be placed if they did not provide proof of insurance within sixty days. The notice warned that if WFB/ASIC ultimately purchased additional coverage, it *would be* obtained with the assistance of an affiliate (WFI), which would collect a commission as compensation for procuring the coverage.   This disclosure misleads borrowers in several respects.  First, the notice misrepresents that insurance "*will be obtained*" with the assistance of WFI.  A master policy was already in place, therefore there was nothing for WFI to "obtain" moving forward.  Second, WFI would do no work to "assist" with the procurement of force-placed insurance, nor was this ever Defendants' intention.  Third, the payment made to WFI in connection with Defendants' force-placed insurance program was not a true "commission" because it did not compensate WFI for any work performed.  The letter, that is, omitted to disclose that the payment was in fact a kickback to WFI.

178.    Finally, WFB sent Plaintiffs Fladell and Crouch monthly statements showing that the premiums for the force-placed insurance were being deducted from their escrow accounts.  In labeling the deductions "premiums," these statements fostered the mistaken impression that that the deductions were for the cost of the policy, when in fact the deductions also included

kickbacks to WFB or WFI and compensation for the cost of insurance tracking.  WFB had a duty to correct this mistaken impression.  This omission was material, as it gave WFB and American Security a colorable reason to charge Plaintiffs Crouch and Fladell unreasonably high premiums and would have influenced Plaintiff Crouch's and Fladell's decision whether to pay the premiums or contest them.

179.    For the purpose of executing the scheme to defraud, WFB and American Security sent, mailed, and transmitted, or caused to be sent, mailed, and transmitted, in interstate or foreign commerce numerous materials, including but not limited to the notices and letters described above informing Plaintiffs and class members that they would charge Plaintiffs and class members artificially inflated and unnecessary premiums for force-placed insurance.  The Wells Fargo Defendants and American Security also transferred sums among themselves, including but not limited to kickbacks, in furtherance of their scheme to defraud Plaintiffs and class members, in violation of the wire fraud statutes.

180.    By reason, and as a result, of the WFB's and American Security's conduct and participation in the racketeering activity described herein, WFB and American Security have caused damages to Plaintiffs and members of the class in the form of unreasonably high force-placed insurance premiums.

WHEREFORE, pursuant to 18 U.S.C. § 1964(c), Plaintiffs and members of the class are seeking to recover compensatory and treble damages, and attorneys' fees and costs.

## COUNT X
### Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d)
### (Plaintiffs Sarah Crouch and Ira Marc Fladell against WFB, WFI, ASIC, and Assurant)

181.    Plaintiffs Crouch and Fladell re-allege and incorporate paragraphs 1-95 and 167-180 above.

182.    At all relevant times, WFB, WFI, American Security, and Assurant were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

183.    WFB, WFI, American Security, and Assurant agreed that Assurant's subsidiary, American Security, would be WFB's exclusive provider of force-placed insurance and would extract artificially inflated premiums from WFB's customers.  WFB, WFI, American Security, and Assurant also agreed that American Security would pay WFB's affiliate, WFI, kickbacks.

184.    Upon information and belief, WFI passes much of its profits from the scheme to defraud to WFB, and American Security passes much of its profits from the scheme to defraud to Assurant.

185.    WFB, WFI, Assurant, and American Security committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to acts set forth above.

186.    As a result of WFB's, WFI's, Assurant's, and American Security Insurance Company's violations of 18 U.S.C. § 1962(d), Plaintiffs and members of the class suffered damages in the form of unreasonably high force-placed insurance premiums.

**WHEREFORE,** pursuant to 18 U.S.C. § 1964(c), Plaintiffs and members of the class are seeking to recover compensatory damages and treble damages, and attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs on behalf of themselves and all similarly situated individuals demand judgment against Defendants as follows:

(1)    Declaring this action to be a proper class action maintainable pursuant to Rule

23(a) and Rule 23(b)(1) and (2) or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs and their counsel to be representatives of the Class;

(2)     Enjoining Defendants from continuing the acts and practices described above;

(3)     Awarding damages sustained by Plaintiffs and the Class as a result of Defendants' breaches of the subject mortgage contracts and the implied covenant of good faith and fair dealing, together with pre-judgment interest;

(4)     Finding that Defendants have been unjustly enriched and requiring Defendants to refund all unjust benefits to Plaintiffs and the Class, together with pre-judgment interest;

(5)     Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses;

(6)     Awarding damages sustained by Plaintiffs and the Class as a result of Assurant's and American Security's tortious interference;

(7)     Awarding compensatory and treble damages, and attorneys' fees and costs under the federal RICO statute;

(8)     Awarding three times the amount of damages sustained, and the cost of suit, including a reasonable attorney's fee pursuant to the Bank Holding Company Act, 12 U.S.C. § 1975;

(9)     Awarding actual damages and a penalty of $500,000.00 or 1% of Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2), and attorneys' fees and costs, as provided by 15 U.S.C. § 1640(a)(3); and

(10)    Awarding such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 28th day of March 2013.

By: /s/ Adam M. Moskowitz

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>amm@kttlaw.com<br>Thomas A. Tucker Ronzetti, Esq.<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>rn@kttlaw.com<br>**KOZYAK, TROPIN, &**<br>**THROCKMORTON P.A.**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br>*Counsel for Plaintiffs* | Aaron S. Podhurst, Esq.<br>apodhurst@podhurst.com<br>Peter Prieto, Esq.<br>pprieto@podhurst.com<br>Stephen F. Rosenthal<br>srosenthal@podhurst.com<br>John Gravante, III, Esq.<br>jgravante@podhurst.com<br>Matthew Weinshall<br>mweinshall@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, Florida 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Counsel for Plaintiffs* |
| Lance A. Harke, P.A.<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, Florida 33138<br>Telephone:     (305) 536-8220<br>Facsimile:      (305) 536-8229<br>*Counsel for Plaintiffs* | Brent Walker, Esq.<br>Russell D. Carter, III<br>**CARTER WALKER PLLC**<br>2171 West Main, Suite 200<br>P.O. Box 628<br>Cabot, AR 72023<br>Telephone: (501) 605-1346<br>Facsimile: (501) 605-1348<br>bwalker@carterwalkerlaw.com<br>dcarter@carterwalkerlaw.com<br>*Counsel for Plaintiffs* |

| | |
|---|---|
| Alexander P. Owings, Esq.<br>apowings@owingslawfirm.com<br>Steven A. Owings, Esq.<br>sowings@owingslawfirm.com<br>**OWINGS LAW FIRM**<br>1400 Brookwood Drive<br>Little Rock, AR 72202<br>Telephone: (501) 661-9999<br>Facsimile: (501) 661-8393<br>*Counsel for Plaintiffs* | Jack Wagoner, III, Esq.<br>**WAGONER LAW FIRM, P.A.**<br>1320 Brookwood, Suite E<br>Little Rock, AR 72202<br>Telephone: (501) 663-5225<br>Facsimile: (501) 660-4030<br>jack@wagonerlawfirm.com<br>*Counsel for Plaintiffs* |
| Chip Merlin, Esq.<br>cmerlin@merlinlawgroup.com<br>Mary E. Fortson, Esq.<br>mfortson@merlinlawgroup.com<br>Sean M. Shaw, Esq.<br>sshaw@merlinlawgroup.com<br>**MERLIN LAW GROUP, P.A.**<br>777 S. Harbour Island Blvd., Suite 950<br>Tampa, FL 33602<br>Telephone: 813-229-1000<br>Facsimile: 813-229-3692<br>*Counsel for Plaintiffs* | Jeffrey N. Golant, Esq.<br>jgolant@jeffreygolantlaw.com<br>**LAW OFFICES OF JEFFREY N. GOLANT, P.A.**<br>1000 W. McNab Road, Suite 150<br>Pompano Beach, FL 33069<br>Telephone: 954-942-5270<br>Facsimile: 954-942-5272<br>*Counsel for Plaintiffs* |
| Roy E. Barnes, Esq.<br>John R. Bevis, Esq.<br>bevis@barnesalwgroup.com<br>**BARNES LAW GROUP, LLC**<br>31 Atlanta Street<br>Marietta, GA 30060<br>Telephone: 770-227-6375<br>Facsimile: 770-227-6373<br>*Counsel for Plaintiffs* | Catherine E. Anderson, Esq.<br>canderson@gslawny.com<br>Oren Giskan, Esq.<br>ogiskan@gslawny.com<br>**GISKAN SOLOTAROFF ANDERSON & STEWART LLP**<br>11 Broadway Suite 2150<br>New York, New York 10004<br>Telephone: 212-847-8315 |
| Albert L. Frevola, Jr., Esq.<br>afrevola@conradscherer.com<br>Gary B. Englander, Esq.<br>genglander@conradscherer.com<br>Ivan J. Kopas, Esq.<br>ikopas@conradscherer.com<br>Matthew Seth Sarelson, Esq.<br>msarelson@conradscherer.com<br>**CONRAD & SCHERER, LLP**<br>P. O. Box 14723<br>Fort Lauderdale, Florida 33302<br>Telephone:     (954) 462-5500 | Brian J. Stack, Esq.<br>bstack@stackfernandez.com<br>Sammy Epelbaum, Esq.<br>sepelbaum@stackfernandez.com<br>**STACK FERNANDEZ ANDERSON & HARRIS, P.A.**<br>1200 Brickell Avenue, Suite 950<br>Miami, Florida  33131<br>Tel.  (305) 371-0001<br>Fax:  (305) 371-0002<br>*Counsel for Plaintiffs* |

| | |
|---|---|
| Facsimile:      (954) 463-9244<br>*Counsel for Plaintiffs* | |
| Guido Saveri, Esq.  (Cal. Bar No. 22349)<br>guido@saveri.com<br>R. Alexander Saveri, Esq.  (Cal. Bar No. 173102)<br>rick@saveri.com<br>Cadio Zirpoli, Esq.  (Cal. Bar No. 179108)<br>cadio@saveri.com<br>**SAVERI & SAVERI, INC.**<br>706 Sansome Street<br>San Francisco, CA  94111<br>Telephone:  (415) 217-6810<br>Facsimile:  (415) 217-6813<br>*Counsel for Plaintiffs* | Michael L. Addicott, Esq.<br>mlaesq@addicottlaw.com<br>**ADDICOTT & ADDICOTT, P.A.**<br>900 N. Federal Hwy.<br>Ste. 201<br>Hallandale Beach, FL 33009<br>Telephone: 954-454-2605<br>*Counsel for Plaintiffs* |

344587.1