## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 0:13-cv-60721-MORENO/OTAZO-REYES

IRA MARC FLADELL, SARAH CROUCH,
GREG OLSON, MARGARET
ZAWISTOWSKI, TILENA ALI, DANNY
LANE and BEVERLY LANE on behalf of
themselves and all others similarly
situated,

        Plaintiffs,

v.

WELLS FARGO BANK, N.A.; WELLS
FARGO INSURANCE, INC.; ASSURANT, INC.;
AMERICAN SECURITY INSURANCE
COMPANY; VOYAGER INDEMNITY
INSURANCE COMPANY, STANDARD
GUARANTY INSURANCE CO.; QBE SPECIALTY
INSURANCE COMPANY; QBE INSURANCE
CORPORATION; QBE FIRST INSURANCE
AGENCY, INC.; QBE FINANCIAL INSTITUTION
RISK SERVICES, INC.; and
PRAETORIAN INSURANCE  COMPANY,

        Defendants.

_____/

### PLAINTIFFS' MOTION FOR PRELIMINARY
### APPROVAL OF CLASS ACTION SETTLEMENT AND
### <u>FOR CERTIFICATION OF THE SETTLEMENT CLASS</u>

The parties to this action have negotiated an extraordinary settlement that provides significant monetary relief to Wells Fargo mortgagors nationwide who had insurance coverage "force-placed" on their properties by Defendant Wells Fargo Bank, N.A. ("WFB"), as well as injunctive relief that would effectively end the lender-placed insurance ("LPI") practices at issue here.[1]  The Settlement requires Defendants to: (1) pay cash in an amount equal to 11% of the Net Premium charged to the Settlement Class Member, if the Class Member paid any of the charge and the charge occurred prior to March 24, 2012, and an amount equal to 7% of the Net Premium if the charge occurred after March 24, 2012, and (2) provide either an escrow account credit or a cash award to Class Members who were charged but did not pay and still owe LPI premiums in an amount equal to 11% of the Net Premium charged to the Settlement Class Member if the charge occurred prior to March 24, 2012, and an amount equal to 7% of the Net Premium if the charge occurred after March 24, 2012.  This settlement follows substantially similar LPI settlements already approved by this Court and others, including the settlement of all hazard LPI claims against the Chase and Assurant Defendants in *Saccoccio v. JPMorgan Chase Bank, N.A.*, No. 13-cv-21107 (S.D. Fla.), which just received final approval, and of all hazard LPI claims against the Citi and Assurant Defendants in *Casey v. Citigroup, Inc.*, Case No. 12-820 (N.D.N.Y. 2014).[2]  *See Casey* Settlement Agreement, attached as **Exhibit C**.

The Settlement's benefits were the result of significant hard-fought, arms'-length negotiations by the parties and their counsel under the direction of a distinguished mediator, Rodney Max.  Undersigned counsel were well positioned to evaluate and negotiate this

---

[1] Plaintiffs and Defendants Wells Fargo Bank, N.A. ("WFB"), Wells Fargo Insurance, Inc. ("WFI") [collectively "the Wells Fargo Defendants"], Assurant, Inc. ("Assurant"), American Security Insurance Company ("ASIC"), Voyager Indemnity Insurance Company ("VIIC"), and Standard Guaranty Insurance Company ("SGIC") [collectively "the Assurant Defendants"], QBE Specialty Insurance Company ("QBE Specialty"), QBE Insurance Corporation ("QBE Insurance"), QBE First Insurance Agency, Inc. ("QBE FIRST"), QBE Financial Institution Risk Services, Inc. ("QBE Financial"), and Praetorian Insurance Company ("Praetorian") [collectively, "the QBE Defendants"] executed a Settlement Agreement on March 4, 2014.  The Settlement Agreement is attached hereto as **Exhibit A** and the Preliminary Approval Order is attached as **Exhibit B**.

[2] Judge Scola also approved a similar settlement of hazard LPI claims brought by Florida mortgagors against the Wells Fargo and QBE Defendants in *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.) (D.E. 356), and the plaintiff in *Lopez v. HSBC Bank (USA), N.A.*, No. 13-cv-21104 (S.D. Fla.), moved for preliminary approval of the class action settlement in that case just last week.

Settlement, the fourth hazard LPI settlement in this district, because they have been investigating mortgage lenders' LPI practices since November 2010, when an article in *American Banker* first brought the exclusive relationships between mortgage lenders and their force-placed insurers to light. Specifically, since that time, Plaintiffs' counsel have investigated the practices of six major mortgage lenders, including the Wells Fargo Defendants, and the two major insurance groups that control more than 99% of the LPI market, reviewing more than three million documents and taking more than thirty depositions. Despite that work, Plaintiffs and the Class faced important hurdles in litigating their claims to resolution. As such, and given the immediate and substantial benefits the Settlement will provide to the Class, there can be no question that the terms of the proposed Settlement are "within the range of reasonableness" and should receive the Court's preliminary approval.

## FACTUAL BACKGROUND

### 1.  Defendants' Force-Placed Insurance Practices

The standard form mortgage agreements used by the Wells Fargo Defendants require the borrower to maintain hazard, wind, and, where applicable, flood insurance on the property securing his or her mortgage loan, and provide that the lender or servicer may force new coverage on the property at the borrower's expense in the event of a lapse. The mortgage agreement authorizes the lender to obtain coverage to protect it against risk of loss, and either advises the borrower that the cost of the coverage obtained might significantly exceed the cost of the borrower's voluntary coverage or provides that the lender may pay the costs necessary to protect its rights in the property. (D.E. 155-1 ¶¶ 36, 51, 60, 108).

Plaintiffs had LPI coverage force placed on their property by the Defendants. (*Id.* ¶¶ 55, 56, 71, 77, 86-88, 96, 102). They do not challenge the Wells Fargo Defendants' contractual right to force place coverage in the first instance, but instead challenge their alleged arrangement with both the Assurant Defendants and the QBE Defendants to artificially inflate borrowers' premiums with costs well beyond the cost of coverage. (*Id.* ¶ 49). Plaintiffs allege that these costs include kickbacks to the Wells Fargo Defendants' affiliates, and other costs unrelated to the procurement of new coverage. (*Id.* ¶¶ 39-48).

Plaintiffs allege that Defendants' scheme operates as follows. Wells Fargo purchases master or "umbrella" policies to cover its entire portfolio of mortgage loans from the Assurant or QBE Defendants. (*Id.* ¶ 39). In exchange, Wells Fargo gives its insurers the exclusive right to

force new coverage in the event of a lapse or the detection of insufficient coverage. (*Id.*). The Assurant Defendants or QBE Defendants monitor the Wells Fargo mortgage loan portfolio to identify these lapses, and when one is identified, send notice to the borrower that new, lender-placed coverage will be purchased if voluntary coverage is not continued. (*Id.*). If the lapse continues, the insurer notifies the borrower that new coverage is being placed at his or her expense. (*Id.*). Plaintiffs allege that these letters are inaccurate, as the lender-placed coverage goes into effect automatically upon lapse under Wells Fargo's umbrella policy with the Assurant or QBE Defendants. (*Id.* ¶ 43).

Premiums for the new coverage are deducted from the borrower's escrow account or added to the balance of the subject mortgage loan. (*Id.* ¶ 41). Plaintiffs allege that the premium amount covers more than the cost of coverage—it also covers kickbacks to Wells Fargo affiliates, which are labeled as "commissions" even though these affiliates do no work to procure or place coverage for individual borrowers. (*Id.* ¶¶ 46, 51-52). Plaintiffs further allege that amounts arising from subsidized servicing costs, and other impermissible costs are also embedded in the premiums without borrowers' knowledge or consent. (*Id.* ¶ 45). Wells Fargo also allegedly charges amounts for duplicative coverage placed during periods covered by Standard Mortgage Clauses or Lender's Loss Payable Endorsements, which typically protect the lender for a period of at least ten days after the termination of a borrower's voluntary policy, (*id.* ¶ 46), and for retroactive coverage for periods when no claims were made, (*id.* ¶ 40).

**2.**   <u>**The Litigation**</u>

Plaintiff Fladell filed claims challenging the Wells Fargo and Assurant Defendants' force-placed hazard insurance scheme in June 2012, in the action captioned *Fladell v. Wells Fargo Bank, N.A.*, No. 12-cv-61368 (S.D. Fla.). Plaintiff Fladell sought centralization of all force-placed insurance litigation pending nationwide in a multidistrict proceeding in June 2012, but the Judicial Panel on Multidistrict Litigation (the "Panel") denied the motion, urging all parties in force-placed litigation to "continue to employ alternatives to transfer which may minimize the risk of duplicative discovery and inconsistent pretrial rulings." *In re Mortg. Lender Force-Placed Ins. Litig.*, MDL No. 2388 (J.P.M.L. 2012) (D.E. 262). Plaintiffs' counsel in *Fladell* heeded the Panel's call, and joined forces with plaintiffs' counsel in other actions to

bring their clients' claims together before this Court in *Hall v. Bank of America, N.A.*, No. 12-cv-22700 (S.D. Fla.).[3]

In March 2013, this Court ordered the plaintiffs in *Hall* to re-file their case in five separate pleadings so that there would be one action pending against each mortgage lender and its force-placed insurer, and that all five of these cases would be handled in a coordinated manner before this Court. *See Hall*, No. 12-cv-22700 (D.E. 177).  The above-captioned case was filed on March 28, 2013 as the separate action regarding the Wells Fargo Defendants.  The Class Action Complaint brought claims against the Wells Fargo and Assurant Defendants for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, breach of fiduciary duty, tortious interference with a business relationship, violations of FDUTPA, TILA, and Violation of the Racketeer Influenced and Corrupt Organizations Act.  (D.E. 1 ¶¶ 96-186).  All of these claims arose from the Wells Fargo and Assurant Defendants' exclusive arrangements regarding the forced placement of insurance coverage on mortgagors' properties, and the allegedly inflated premiums and excessive coverage that they impose on homeowners whose "voluntary" property insurance has lapsed.  (*Id.* ¶¶ 96-186).

After the Complaint was filed, Defendants moved to dismiss all claims.  Those motions were fully briefed, and the Court held a hearing on May 16, 2013.  By Order dated June 20, 2013, the Court denied the motions to dismiss, but with leave to re-file after additional discovery on the filed-rate doctrine, among other things. (D.E. 43.). The Defendants produced over a million pages of responsive discovery, all carefully reviewed by Plaintiffs.

On August 12, 2014, Plaintiffs moved to substitute Plaintiff Olson for Plaintiff Stephens and lodged a Corrected Class Action Complaint. (D.E. 55).  On September 9, 2013, the Court entered an order granting the motion and making the Corrected Class Action Complaint the operative pleading.  (D.E. 60).  On September 16, 2013, the Court set this matter for trial on February 10, 2014.  (D.E. 63).  The Court also set a mediation deadline of December 10, 2013.

On November 14, 2013, Plaintiffs filed their motion for class certification. (D.E. 97 and 98).  The Wells Fargo Defendants responded on December 9, 2013. (D.E. 108).  The Assurant Defendants responded on December 10, 2013.  (D.E. 116).  The Motion for Class Certification is still pending before the Court.

---

[3] This Complaint added the claims of Plaintiffs Crouch and Stephens.

4

In addition to class certification briefing, on November 12, 2013, the Assurant Defendants renewed their motion to dismiss this action with prejudice. (D.E. 93). At the same time, the Wells Fargo Defendants moved for judgment on the pleadings. (D.E. 95). Plaintiffs have responded to the motions and they are currently pending. (D.E. 111 and 113). On February 6, 2014, Plaintiffs filed an Amended Complaint to include claims against additional VIIC, SGIC, and the QBE Defendants, as well as add Plaintiff Zawistowski's claims relating to lender-placed flood insurance. (D.E. 147). This amendment occurred after Plaintiffs' counsel had spent more than two years litigating similar issues against the Wells Fargo Defendants and the QBE Defendants in *Williams v. Wells Fargo*. In *Williams*, before a Florida-class was certified, Plaintiffs sought a nationwide class and took extensive discovery – including numerous depositions and the productions of millions of pages of documents – regarding the QBE Defendants' nationwide LPI program. On February 21, 2014, Plaintiffs filed a Second Amended Complaint which added the claims of Tilena Ali, Danny Lane, and Beverly Lane.

**3.**     **The Mediation**

Pursuant to the Court's order requiring mediation, on November 18, 2013, Plaintiffs and the Wells Fargo and Assurant Defendants participated in a formal mediation of this matter with Rodney Max as the mediator (the "Fladell Mediation"). In advance of and during the mediation, the Wells Fargo and Assurant Defendants provided Plaintiffs and Class Counsel additional information concerning the Wells Fargo Defendants' LPI program, including aggregate LPI premium information. The Fladell Mediation involved an in-person mediation session, conference calls, and the exchange of requested written information concerning the claims raised in the Fladell Litigation. It also included the collection, production, and review of large volumes of electronically-stored data concerning LPI Policies.

As settlement discussions progressed, the Wells Fargo Defendants expressed a desire to include the QBE Defendants' portion of the Wells Fargo loan portfolio in order to obtain global resolution. Class Counsel's years of litigation with the QBE Defendants, along with certain confirmatory information, provided them with significant comfort as to the damages and liability of the QBE Defendants.

On February 3, 2013, over two months after starting the mediation process, the Settling Parties reached a settlement in principle and the Settling Parties' counsel signed off on a settlement outline that identified the material terms for the Settlement Agreement. Plaintiffs

announced their settlement with the Defendants of all LPI claims nationwide on February 3, 2014.  (D.E. 145).

4.    **The Settlement Terms and Agreement**

    *A.  The Proposed Class*

The Settlement Class consists of:

(a)    All borrowers in the United States who, within the Class Period (as defined in Paragraph 4(b) below), were charged by the Wells Fargo Defendants under a hazard, flood, flood gap or wind-only LPI Policy for residential property, and who, within the Class Period, either (i) paid to the Wells Fargo Defendants the Net Premium for that LPI Policy or (ii) did not pay to and still owe the Wells Fargo Defendants the Net Premium for that LPI Policy.

(b)    The "Class Period" shall commence on the dates indicated below, based on the state in which the property is located, and shall continue through and including the date of the Preliminary Approval Order preliminarily approving the settlement:

    1.  California:  October 7, 2007.
    2.  Florida:  September 2, 2006.
    3.  Illinois:  July 5, 2002.
    4.  Indiana:  June 15, 2002.
    5.  Louisiana:  February 19, 2003.
    6.  New Jersey:  April 2, 2007.
    7.  New York:  July 5, 2006.
    8.  Ohio:  August 8, 1998.
    9.  Pennsylvania:  April 7, 2005.
    10. Texas:  October 7, 2007.
    11. All other states:  January 1, 2008.

(c)    Excluded from the Class are:  (i) individuals who are or were during the Class Period officers or directors of the Defendants or any of their respective affiliates; (ii) any justice, judge, or magistrate judge of the United States or any State, their spouses, and persons within the third degree of relationship to either of them, or the spouses of such persons; (iii) borrowers whose LPI Policy was cancelled in its entirety such that any premiums charged and/or collected were fully refunded to the borrower's escrow account; (iv) borrowers who are members of the settlement classes in *Williams v. Wells Fargo Bank, N.A.* (S.D. Fla. Case No. 1:11-CV-21233-RNS) and *Guerrero v. Wells Fargo Bank, N.A.* (N.D. Cal. Case No. 12-cv-4026 WHA); and, (v) all borrowers who file a timely and proper request to be excluded from the Class.

(Ex. A ¶ 3).  This class will include borrowers whose homes are in foreclosure and short sale, as well as those who were granted a deed in lieu of foreclosure or have modified the terms of their loans.[4]

### B.  Monetary and Injunctive Relief

The Settlement Agreement affords Class Members significant monetary relief, and enjoins the Wells Fargo and Assurant Defendants from continuing to inflate the charges imposed on mortgagors for a period of five years.  (*Id.* ¶¶ 4.2, 4.3).  The monetary relief will compensate class members for a significant part of the allegedly inflated portion of the force-placed premiums that they either paid or were charged.  All class members who paid any portion of a premium for FPI and who submit a valid claim form will recover an amount equal to 11% of the Net Premium charged to the Settlement Class Member if the charge occurred prior to March 24, 2012,[5] and an amount equal to 7% of the Net Premium if the charge occurred after March 24, 2012.  (*Id.* ¶ 4.5.3).  The 11% and 7% relief percentages are applied to the entire premium, rather than the alleged "excess" or inflated portion of the premium, since a considerable portion of the premiums charged, in fact, were applied to pay for insurance to cover the borrower's property.  Qualified class members who paid their premiums will receive a check from Wells Fargo for the full settlement amount.  (*Id.*).  Class members who were charged but did not pay and still owe for an LPI policy on their property will receive a check or credit to their Wells Fargo account in an amount equal to 11% or 7% of the Net Premium charged to the Settlement Class Member depending upon the date of placement.  (*Id.* ¶ 4.5.2).

The injunctive relief provided by the Settlement Agreement will put an end to numerous force-placed insurance practices that have been the subject of extensive media coverage and are the subject of this lawsuit.  The Settlement Agreement enjoins the Wells Fargo and Assurant Defendants from continuing to charge what Plaintiffs allege are inflated premiums for force-placed insurance.  For a period of five years following the Final Settlement Date, the Wells Fargo Defendants will accept no financial interest in the placement of force-placed insurance

---

[4] By contrast, the court in *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.), specifically excluded certain categories that are included in this Settlement from the class of Florida borrowers that it certified in February 2012.  *See Williams,* No. 11-cv-21233 (S.D. Fla. Feb. 21, 2012) (D.E. 211).

[5] The Wells Fargo Defendants ceased accepting commissions as of this date.

policies other than the premium itself and the protection afforded it by the insurance coverage. (Ex. A ¶ 4.2.1.)  The Settlement Agreement prohibits the Wells Fargo Defendants and their affiliated companies from accepting commissions on force-placed insurance; entering into quota-share reinsurance arrangements with Assurant or any other insurer; and accepting payments from any forced-placed insurer or vendor for administrative or other services related to forced-placed insurance.  (*Id.*)  The Assurant Defendants will similarly be prohibited for a period of five years from providing force-placed insurance commissions to Wells Fargo-affiliated agents or brokers, quota-share reinsurance arrangements, payments for any administrative or other service associated with force-placed insurance policies, and from accepting from Wells Fargo payments for certain below-cost or free outsourced services.  (*Id.* ¶ 4.3.1).[6]

The Settlement also binds the Wells Fargo Defendants to establish lender-placed hazard insurance coverage at the last known coverage amount or the unpaid principal balance on a borrower's loan, so that lender-placed coverage moving forward is related to the value of the interest being protected.  (Ex. A ¶ 4.2.1).  In certain circumstances, Wells Fargo will also advance funds in the event of a lapse to continue coverage under the borrower's voluntary policy, (*id.*), thus further ensuring that the cost of coverage is related to the collateral's value and also reducing the number of lender-placed policies issued by Wells Fargo and Assurant.  Finally, the Settlement terms require Wells Fargo to refund any amounts due the borrower once voluntary insurance is reinstated within fifteen days of receipt of evidence of the voluntary coverage.  (*Id.*).

### C.  Release of Claims against Defendants

In exchange for the relief provided by the Settlement, members of the Settlement Class will release the Wells Fargo Defendants, Assurant Defendants, and QBE Defendants, as well as their former and current subsidiaries, affiliates, divisions, parents, and other affiliated companies, among others, from all claims, obligations, or damages that were or could have been sought in this litigation or that "relate, concern, arise from or pertain in any way to [Defendants'] conduct, policies, or practices concerning LPI Policies placed by the Wells Fargo Defendants during the Class Period."  (*Id.* ¶ 10).

---

[6] The QBE Defendants are no longer writing LPI policies for the Wells Fargo Defendants.

### D. Class Notice

Class members will receive notice of the settlement by first-class mail at their last known mailing address in the form of notice attached to the Settlement Agreement as Exhibit A, assuming that form is approved by the Court. (*Id.* ¶ 6). The notice will be mailed no less than 90 days before the date set for the final approval hearing. (*Id.*). The Claims Administrator shall perform a search of the National Change of Address database for each mailing address prior to sending the notice. (*Id.*). The Settlement Administrator will also establish a website on which Class Members may download a claim form and review the Settlement Agreement and its accompanying exhibits. (*Id.* ¶ 6.2). Class Members may upload and file claims via the website. (*Id.*). The site will provide a toll-free number that class members may call for information about the settlement. (*Id.* ¶ 6.1). Class members may opt out of the settlement or object by following the prescribed process. (*Id.* ¶¶ 11, 12).

### E. Claims Process

To obtain relief from Defendants, class members will be required to submit a claim form.[7] (*Id.* ¶¶ 2.11, 6.2). The claims will be reviewed and approved by the Settlement Administrator, who will then make a determination of the amount owed each class member using Defendants' electronic records, and then have 180 days after the Final Settlement Date to distribute the monetary relief provided for by the Settlement. (*Id.* ¶ 7). The parties will use their best efforts to amicably resolve any dispute about the processing of any Claim. (*Id.* ¶ 7.3.2).

### F. Class Counsel Fees and Expenses and Named Plaintiffs Case Contribution Award

The parties stipulate in the Settlement Agreement that the law firms of Kozyak Tropin & Throckmorton, P.A., Podhurst Orseck, P.A., and Harke Clasby & Bushman LLP will serve as Class Counsel for the settlement class. (Ex. A ¶ 2.6). Pursuant to Section 15.1 of the Settlement Agreement, Class Counsel's application for attorneys' fees and expenses shall not exceed $19 million. (*Id.* ¶ 15.1.) Defendants will also pay each Plaintiff or set of married Plaintiffs a service award not to exceed $5,000.00. (*Id.* ¶ 15.4.) The Court will consider whether to grant or deny

---

[7] The claims submission deadline can be and often is, after final approval. *See, e.g.*, *Appel v. Liberty Am. Ins. Co.*, Case No. 08-20385 (S.D. Fla.) (Joint Motion for Final Approval submitted by Aronovitz Law and other class counsel, using a claims process extending beyond final approval, attached as **Exhibit D**). A longer claims submission period provides the class more time and so benefits the class.

these awards separate and apart from its consideration of the fairness, reasonableness, and adequacy of the settlement at the Final Fairness hearing. (*Id.* ¶ 15.5.)

       **G.**    **Final Approval and Objections**

A class member may object to the settlement no later than 30 days prior to the Final Approval Hearing, or as the Court may otherwise direct and shall be specified in the class notice. (*Id.* ¶ 2.20.) The Motion for Attorney's Fees shall be filed 10 days prior to the deadline for filing objections and the Parties shall respond to any objections within 10 days prior to the Final Approval Hearing.

## LEGAL ARGUMENT

**I.**    **THE COURT SHOULD ENTER AN ORDER GRANTING PRELIMINARY APPROVAL OF THE SETTLEMENT.**

Settlement "has special importance in class actions with their notable uncertainty, difficulties of proof, and length. Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice[.]" *Turner v. Gen. Elec. Co.*, No. 2:05-CV-186-FTM-99DNF, 2006 WL 2620275, at *2 (M.D. Fla. Sept. 13, 2006). For these reasons, "[p]ublic policy strongly favors the pretrial settlement of class action lawsuits." *In re U.S. Oil & Gas Litig.,* 967 F.2d 489, 493 (11th Cir.1992). "Approval of a class action settlement is a two-step process." *Fresco v. Auto Data Direct, Inc.*, No. 03-cv-61063, 2007 WL 2330895, at *4 (S.D. Fla. May 14, 2007). Preliminary approval is the first step, requiring the Court to "make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms." *Id.* In the second step, after notice to the class and time and opportunity for absent class members to object or otherwise be heard, the court considers whether to grant final approval of the settlement as fair and reasonable. *Smith v. Wm. Wrigley Jr. Co.*, 2010 WL 240119, at *2 (S.D. Fla. June 15, 2010).

The standard for preliminary approval of a class action settlement is not high—a proposed settlement should be preliminarily approved if it falls "within the range of possible approval" or, otherwise stated, if there is "probable cause" to notify the class of the proposed settlement and "to hold a full-scale hearing on its fairness[.]" *In re Mid-Atl. Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1384 (D. Md. 1983) (quoting MANUAL FOR COMPLEX LITIGATION § 1.46 at 62, 64-56 (5th ed. 1982)). Applying this standard, the Court granted preliminary

approval of class action settlements with similar facts, including in *Williams* and *Saccoccio*, both of which have now been granted final approval.

Here, the proposed settlement is the product of arms'-length negotiations before an experienced and respected mediator by counsel with significant experience in complex class action litigation, carries no "obvious deficiencies," and falls well within the range of reason. The Court should accordingly enter an order granting preliminary approval.

### A. The Settlement Is the Product of Good Faith, Informed, and Arm's-Length Negotiations among Experienced Counsel.

At the preliminary approval stage, district courts consider whether the proposed settlement appears to be "'the result of informed, good-faith, arm's-length negotiation between the parties and their capable and experienced counsel' and not 'the result of collusion[.]'" *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1341 (S.D. Fla. 2011) (citation omitted). Courts begin with a presumption of good faith in the negotiating process. *See Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992) ("Absent evidence of fraud or collusion, such settlements are not to be trifled with"); MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.42) ("a presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arms-length negotiations between experienced, capable counsel").

The settlement terms in this case are the product of significant give and take by the settling parties, and were negotiated at arms' length. The parties participated in an intensive mediation with the Rodney Max, a well-respected mediator with significant experience mediating complex commercial suits to resolution. The very fact of his involvement weighs in favor of preliminary approval. *See, e.g., Lobatz v. U.S. In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 619-20 (E.D. La. 2006); *In re AMF Bowling*, 334 F. Supp. 2d 462, 465 (S.D.N.Y. 2004); *In re WorldCom, Inc. ERISA Litig.*, 2004 WL 2338151, at *6 (S.D.N.Y. 2004).

The parties' extensive negotiations were also informed by considerable discovery. Class counsel has been litigating force-placed insurance claims involving the Assurant and QBE Defendants in this action and others for almost three years. *See, e.g., Kunzelmann v. Wells Fargo Bank, N.A.*, No. 11-cv-81373-DMM (S.D. Fla.); *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233-RNS (S.D. Fla.); *Popkin v. Citibank, N.A.*, No. 13-cv-60722 (S.D. Fla*.); Lopez v. HSBC Bank (USA), N.A.*, No. 13-cv-21104 (S.D. Fla.); *Hall v. Bank of America, N.A.*, Case No.

11

1:12-cv-22700-FAM (S.D. Fla). More than thirty depositions have been taken or used in those cases, and more than three million documents produced and reviewed. Defendants produced over a million pages of discovery in this case, as well as additional information to confirm the reasonableness of the Settlement's terms.

**B. The Settlement Provides Considerable Benefits to the Class and Falls Squarely within the Range of Reasonableness.**

As a result of this mediation process, the terms negotiated by the parties provide considerable benefits to the class, in terms of both monetary and injunctive relief, and fall well within the range of possible approval.

**1. Monetary Relief**

The Settlement Agreement provides significant monetary benefits. All class members who paid any portion of a premium for LPI and who submit a valid claim form will recover an amount equal to 11% of the Net Premium charged to the Settlement Class Member if the charge occurred prior to March 24, 2012 and an amount equal to 7% of the Net Premium if the charge occurred after March 24, 2012.[8] (*Id.* ¶ 4.5.3). The 11% and 7% payment percentages are applicable to the entire premium, rather than the "excess" or inflated portion of the premium, since a considerable portion of the premiums charged, in fact, were applied to pay for insurance to cover the borrower's property. Qualified class members who paid their premiums will receive a check from Wells Fargo in an amount equal to 11% of the Net Premium charged to the Settlement Class member if the charge occurred prior to March 24, 2012 and an amount equal to 7% of the Net Premium if the charge occurred after March 24, 2012. Class members who were charged but did not pay and still owe for an LPI policy on their property will receive a check or credit to their Wells Fargo account in an amount equal to 11% of the Net Premium charged to the Settlement Class Member if the charge occurred prior to March 24, 2012 and an amount equal to 7% of the Net Premium if the charge occurred after March 24, 2012. (*Id.* ¶ 4.5.2).

The 11% of the premium awarded to class members here as recovery is exactly the amount of commission percentage retained by Wells Fargo Insurance, Inc. until approximately

---

[8] A claims-made process is required here, as the Wells Fargo, the Assurant Defendants, and the QBE Defendants have testified under oath, and discovery has confirmed, that they cannot, on a system-wide basis, determine the amount of force-placed premiums paid or currently owed by a borrower, or the number of loans that are in foreclosure, or have been modified or refinanced. The claims that are filed will describe that specific information.

March 24, 2012, when it stopped receiving commissions.  Further, it is extremely close to the maximum rate credit that has been recently approved by forty-six states and the District of Columbia quantifying the percentage of Assurant's LPI premium associated with loan servicer affiliates receiving, or not receiving, commissions or ceded quota share reinsurance premium. Recently, the Assurant Defendants made fifty-state filings for a new LPI product (the "MIP"), and associated premium rate filings. The MIP rates include an Expense Modification Plan Credit representing a one-for-one percentage rate credit for commission percentages up to a maximum of 12.5%, as well as a comparable reinsurance credit.  The 11% relief percentage closely approximates the regulator-approved quantification of the principal relief element sought in this case.

Federal courts hold that settlements providing the class with a percentage of the recovery sought in litigation are reasonable in light of the attendant risks of litigation.  *See, e.g., Johnson v. Brennan*, No. 10-cv-4712, 2011 WL 4357376 (S.D.N.Y. Sept. 16, 2011) ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."); *Behrens*, 118 F.R.D. at 542-43 (approving recovery of $0.20 per share where desired recovery was $3.50 a share because "the fact that a proposed settlement amounts to only a fraction of the possible recovery does not mean the settlement is inadequate or unfair"); *Fisher Bros., Inc. v. Mueller Brass Co.*, 630 F. Supp. 493, 499 (E.D. Pa. 1985) (approving settlement providing recovery of 0.2% of sales). "Moreover, when settlement assures immediate payment of substantial amounts to class members, even if it means sacrificing speculative payment of a hypothetically larger amount years down the road, settlement is reasonable[.]"  *Johnson*, 2011 WL 4357376, at *12.

Plaintiffs and the class faced significant hurdles in litigating their claims to resolution, including the risks presented by class certification, dispositive motions, and trial, and overcoming Defendants' filed-rate doctrine defense, among others.  Each class member stands to recover hundreds, if not thousands, of dollars as a result of the settlement.  The Settlement's monetary recovery falls well within the range of reasonableness.

### 2.  Injunctive Relief

Once approved, the settlement terms will also enjoin the Wells Fargo Defendants and the Assurant Defendants for a period of five years from accepting a financial interest in the placement of force-placed LPI policies beyond the premium itself and the protection afforded by

the policy on the properties that serve as the collateral for the loans that they extend to borrowers. (Ex. A ¶ 4.2). This means that the Wells Fargo Defendants will not collect, and the Assurant Defendants will no longer pay, *inter alia*, LPI commissions to Wells Fargo-affiliated agents or brokers, revenue arising from quota-share reinsurance arrangements, or payments for administrative or other services associated with placement of LPI coverage. (*Id.* ¶¶ 4.2, 4.3). Additionally, Wells Fargo will not place LPI through affiliated companies. (*Id.*) Subject to certain conditions, Assurant will not accept below-cost compensation from Wells Fargo for certain outsourced services which Plaintiffs believe were being subsidized by the inflated lender-placed insurance premiums. (*Id.* ¶ 4.2). The Settlement Agreement effectively prohibits the Wells Fargo Defendants and the Assurant Defendants from continuing to implement the practices complained of in the Complaint. There can be no question that this result is reasonable.

### C. The Settlement Saves Plaintiffs and the Class from Considerable Litigation Hurdles.

Any evaluation of the benefits of settlement must be tempered by the recognition that any compromise involves concessions by all settling parties. Indeed, "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Officers for Civil Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 624 (9th Cir. 1982) (citation omitted). Had litigation continued, Plaintiffs and the Class would have faced the risk of not prevailing on their claims. For example, in one force-placed insurance case, *Cohen v. American Sec. Ins. Co.*, 735 F.3d 601 (7th Cir. 2013), the district court dismissed the complaint in its entirety—and also rejected two attempted amendments—based on federal preemption and the filed-rate doctrine. The Seventh Circuit affirmed dismissal on different grounds as it found that maintaining property insurance was a Plaintiff's "contractual obligation and she failed to fulfill it; because the consequences of that failure were clearly disclosed to her, none of her claims for relief can succeed." *Id.* at 604; *see also Feaz v. Wells Fargo Bank, N.A.*, No. 13-10230, 2014 WL 503149 (11th Cir. Feb. 10, 2014) (citing *Cohen*); *Kolbe v. BAC Home Loans Serv'g, LP*, 2013 WL 5394192, at *17-18 (1st Cir. Sept. 27, 2013) (en banc); *Kunzelmann v. Wells Fargo Bank, N.A.*, No. 11-cv-81373, 2013 WL 139913 (S.D. Fla. Jan. 10, 2013) (noting obstacles created by filed-rate doctrine and application of multistate law, among other things).

The proposed settlement saves Plaintiffs and the proposed Class from facing these significant obstacles, and eliminates the significant risk that they would recover nothing at all after several more years of litigation.

### D.  Class Counsel Believes the Settlement Is Reasonable and in the Best Interest of the Class.

Significant weight should be attributed to the belief of experienced counsel that the negotiated settlement is in the best interest of the class.  *See In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F. Supp. 659, 666 (D. Minn. 1974) (the recommendation of experienced counsel is entitled to great weight); *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995).  Counsel here have litigated numerous force-placed insurance class actions over the course of just under three years, and fully support the Settlement. They certified the first force-placed hazard insurance class in Florida in *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.), litigated the motion for class certification in *Kunzelmann*, briefed and argued two motions to centralize force-placed insurance litigation in a nationwide MDL, and are currently litigating additional cases against other major mortgage lenders in the Southern District of Florida.  Based on this experience, and decades of experience litigating consumer class action lawsuits, it is Plaintiffs' counsels' informed opinion that, given the uncertainty and substantial expense of pursuing the Wells Fargo Defendants, Assurant Defendants, and QBE Defendants on all claims throughout trial, the settlement is fair, reasonable, adequate, and in the best interests of the Class.

## II.    THE COURT SHOULD CERTIFY THE PROPOSED SETTLEMENT CLASS.

"It is well established that a class may be certified solely for purposes of settlement [if] a settlement is reached before a litigated determination of the class certification issue." *In re Checking Account Overdraft Litig.*, 275 F.R.D. at 659 (brackets in original).  "In deciding whether to provisionally certify a settlement class, a court must consider the same factors that it would consider in connection with a proposed litigation class," save manageability, "since the settlement, if approved, would obviate the need for a trial." *Id.*

However, "[t]he standards of Rule 23 for class certification are more easily met in the context of settlement than in the context of contested litigation."  *Horton v. Metropolitan Life Ins. Co.,* No. 93-1849-CIV-T-23A, 1994 U.S. Dist. LEXIS 21395, at *15 (M.D. Fla. Oct. 25, 1994); *see, e.g., White v. Nat'l Football League*, 822 F. Supp. 1389, 1402 (D. Minn. 1993) ("The requirements for class certification are more readily satisfied in the settlement context than when a class has been proposed for the actual conduct of the litigation."); *Bowling v. Pfizer, Inc.*, 143 F.R.D. 157-58 (S.D. Ohio 1992) ("We agree that the proposed settlement must comply with Rule 23; however, courts have recognized that ... the requirements of Rule 23 may be more easily

satisfied in the settlement context than in the more complex litigation context … The rationale behind the loosening of the requirements is to encourage sweeping settlements of complex disputes.").  The Settlement Class here meets the requirements of numerosity, commonality, typicality and adequacy of representation required by Rule 23(a) of the Federal Rules of Civil Procedure, as well as the requirements of Rule 23(b)(3).

**A.  The Settlement Class Meets the Four Requirements of Rule 23(a).**

Rule 23(a) sets forth four prerequisites for class certification:  numerosity, commonality, typicality, and adequacy of representation.  *Cheney v. Cyberguard Corp.,* 213 F.R.D. 484,489 (S.D. Fla. 2003); *see* Fed. R. Civ. P. 23(a).  The policies underlying the class action rule dictate that Rule 23(a) should be liberally construed.  *See Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 323 (S.D. Fla. 1996).  Plaintiffs satisfy all four requirements as set forth below.

**1.  The Settlement Class Is Sufficiently Numerous That Joinder Would Be Impracticable.**

Rule 23(a)(1) requires Plaintiffs to show that the proposed class is so numerous that joinder of all members would be impracticable.  *See* Fed. R. Civ. P. 23(a)(1).  "While there is no fixed rule, generally a class size [of] less than twenty-one is inadequate, while a class size of more than forty is adequate." *Williams v. Wells Fargo Bank, N.A.*, 11-cv-21233, 2012 WL 566067, at *4 (S.D. Fla. Feb. 21, 2012) (citing *Cheney,* 213 F.R.D. at 489-90); *see, e.g., Anderson v. Bank of S., N.A.*, 118 F.R.D. 136, 145 (M.D. Fla. 1987) ("[T]he size of the class and geographic location of the would-be class members are relevant to any consideration of practicality."); *Checking Overdraft Litig.,* 2011 WL 3158998, at *2.  The proposed number of class members in this case well exceeds the minimum threshold recognized by the Eleventh Circuit.  *See Cox,* 784 F.2d at 1553.  The numerosity requirement is clearly satisfied here.

**2.  There Are Questions of Law and Fact Common to All Class Members.**

Rule 23(a)(2) requires class action plaintiffs to identify questions of law or fact common to the class.  *See* Fed. R. Civ. P. 23(a)(2).  "The threshold for commonality is not high." *Cheney,* 213 F.R.D. at 490.  Commonality requires a showing that the class members' claims "depend on a common contention" and that the class members have "suffered the same injury."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  "[F]or purposes of Rule 23(a)(2), even a single [common] question will do[,]" *id.* at 2556 (brackets in original), and "where a common scheme of conduct has been alleged, the commonality requirement should be satisfied." *Checking Overdraft,* 2011 WL 3158998, at *4.

Plaintiffs' claims here depend on the common contention that Defendants conceived and implemented a scheme to manipulate and artificially inflate force-placed insurance premiums that they would then charge to the borrower. All members of the putative class were injured in the same manner: they were charged LPI premiums that included inflated costs, and as a result have paid or now owe amounts in excess of what their mortgage agreements allowed. (*Id.*); *see Williams,* 2012 WL 566067, at *5 (finding commonality where plaintiffs had argued that "all members of the propose class were injured in the same manner, namely by being charged inflated premiums for the force-placed insurance).

Thus, while only one question of law *or* fact is required to establish commonality, several common questions capable of class-wide resolution—or that would "generate common answers"—arise from Plaintiffs' allegations, including whether:

a. Defendants overcharged borrowers for force-placed insurance policies that included impermissible charges;

b. The premiums collected from consumers included charges to which Wells Fargo was not entitled under the contracts at issue;

c. Wells Fargo breached the implied covenant of good faith and fair dealing by entering into exclusive arrangements with Assurant and QBE to place insurance policies on mortgagors' homes with artificially inflated premiums;

d. Wells Fargo was unjustly enriched as a result of its policies and practices related to force-placed LPI insurance; and

e. Whether the Wells Fargo Defendants, the Assurant Defendants, and the QBE Defendants violated the federal RICO statute.

As the Court has found in other force-placed insurance cases, these issues satisfy commonality. *See, e.g., Williams,* 2012 WL 566067, at *5 ("The determination of the truth or falsity of the Plaintiffs' allegations that Wells Fargo and QBE engaged in a scheme to force-place insurance with inflated and excessive premiums will resolve an issue that is central to the validity of each one of the claims in one stroke.").

**3. Plaintiffs' Claims Are Typical of Those of the Class.**

Rule 23(a)(3) requires Plaintiffs to demonstrate that their claims are typical of those held by the proposed class. *See* Fed. R. Civ. P. 23(a)(3). Typicality and commonality are related, with commonality referring to "the group characteristics of the class as a whole" and typicality focusing on the named plaintiff's claims in relation to the class. *Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. at 686 n.23. "Any atypicality or conflict between the named

17

Plaintiffs' claims and those of the class must be clear and must be such that the interests of the class are placed in significant jeopardy." *Cheney,* 213 F.R.D. at 491.

Plaintiffs' claims in this case arise from the same course of conduct and are based on the same legal theories as those brought on behalf of the proposed class. Plaintiffs and every member of the proposed class took mortgage loans from Wells Fargo or its predecessors that were governed by common and materially uniform agreements. (D.E. 155-1 ¶¶ 1, 107, 108). As a result, once their voluntary policies lapsed, Plaintiffs and every other member of the proposed class were charged force-placed insurance premiums by the Wells Fargo Defendants that Plaintiffs allege were artificially inflated. (*Id.* ¶¶ 1, 39-49). Plaintiffs and the class seek redress through common claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, tortious interference, breach of fiduciary duty, and violations of TILA, the Bank Holding Company Act and RICO against Defendants. (*Id.* at ¶¶ 122-232). Thus, the claims of Plaintiffs and those belonging to the putative class arise from the same course of conduct and are based on the same legal theories, thereby satisfying Rule 23(a)(3). *See, e.g., Williams,* 2012 WL 566067, at *6 (holding that the named plaintiffs were "typical of the class in that they were both charged and either paid or still owe Wells Fargo for the alleged excessive and inflated premiums for the force-placed property insurance").

### 4. Plaintiffs and Plaintiffs' Counsel Are Adequate Representatives.

To satisfy Rule 23(a)(4), the representative parties must "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is satisfied when the class representatives have (1) no interests antagonistic to the rest of the class and (2) counsel who are "qualified, experienced, and generally able to conduct the proposed litigation." *Cheney,* 213 F.R.D. at 495. "Adequate representation is presumed in the absence of contrary evidence." *Association for Disabled Ams., Inc. v. Amoco Oil Co.,* 211 F.R.D. 457, 464 (S.D. Fla. 2002).

### a. Plaintiffs Do Not Have Interests Antagonistic to the Rest of the Class.

Adequacy exists where a class representative shares common interests with the class and seeks the same type of relief for himself as he does for other class members. *See Tefel v. Reno,* 972 F. Supp. 608, 617 (S.D. Fla. 1997); *Kreuzfeld A.G. v. Carnehammar,* 138 F.R.D. 594, 600 (S.D. Fla. 1991). Here, the named Plaintiffs have no interest that is antagonistic to those held by the rest of the class. The class definition includes only individuals who were subjects of Defendants' force-placed insurance scheme. (Ex. A ¶ 2.31). All members of the class, including

the named Plaintiffs, had LPI policies placed on their properties and were charged inflated premiums that were added to the balance of their mortgage loans or taken from escrow. (*Id.*) Thus, the critical issues in this case—the existence, implementation, and unlawfulness of Defendants' force-placed insurance scheme—are common to Plaintiffs' claims and the claims of the class. The Plaintiffs and the proposed class members share a common goal: to recover the excess charges that were added to their insurance premiums. Accordingly, Plaintiffs have satisfied the requirements of Rule 23(a)(4). *See Williams,* 2012 WL 566067, at *6-7.

> **b. Plaintiffs' Counsel Are Qualified, Experienced, and Generally Able to Conduct the Proposed Litigation.**

The attorneys who seek to represent the Class in this case are highly qualified to serve as class counsel, have been investigating force-placed insurance claims for almost three years, and have served as lead and co-lead counsel in some of the largest class actions in the country as well as insurance related complex cases. There are three law firms that Plaintiffs seek to name as Class Counsel in this action – Kozyak, Tropin, & Throckmorton, P.A., Podhurst Orseck, P.A. and Harke Clasby & Bushman, LLP. These firms have successfully prosecuted consumer class actions and their law firms are well respected in the communities that they serve. "[T]he single most important factor considered by the courts in determining the quality of the representative's ability and willingness to advocate the cause of the class has been the caliber of the plaintiff's attorney." 1 NEWBERG ON CLASS ACTIONS 3d (1992) § 3.24 at 3-133 n. 353; *see also Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985) (question of adequacy of plaintiffs most often "involve[s] questions of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation and of whether plaintiffs have interests antagonistic to those of the rest of the class"). The firms representing Plaintiffs have overseen the litigation strategy, the briefing and argument of dispositive and other motions, and the vigorous pursuit of discovery, in this as well as *Williams, Saccoccio*, *Lopez*, and several other force-placed insurance cases.

> **B. The Settlement Class Meets the Requirements of Rule 23(b)(3).**

In addition to meeting the four requirements of Rule 23(a), a plaintiff seeking class certification must satisfy one subsection of Rule 23(b). *Cheney,* 213 F.R.D. at 489. Plaintiffs here seek certification under Rule 23(b)(3). Under Rule 23(b)(3), certification is appropriate if (1) common questions of law or fact predominate over those affecting only individual class members and (2) class treatment is superior to other adjudication methods. *See* Fed. R. Civ. P.

23(b)(3). The latter question implicates manageability concerns, and does not bear on certification of a settlement class. *See Checking Account Overdraft Litig.*, 275 F.R.D. at 659.

For common questions of law or fact to predominate over individualized questions, "the issues in the class action that are subject to generalized proof, and [are] thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." *Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. at 694. "Common questions need only predominate; they need not be dispositive of the litigation." *Id.* "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Checking Overdraft Litig.*, 2011 WL 3158998, at *7.

Here, "irrespective of the individual issues which may arise, the focus of the litigation concerns the alleged common course of unfair conduct embodied in [Defendants'] scheme to" manipulate force-placed insurance premiums charged to Plaintiffs and the proposed class. *Checking Overdraft Litig.*, 2011 WL 3158998, at *7. Proof of this scheme may be substantiated by common evidence that would remain the same regardless of class size or composition. Common issues would predominate over any individual issue that might arise.

Moreover, a comprehensive resolution of the class members' claims in this action would be far superior to litigating each of their claims separately. "Since the damage amounts allegedly owed to each individual [borrower] are relatively low—especially as compared to the costs of prosecuting the types of claims in this case involving complex, multi-level business transactions between sophisticate defendants—the economic reality is that many of the class members would never be able to prosecute their claims through individual lawsuits." *Williams*, 280 F.R.D. at 675. Accordingly, the Court should certify the proposed settlement class.

## III.   THE COURT SHOULD APPROVE THE PROPOSED CLASS NOTICE AND NOTICE PLAN.

Federal Rule of Civil Procedure 23(e)(1) provides that the "court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Class notice should be "reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). "Not only must the substantive claims be adequately described but notice must also contain information reasonably necessary to

make a decision to remain a class member and be bound by the final judgment or opt out of the action." *Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222, 1227 (11th Cir. 1998).

The parties' proposed notice plan readily meets this standard. The Settlement Agreement provides that the Settlement Administrator shall distribute class notice in English and Spanish by first-class mail in the form attached as Exhibit A to the Settlement Agreement to all identifiable members of the class no less than ninety days before the date set for a final approval hearing. (Ex. A ¶ 6.1). The Settlement also provides for internet notice and establishment of a toll-free number through which class members can acquire information about the settlement. (*Id.* ¶¶ 6.1(k), 6.2).

The notice itself, a copy of which is attached to the Settlement Agreement as Exhibit A, also satisfies the requirements of the Federal Rules. The proposed Notice provides, among other things, a clear definition of the Class; a description of the underlying lawsuit and the material terms of the Settlement; instructions as to how Class members may make a claim and determine whether they are eligible to do so; an explanation of class members' objection and opt-out rights and a date by which Class members may opt out, and information regarding how to do so; instructions as to how to object to the Settlement and a date by which Class members may object; the date on which the Court will hold a Final Approval Hearing; and the internet address and toll-free number from which Class members may obtain additional information about the Settlement and its terms. (Ex. A at Ex. A.) The proposed claim form and instructions thereto also provide clear and comprehensive instructions as to who is eligible for relief and how to make a claim. (Ex. A at Ex. B.) The Court should approve the proposed Notice and Notice plan. *See, e.g., Saccoccio* at D.E. 77) (approving notice plan providing for notice by mail, website, and toll-free number).

## IV.   THE COURT SHOULD APPOINT THE UNDERSIGNED FIRMS AS CLASS COUNSEL.

The parties have defined Class Counsel to include the three law firms of Kozyak Tropin & Throckmorton, P.A., Podhurst Orseck, P.A., and Harke Clasby & Bushman, LLP. (Ex. A ¶ 2.6). Plaintiffs and undersigned counsel now move the Court to appoint these three firms as Class Counsel for the Settlement Class. Undersigned counsel have significant experience litigating force-placed insurance class actions, having represented plaintiffs in seven different actions against five major mortgage lenders, the Assurant Defendants, and the QBE Defendants. Counsel's investigation into these claims began over three years ago, and since that time, counsel

has worked extensively with Birny Birnbaum, the foremost expert of force-placed insurance, taken significant discovery from the insurer and lender/servicer defendants, briefed and argued numerous dispositive motions, briefed and argued two motions to centralize these cases before a single district judge, and moved for certification of three mortgagor classes, including the settlement class here, among other things.   The undersigned firms also have considerable experience litigating nationwide and multistate class actions, including *LiPuma v. American Express, et al*, Case No. 04-cv-20314 (S.D. Fla.), *In re Managed Care HMO Litigation*, MDL No. 1334 (S.D. Fla.), *In re Checking Account Overdraft Litigation*, MDL No. 2036 (S.D. Fla.); and *Kenneth F. Hackett & Associates, Inc. v. GE Capital Information Technology Solutions, Inc.*, No. 10-cv-20715 (S.D. Fla.).   Because undersigned counsel are highly qualified and are determined to represent the best interests of the Class, the Court should appoint them Class Counsel moving forward.

## V.      THE COURT SHOULD SCHEDULE A FINAL APPROVAL HEARING.

The second step of class action settlement approval is the Court's consideration of the settlement at a final approval hearing, at which the Court will hear evidence and argument presented by the parties and any objectors, and consider whether to approve the settlement and Class Counsel's fee application.  Plaintiffs request that the Court schedule the Final Approval Hearing at the Court's earliest convenience after June 12, 2014. Should the Court grant this Motion, Plaintiffs will file their motion for final approval on the date set by the Court, which shall be no earlier than ninety days after service of class notice, and Class Counsel will file their fee application at least 10 days prior to any objection or opt-out deadline and well in advance of the Final Approval Hearing.

## CONCLUSION

Plaintiffs respectfully request the Court enter an order certifying the proposed class for purposes of settlement, preliminarily approving the terms of settlement, and setting a Final Fairness Hearing.

Respectfully submitted this 5th day of March, 2014.

By: /s/ Adam M. Moskowitz

| Adam M. Moskowitz, Esq.<br>amm@kttlaw.com | Aaron S. Podhurst, Esq.<br>apodhurst@podhurst.com |
|---|---|

| | |
|---|---|
| Harley S. Tropin, Esq.<br>hst@kttlaw.com<br>Tucker Ronzetti, Esq.<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>rn@kttlaw.com<br>**KOZYAK, TROPIN, &**<br>**THROCKMORTON P.A.**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br>*Counsel for Plaintiffs* | Peter Prieto, Esq.<br>pprieto@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, Florida 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Counsel for Plaintiffs* |
| Lance A. Harke, P.A.<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, Florida 33138<br>Telephone:     (305) 536-8220<br>Facsimile:     (305) 536-8229<br>*Counsel for Plaintiffs* | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing was filed electronically via CM/ECF on the 5th day of March, 2014 and served by the same means on all counsel of record.

By:  /s/ Adam M. Moskowitz

352285