**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 0:13-cv-60721-MORENO/GARBER**

IRA MARC FLADELL, SARAH CROUCH,
GREG OLSON, MARGARET
ZAWISTOWSKI, TILENA ALI, DANNY
LANE and BEVERLY LANE on behalf of
themselves and all others similarly
situated,

                    Plaintiffs,

v.

WELLS FARGO BANK, N.A.; WELLS
FARGO INSURANCE, INC.; ASSURANT, INC.;
AMERICAN SECURITY INSURANCE
COMPANY; VOYAGER INDEMNITY
INSURANCE COMPANY, STANDARD
GUARANTY INSURANCE CO.; QBE SPECIALTY
INSURANCE COMPANY; QBE INSURANCE
CORPORATION; QBE FIRST INSURANCE
AGENCY, INC.; QBE FINANCIAL INSTITUTION
RISK SERVICES, INC.; and
PRAETORIAN INSURANCE  COMPANY,

                    Defendants.
_____/

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS**
**ACTION SETTLEMENT, APPLICATION FOR SERVICE AWARDS, CLASS**
**COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES,**
**AND INCORPORATED MEMORANDUM OF LAW**

## INTRODUCTION

Plaintiffs are proud to present for final approval a class action settlement that provides meaningful relief to the settlement class and addresses controversial force-placed insurance practices on a nationwide basis.[1]  This settlement follows the final approval of the settlement in *Saccoccio v. JPMorgan Chase Bank, N.A.*, No. 13-cv-21107 (S.D. Fla.) by this Court, as well as the approval of *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233-RNS (S.D. Fla.), which was the result of many years of hard-fought litigation of claims based on facts similar to those presented here.  A majority of the defendants in all pending force-placed insurance cases before this Court have reached substantially similar settlements, which will provide recovery for millions of homeowners nationwide.

This settlement resolves claims of 1,340,157 American homeowners by making available just over $515 million in benefits.  The monetary award will provide the settlement class more than $281 million in monetary relief, which constitutes 50% to 100% of the best-case scenario damages recoverable by the class had the parties proceeded to trial.  The injunctive portion mandates an end to force-placed insurance practices which is valued at more than $234 million. As of the date of this filing, only one objection and 76 valid opt-outs to the settlement have been received.[2]  This is an extraordinary result.

This result is all the more extraordinary because it involved the resolution of  complex issues against a rising tide of adverse decisions from federal district and appellate courts— decisions Class Counsel would certainly distinguish, but their opponents would just as vigorously assert.  For this achievement, Class Counsel are asking the Court to award them $19 million in fees and expenses, negotiated only after all class benefits had been secured under the

---

[1] Plaintiffs Ira Marc Fladell, Sarah Crouch, Greg Olson, Margaret Zawistowski, Tilena Ali, Danny Lane and Beverly Lane shall be referred to collectively as "Plaintiffs."  Defendants Wells Fargo Bank, N.A. ("WFB"), Wells Fargo Insurance, Inc. ("WFI") [collectively "the Wells Fargo Defendants"], Assurant, Inc. ("Assurant"), American Security Insurance Company ("ASIC"), Voyager Indemnity Insurance Company ("VIIC"), and Standard Guaranty Insurance Company ("SGIC") [collectively "the Assurant Defendants"], QBE Specialty Insurance Company ("QBE Specialty"), QBE Insurance Corporation ("QBE Insurance"), QBE First Insurance Agency, Inc. ("QBE FIRST"), QBE Financial Institution Risk Services, Inc. ("QBE Financial"), and Praetorian Insurance Company ("Praetorian") [collectively, "the QBE Defendants"] shall be referred to collectively as "Defendants."  All capitalized terms have the same meaning as defined in the Settlement Agreement attached as **Exhibit A**.

[2] Plaintiffs shall separately respond to any objections or opt-outs to the extent any are filed.

355912

direct supervision of a nationally recognized mediator, and payable by Defendants beyond and outside of the benefits to the class.  Such a fee would amount to only 6.8% of the monetary recovery and less than 3.7% of the overall benefits to the class, and is well within the parameters established by the Eleventh Circuit.

Plaintiffs therefore respectfully request that the Court overrule the sole objection, grant final approval of the settlement, and approve the application for attorneys' fees and Plaintiffs' service awards.

<b><u>FACTUAL BACKGROUND</u></b>

**1.**    **<u>Defendants' Force-Placed Insurance Practices</u>**

The standard form mortgage agreements used by the Wells Fargo Defendants require the borrower to maintain hazard, wind, and, where applicable, flood insurance on the property securing his or her mortgage loan, and provide that the lender or servicer may force new coverage on the property at the borrower's expense in the event of a lapse.  The mortgage agreement authorizes the lender to obtain coverage to protect it against risk of loss, and either advises the borrower that the cost of the coverage obtained might significantly exceed the cost of the borrower's voluntary coverage or provides that the lender may pay the costs necessary to protect its rights in the property.  (D.E. 155-1 ¶¶ 36, 51, 60, 108).

Plaintiffs had LPI coverage forced on their properties by the Wells Fargo Defendants.  (*Id.* ¶¶ 55, 56, 71, 77, 86-88, 96, 102).  They do not challenge the Wells Fargo Defendants' contractual right to force place coverage in the first instance, but instead challenge their alleged arrangement during the class period with both the Assurant and the QBE Defendants[3] to artificially inflate borrowers' premiums with costs well beyond the cost of coverage.  (*Id.* ¶ 49).  Plaintiffs allege that these costs included kickbacks to the Wells Fargo Defendants' affiliates, and other costs unrelated to the procurement of new coverage.  (*Id.* ¶¶ 39-48).

Plaintiffs allege that Defendants' scheme operated as follows.  During the class period, Wells Fargo purchased master policies to cover its entire portfolio of mortgage loans from the Assurant or QBE Defendants. (*Id.* ¶ 39).  In exchange, Wells Fargo gave its insurers the exclusive right to force new coverage on their respective portions of the portfolio in the event of a lapse or the detection of insufficient coverage.  (*Id.*).  The Assurant or QBE Defendants

---

[3] As of mid-2012, Wells Fargo no longer had a relationship with the QBE Defendants.

2

monitored the Wells Fargo mortgage loan portfolio to identify these lapses, and when one was identified, sent notice to the borrower that new, lender-placed coverage would be purchased if voluntary coverage was not continued. (*Id.*). If the lapse continued, the insurer notified the borrower that new coverage was being placed at his or her expense. (*Id.*). Plaintiffs allege that these letters were inaccurate, as the lender-placed coverage went into effect automatically upon lapse under Wells Fargo's master policy with the Assurant or QBE Defendants. (*Id.* ¶ 43).

Premiums for the new coverage were deducted from the borrower's escrow account or added to the balance of the subject mortgage loan. (*Id.* ¶ 41). Plaintiffs allege that the premium amount covered more than the cost of coverage—it also covered kickbacks to Wells Fargo affiliates, which were labeled as "commissions" even though these affiliates did no work to procure or place coverage for individual borrowers. (*Id.* ¶¶ 46, 51-52). Plaintiffs further allege that amounts arising from subsidized servicing costs, and other impermissible costs were also embedded in the premiums without borrowers' knowledge or consent. (*Id.* ¶ 45). Wells Fargo also allegedly charged amounts for duplicative coverage placed during periods potentially covered by Standard Mortgage Clauses or Lender's Loss Payable Endorsements, (*id.* ¶ 46), and for retroactive coverage for periods when no claims were made, (*id.* ¶ 40).

## 2. **The Litigation**

Plaintiff Fladell filed claims challenging the Wells Fargo and Assurant Defendants' force-placed hazard insurance scheme in June 2012, in the action captioned *Fladell v. Wells Fargo Bank, N.A.*, No. 12-cv-61368 (S.D. Fla.). Plaintiff Fladell sought centralization of all force-placed insurance litigation pending nationwide in a multidistrict proceeding in June 2012, but the Judicial Panel on Multidistrict Litigation (the "Panel") denied the motion, urging all parties in force-placed litigation to "continue to employ alternatives to transfer which may minimize the risk of duplicative discovery and inconsistent pretrial rulings." *In re Mortg. Lender Force-Placed Ins. Litig.*, MDL No. 2388 (J.P.M.L. 2012) (D.E. 262). Plaintiffs' counsel in *Fladell* heeded the Panel's call, and joined forces with plaintiffs' counsel in other actions to bring their clients' claims together before this Court in *Hall v. Bank of America, N.A.*, No. 12-cv-22700 (S.D. Fla.).[4]

In March 2013, this Court ordered the plaintiffs in *Hall* to re-file their case in five separate pleadings so that there would be one action pending against each mortgage lender and

---

[4] This complaint added the claims of Plaintiffs Crouch and Stephens.

its force-placed insurer, and all five cases would be handled in a coordinated manner before this Court. *See Hall*, No. 12-cv-22700 (D.E. 177).   The above-captioned action was filed on March 28, 2013 as the separate action regarding the Wells Fargo Defendants.   The Class Action Complaint brought claims against the Wells Fargo and Assurant Defendants for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, breach of fiduciary duty, tortious interference with a business relationship, and violations of FDUTPA, TILA, the Bank Holding Company Act (the "BHCA"), and the federal RICO statute.  (D.E. 1 ¶¶ 96-186).   All of these claims arose from the Wells Fargo and Assurant Defendants' exclusive arrangements regarding the forced placement of insurance coverage on mortgagors' properties, and the allegedly inflated premiums and excessive coverage that they impose on homeowners whose "voluntary" property insurance has lapsed.   (*Id.* ¶¶ 96-186).

After Plaintiffs filed the Complaint, Defendants moved to dismiss all claims.   Those motions were fully briefed, and the Court held a hearing on May 16, 2013.   By Order dated June 20, 2013, the Court denied the motions to dismiss, but with leave to re-file after additional discovery on the filed-rate doctrine, among other things. (D.E. 43.). The Defendants produced over one million pages of responsive discovery, all of which was carefully reviewed by Plaintiffs' counsel.

On August 12, 2013, Plaintiffs moved to substitute Plaintiff Olson for Plaintiff Stephens and filed a Corrected Class Action Complaint. (D.E. 55).  On September 9, 2013, the Court made the Corrected Class Action Complaint the operative pleading.  (D.E. 60).  On September 16, 2013, the Court set this matter for trial on February 10, 2014.  (D.E. 63).  The Court also set a mediation deadline of December 10, 2013.

On November 14, 2013, Plaintiffs filed their motion for class certification. (D.E. 97, 98). The Wells Fargo and Assurant Defendants responded on December 9th and 10th, 2013, respectively. (D.E. 108, 116).  The Motion for Class Certification is still pending before the Court.

In addition to class certification briefing, on November 12, 2013, the Assurant Defendants renewed their motion to dismiss this action with prejudice.  (D.E. 93).  At the same time, the Wells Fargo Defendants moved for judgment on the pleadings.  (D.E. 95).  Plaintiffs have responded to the motions and they are currently pending.  (D.E. 111 and 113).  On February 6, 2014, Plaintiffs filed an Amended Complaint to include claims against VIIC, SGIC, and the

4

QBE Defendants, as well as to add Plaintiff Zawistowski's claims relating to lender-placed flood insurance. (D.E. 147). This amendment was made after Plaintiffs' counsel had spent more than two years litigating similar issues against the Wells Fargo Defendants and certain of the QBE Defendants in *Williams v. Wells Fargo*. In *Williams*, before a Florida class was certified, Plaintiffs sought a nationwide class and took extensive discovery, including numerous depositions and the productions of millions of pages of documents, regarding certain of the QBE Defendants' nationwide LPI program. On February 21, 2014, Plaintiffs filed a Second Amended Complaint which added the claims of Tilena Ali, Danny Lane, and Beverly Lane.

**3.**     **The Mediation**

Pursuant to the Court's order requiring mediation, on November 18, 2013, Plaintiffs and the Wells Fargo and Assurant Defendants participated in a formal mediation of this matter with Rodney Max as the mediator (the "Fladell Mediation"). In advance of and during the mediation, the Wells Fargo and Assurant Defendants provided Plaintiffs and Class Counsel with additional information concerning the Wells Fargo Defendants' LPI program, including aggregate LPI premium information. The Fladell Mediation involved an in-person mediation session, conference calls, and the exchange of requested written information concerning the claims raised in the Fladell Litigation. It also included the collection, production, and review of large volumes of electronically stored data concerning LPI Policies.

As settlement discussions progressed, the Wells Fargo Defendants expressed a desire to include the QBE Defendants' portion of the Wells Fargo loan portfolio in the parties' settlement in order to obtain a global resolution of force-placed insurance claims pending against them. Class Counsel's years of litigation with the QBE Defendants, along with certain confirmatory information, provided them with significant knowledge as to the QBE Defendants' force-placed insurance program.

On February 3, 2014, more than two months after starting the mediation process, the Settling Parties reached a settlement in principle and the Settling Parties' counsel signed off on a settlement outline that identified the material terms for the Settlement Agreement. Plaintiffs announced their settlement with Defendants of all LPI claims nationwide on February 3, 2014. (D.E. 145).

4. **The Settlement Terms and Agreement**

   A. *The Proposed Class*

The Settlement Class consists of:

(a)    All borrowers in the United States who, within the Class Period (as defined in Paragraph 4(b) below), were charged by the Wells Fargo Defendants under a hazard, flood, flood gap or wind-only LPI Policy for residential property, and who, within the Class Period, either (i) paid to the Wells Fargo Defendants the Net Premium for that LPI Policy or (ii) did not pay to and still owe the Wells Fargo Defendants the Net Premium for that LPI Policy.

(b)    The "Class Period" shall commence on the dates indicated below, based on the state in which the property is located, and shall continue through and including the date of the Preliminary Approval Order preliminarily approving the settlement:

      1. California:  October 7, 2007.
      2. Florida:  September 2, 2006.
      3. Illinois:  July 5, 2002.
      4. Indiana:  June 15, 2002.
      5. Louisiana:  February 19, 2003.
      6. New Jersey:  April 2, 2007.
      7. New York:  July 5, 2006.
      8. Ohio:  August 8, 1998.
      9. Pennsylvania:  April 7, 2005.
     10. Texas:  October 7, 2007.
     11. All other states:  January 1, 2008.

(c)    Excluded from the Class are:  (i) individuals who are or were during the Class Period officers or directors of the Defendants or any of their respective affiliates; (ii) any justice, judge, or magistrate judge of the United States or any State, their spouses, and persons within the third degree of relationship to either of them, or the spouses of such persons; (iii) borrowers whose LPI Policy was cancelled in its entirety such that any premiums charged and/or collected were fully refunded to the borrower's escrow account; (iv) borrowers who are members of the settlement classes in *Williams v. Wells Fargo Bank, N.A.* (S.D. Fla. Case No. 1:11-CV-21233-RNS) and *Guerrero v. Wells Fargo Bank, N.A.* (N.D. Cal. Case No. 12-cv-4026 WHA); and, (v) all borrowers who file a timely and proper request to be excluded from the Class.

(Exhibit A ¶ 3). This class will include borrowers whose homes are in foreclosure and short sale, as well as those who were granted a deed in lieu of foreclosure or have modified the terms of their loans.[5]

### B. *Monetary and Injunctive Relief*

The Settlement Agreement affords Class Members significant monetary relief, and enjoins the Wells Fargo and Assurant from continuing to inflate the charges imposed on mortgagors for a period of five years. (*Id.* ¶¶ 4.2, 4.3). The monetary relief will compensate class members for a significant part of the allegedly inflated portion of the force-placed premiums that they either paid or were charged. All class members who paid any portion of a premium for FPI and who submit a valid claim form will recover an amount equal to 11% of the Net Premium charged to the Settlement Class Member if the charge occurred prior to March 24, 2012,[6] and an amount equal to 7% of the Net Premium if the charge occurred after March 24, 2012. (*Id.* ¶ 4.5.3). The 11% and 7% relief percentages are applied to the entire premium, rather than the alleged "excess" or inflated portion of the premium, since a considerable portion of the premiums charged, in fact, were applied to pay for insurance to cover the borrower's property. Qualified class members who paid their premiums will receive a check from Wells Fargo for the full settlement amount. (*Id.*). Class members who were charged but did not pay and still owe for an LPI policy on their property will receive a check or credit to their Wells Fargo account in an amount equal to 11% or 7% of the Net Premium charged to the Settlement Class Member depending upon the date of placement. (*Id.* ¶ 4.5.2).

The injunctive relief provided by the Settlement Agreement will put an end to numerous force-placed insurance practices that have been the subject of extensive media coverage and are the subject of this lawsuit. The Settlement Agreement enjoins the Wells Fargo and Assurant Defendants from continuing to charge what Plaintiffs allege are inflated premiums for force-placed insurance. For a period of five years following the Final Settlement Date, the Wells Fargo Defendants will accept no financial interest in the placement of force-placed insurance policies other than the premium itself and the protection afforded it by the insurance coverage.

---

[5] By contrast, the court in *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.), specifically excluded certain categories that are included in this Settlement from the class of Florida borrowers that it certified in February 2012. *See Williams*, No. 11-cv-21233 (S.D. Fla. Feb. 21, 2012) (D.E. 211).

[6] The Wells Fargo Defendants ceased accepting commissions as of this date.

355912

(Ex. A ¶ 4.2.1.)   The Settlement Agreement prohibits the Wells Fargo Defendants and their affiliated companies from accepting commissions on force-placed insurance; entering into quota-share reinsurance arrangements with Assurant or any other insurer; and accepting payments from any forced-placed insurer or vendor for administrative or other services related to forced-placed insurance.  (*Id.*)  The Assurant Defendants will similarly be prohibited for a period of five years from providing force-placed insurance commissions to Wells Fargo-affiliated agents or brokers, quota-share reinsurance arrangements, payments for any administrative or other service associated with force-placed insurance policies, and from accepting from Wells Fargo, payments for certain below-cost or free outsourced services.  (*Id.* ¶ 4.3.1).[7]

The Settlement also binds the Wells Fargo Defendants to establish lender-placed hazard insurance coverage at the last known coverage amount or the unpaid principal balance on a borrower's loan, so that lender-placed coverage moving forward is related to the value of the interest being protected.  (Ex. A ¶ 4.2.1).  In certain circumstances, Wells Fargo will also advance funds in the event of a lapse to continue coverage under the borrower's voluntary policy, (*id.*), thus further ensuring that the cost of coverage is related to the collateral's value and also reducing the number of lender-placed policies issued by Wells Fargo and Assurant.  Finally, the Settlement terms require Wells Fargo to refund any amounts due the borrower once voluntary insurance is reinstated within fifteen days of receipt of evidence of the voluntary coverage.  (*Id.*).

### C.  *Release of Claims against Defendants*

In exchange for the relief provided by the Settlement, members of the Settlement Class will release the Wells Fargo Defendants, Assurant Defendants, and QBE Defendants, as well as their former and current subsidiaries, affiliates, divisions, parents, and other affiliated companies, among others, from all claims, obligations, or damages that were or could have been sought in this litigation or that "relate, concern, arise from or pertain in any way to [Defendants'] conduct, policies, or practices concerning LPI Policies placed by the Wells Fargo Defendants during the Class Period."  (*Id.* ¶ 10).

### D.  *Class Counsel Fees and Expenses and Named Plaintiffs Case Contribution Awards*

The parties stipulate in the Settlement Agreement that the law firms of Kozyak Tropin & Throckmorton, Podhurst Orseck, P.A., and Harke Clasby & Bushman LLP will serve as Class Counsel for the settlement class.  (Ex. A ¶ 2.6).   Pursuant to Section 15.1 of the Settlement

---

[7] The QBE Defendants ceased writing LPI policies for the Wells Fargo Defendants in mid-2012.

Agreement, Class Counsel's application for attorneys' fees and expenses shall not exceed $19 million.  (*Id.* ¶ 15.1.)  Defendants will also pay each Plaintiff or set of married Plaintiffs a service award not to exceed $5,000.00.  (*Id.* ¶ 15.4.)  The Court will consider whether to grant or deny these awards separate and apart from its consideration of the fairness, reasonableness, and adequacy of the settlement at the Final Fairness hearing.  (*Id.* ¶ 15.5.)

**5.      Preliminary Approval and Settlement Administration**

After a lengthy hearing on Plaintiffs' motion, the Court preliminarily approved the settlement and certified the proposed Settlement Class on March 17, 2014.[8]  (D.E. 168.)  The Court approved all terms, including the proposed Notice and notice plan, and also ordered the parties to provide Spanish-language versions of the Notice, Claim Instructions, and Claim Form, to be mailed to all class members together with the English-language version.  (*Id.* ¶ 9(a).)  The Court also ordered the parties to include both versions on the settlement website, to allow class members to submit their claim forms electronically, and to publish notice of the settlement in the print edition of *USA Today.*  (*Id.* ¶ 9.)

The Settlement Administrator, the Garden City Group ("GCG"), obtained 2,548,182 class member records from the Assurant and QBE Defendants, including the current or last-known names, mailing addresses, and LPI policy numbers for all persons meeting the class definition. (Declaration of Jennifer M. Keough ("Keough Decl."), attached as **Exhibit B**, at ¶¶ 4-8.)  GCG updated the mailing list and standardized the address information using the U.S. Postal Service database.  (*Id.* ¶ 5.)  GCG mailed the 2,548,182 notice packets to a total of 1,340,157 class members.  (*Id.* ¶ 8.)  GCG re-mailed notice packets to those class members for whom it received a change of address notification from the U.S. Postal Service.  (*Id.* ¶ 9.)

GCG also established and activated the settlement website, published notice in the print edition of *USA Today* on July 10, 2014, and established a toll-free telephone line that is accessible 24 hours a day, 7 days a week for class members who have questions or seek additional information.  (*Id.* ¶¶ 7, 10-12.)

---

[8] In *Saccoccio,* a group of lawyers filed objections to the settlement that this Court rejected and found to be "meritless," "laughable," "specious," and completely unsupported.  *See Saccoccio* (D.E.  128 at 19-22) ("*Saccoccio* Order").  These same lawyers sought to derail this settlement at the preliminary approval stage by filing a similar objection.  (D.E. 160).  The Court approved the settlement on a preliminary basis despite these objections.

The deadline for opt-outs is August 19, 2014.  (*Id.* ¶ 13.)  As of July 30, 2014, GCG had received only 76 valid requests, representing only .0056% of the settlement class.  (*Id.* ¶¶ 7, 13.)  As of the date of this Motion, only one objection has been filed with the Court.  (D.E. 178.)

## LEGAL ARGUMENT

## I.    THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT.

Settlement "has special importance in class actions with their notable uncertainty, difficulties of proof, and length.  Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice[.]" *Turner v. Gen. Elec. Co.*, No. 2:05-CV-186-FTM-99DNF, 2006 WL 2620275, at *2 (M.D. Fla. Sept. 13, 2006) (citation omitted).  For these reasons, "there exists an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005) (citation omitted).  The Rule 23(e) analysis should be informed by this policy "as well as the realization that compromise is the essence of settlement." *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982); *see Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 538 (S.D. Fla. 1988) ("When exercising its discretion, a court should always review the proposed settlement in light of the strong judicial policy that favors settlements.") (citations omitted).

On final approval, after notice to the class and time and opportunity for absent class members to object or otherwise be heard, the court considers whether the settlement "is fair, adequate and reasonable and is not the product of collusion between the parties." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) (citation omitted).  The Court is "not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial." *In re Mex. Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1014 (N.D. Ill. 2000) (citations omitted).  Instead, courts in this circuit consider the following factors:  (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense and duration of litigation; (3) the stage of proceedings at which the settlement was achieved and the amount of discovery completed; (4) the probability of the plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of class counsel, class representatives, and the substance and amount of opposition received.  *See Saccoccio* Order at 9; *Leverso v. SouthTrust Bank of Ala., N.A.*, 18 F.3d 1527, 1530 n.6 (11th Cir. 1994); *see also Bennett*, 737 F.2d at 986. "In

355912

assessing these factors, the Court 'should be hesitant to substitute ... her own judgment for that of counsel.'" *Lipuma*, 406 F. Supp. 2d at 1315 (quoting *In re Smith,* 926 F.2d 1027, 1028 (11th Cir. 1991)).

Analysis of these factors here compels the conclusion that the Court should approve the proposed settlement.

**A.  The Fladell Settlement Is the Product of Good Faith, Informed, and Arms'-Length Negotiations among Experienced Counsel.**

The first factor for final approval requires the Court to consider whether the settlement was obtained by fraud or collusion among the parties and their counsel.  Courts begin with a presumption of good faith in the negotiating process.  *See Saccoccio* Order at 9 ("Where the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion")*; Hemphill v. San Diego Ass'n of Realtors, Inc.*, 225 F.R.D. 616, 621 (S.D. Cal. 2004) ("the courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement").  The settlement terms in this case are the product of significant give and take by the settling parties, and were negotiated at arms' length.  The parties participated in a mediation process before Rodney A. Max that spanned over two months.  (Joint Decl. ¶¶ 17, 46).  The parties met in person, as well as through regular telephonic sessions and email communications over the course of these two months, negotiating first the terms of an initial memorandum of understanding and then a final settlement agreement.  Mr. Max has significant experience mediating complex commercial suits to resolution, and was involved at every step of the process.  (Joint Decl. ¶ 46; *Saccoccio* at (D.E. 59-5)).  The very fact of his involvement weighs in favor of approval.  *See, e.g., Lobatz v. U.S. In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 619-20 (E.D. La. 2006) (use of special master to oversee mediation evidenced procedural fairness of negotiating process); *In re WorldCom, Inc. ERISA Litig.*, 2004 WL 2338151, at *6 (S.D.N.Y. 2004) (fact that "[a] respected and dedicated judicial officer presided over the lengthy discussions from which this settlement emerged" belied any suggestion of collusion).

The parties' extensive negotiations were also informed by considerable discovery.  In this action, the parties participated in lengthy litigation discovery, including document production, interrogatory responses, and depositions.  Further, discovery motion practice yielded discovery that the Defendants were unwilling to provide at first; however, Plaintiffs' were able to obtain

11

this critical information in order to file their motion for class certification and prepare their expert reports.

This litigation discovery was taken in addition to the information from the considerable discovery obtained by Class Counsel through litigating force-placed insurance claims involving the Assurant and QBE Defendants over the last three years.  (Joint Declaration of Class Counsel ("Joint Decl."), attached as **Exhibit C**, ¶¶ 13, 35-38.); *see, e.g., Kunzelmann v. Wells Fargo Bank, N.A.*, No. 11-cv-81373-DMM (S.D. Fla.); *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233-RNS (S.D. Fla.); ; *Popkin v. Citibank, N.A.*, No. 13-cv-60722 (S.D. Fla.); *Diaz v. HSBC Bank (USA), N.A.*, No. 13-cv-21104 (S.D. Fla.).

The Defendants also provided additional information during the mediation process to confirm the reasonableness of the Settlement's terms.[9]  (Joint Decl. ¶ 19.)  The fact that some evidence was obtained through informal methods does not affect the ability of counsel to assess the strength and weaknesses of their respective positions.  *See, e.g., D'Amato v. Deutsche Bank*, 236 F.3d 78, 87 (2d Cir. 2001) ("although no formal discovery had taken place, the parties had engaged in an extensive exchange of documents and other information . . . thus, the stage of the proceedings' factor . . . weighed in favor of settlement approval") (internal citation omitted); *Corrugated Container Antitrust Litig.*, 643 F.2d at 211 ("The trial court may legitimately presume that counsel's judgment that they had achieved the desired quantum of information necessary to achieve a settlement is reliable.") (internal quotations and citations omitted); *Cotton*,

_____

[9] "There is no precise yardstick to measure the amount of litigation that the parties should conduct before settling." *In re Rio Hair Naturalizer Prods. Liab. Litig.*, MDL No. 1055, 1996 WL 780512, at *13 (E.D. Mich. Dec. 20, 1996); *see also In re Austrian & German Holocaust Litig.*, 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2000) ("[t]he Court need not find that the parties have engaged in extensive discovery").  The question instead is whether the parties have engaged in sufficient discovery and investigation to afford them an "adequate appreciation of the merits of the case," *In re Prudential Ins. Co. of Am. Sales Litig.*, 148 F.3d 283, 319 (3d Cir. 1998), such that the settlement is not "the product of uneducated guesswork," *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981).  The test is one of sufficiency—not sheer quantity—because "it would be inconsistent with the salutary purposes of settlement," *Handschu v. Special Servs. Div.*, 787 F.2d 828, 834 (2d Cir. 1986), to find that extensive pretrial discovery is a prerequisite to approval, *Plummer v. Chemical Bank*, 668 F.2d 654, 660 (2d Cir. 1982).  *See also, e.g., Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir. 1977) (lack of formal discovery did not compel conclusion that insufficient discovery was conducted).

355912

559 F.2d at 1332 ("Discovery in its most efficient utilization should be totally extra-judicial [and . . .] informality in the discovery of information is desired.").

Litigation of Plaintiffs' claims was also adversarial, and in the twenty months during which the claims were pending, the parties advocated their positions zealously, briefing numerous dispositive motions. (D.E. 11, 12, 13, 29, 32, 33, 36, 38, 39, 43, 93, 94, 95, 111, 112, and 114); *see Hall*, No. 12-cv-22700 (D.E. 104, 110, 152, and 159). The parties also briefed class certification as well as contentious discovery motion practice. (D.E. 97, 98, 108, 116, 105, and 126). The contentious nature of the proceedings confirms the absence of fraud or collusion. *See, e.g., Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) (there was "no doubt that th[e] case ha[d been] adversarial, featuring a high level of contention between the parties").

**B. The Issues Presented Were Highly Complex, and Settlement Approval Will Save the Class Years of Extremely Costly Litigation in this Court and on Appeal.**

This case involves complex legal claims and defenses brought on behalf of 1,340,157 class members, (Keough Decl. ¶ 8; Declaration of Thomas E. Scott ("Scott Decl."), attached as **Exhibit D**, ¶¶ 11, 15, 16, 41), and includes not only common law contractual, quasi-contractual, and tort claims, but also state and federal statutory claims for violations of FDUTPA, and the federal TILA, BHCA, and RICO statutes. (D.E. 155-1.) Litigating these claims would have undoubtedly proven difficult and consumed significant time, money, and judicial resources. Even if Plaintiffs were ultimately to have prevailed in this litigation (which Defendants contest), that success would likely have borne fruit for the Class only after years of trial and appellate proceedings and the expenditure of millions of dollars by both sides. (Scott Decl. ¶ 18); *see, e.g., In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex., on April 20, 2010*, 910 F. Supp. 2d 891, 932 (E.D. La. 2012) *aff'd* 2014 WL 103836 (5th Cir. Jan. 10, 2014) ("Even assuming litigation could obtain the results that this Settlement provides, years of litigation would stand between the class and any such recovery. Hence, this second … factor weighs strongly in favor of granting final approval to the Settlement Agreement.").

By contrast, the settlement provides immediate and substantial monetary relief to the Settlement Class, with cash payments and credits approximating 50%-100% of class members' actual damages. (Joint Decl. ¶¶ 61, 65; Scott Decl. ¶ 13.) This range is extremely favorable, and constitutes an excellent result. *See Saccoccio* Order at 12-13 (return of 12.5% of premiums charged for lender placed insurance with injunctive relief "very likely exceeds what Plaintiffs

could have won at trial."); *Checking Account Overdraft Litig.*, 2011 WL 5873389, at *10 (range of 9% to 45% of damages was an "exemplary" result). These benefits come without the expense, uncertainty, and delay of continued and indefinite litigation. As the court stated in *In re Shell Oil Refinery*, 155 F.R.D. 552 (E.D. La. 1993):

> The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, '[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush.'

*Id.* at 560 (alterations in original) (citation omitted); *see, e.g., In re U.S. Oil & Gas Litig.,* 967 F.2d 489, 493 (11th Cir. 1992) (complex litigation "can occupy a court's docket for years on end, depleting the resources of the parties and taxpayers while rendering meaningful relief increasingly elusive"). In light of the costs, uncertainties, and delays of litigating through trial— to say nothing of an appeal—"the benefits to the class of the present settlement become all the more apparent." *See Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992).

### C. The Factual Record Was Sufficiently Developed to Enable Class Counsel to Make a Reasoned Judgment Regarding the Settlement.

Courts consider "the degree of case development that class counsel have accomplished prior to settlement" to ensure that "counsel had an adequate appreciation of the merits of the case before negotiating." *In re Gen. Motors Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 813 (3d Cir. 1995). At the same time, "[t]he law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *Ressler*, 822 F. Supp. at 1555.

Prior to settlement, Class Counsel had been litigating claims against the Assurant Defendants for nearly two years, and had familiarized themselves thoroughly with the mechanics of Assurant's force-placed insurance program. (Joint Decl. ¶ 43.) The parties engaged in significant discovery, merits briefing, and class certification motion practice, prior to resolving this matter through mediation. (Joint Decl. ¶¶ 10, 12-13.) Further, before and during the mediation process, counsel took considerable discovery from Defendants to confirm certain aspects of the settlement and to confirm the value of the relief that the settlement would provide to the class; the discovery included answers to written questions, the production of business records, and multiple depositions. (Joint Decl. ¶¶ 10, 13, 19, 45, 57, 83.) The information that Defendants provided through discovery and the mediation process not only confirmed the terms

14

355912

and value of the settlement, but also provided additional insight into the strengths and weaknesses of the parties' claims and defenses, which allowed counsel to analyze thoroughly the probability of their success on the merits, the possible range of recovery, and the likely expense and duration of the litigation. *See generally* Joint Decl.

### D.  Plaintiffs Would Have Faced Significant Obstacles to Obtaining Relief.

"[T]he likelihood and extent of any recovery from the defendants absent … settlement" must be considered in assessing the reasonableness of a settlement. *See In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 314 (N.D. Ga. 1993); *see also Ressler*, 822 F. Supp. at 1555 ("a court is to consider the likelihood of the plaintiffs' success on the merits of his claims against the amount and form of relief offered in the settlement before judging the fairness of the compromise").  Class Counsel and Plaintiffs believe they have a compelling case, but also recognize that Defendants have raised significant defenses to all claims, including application of the filed-rate doctrine, unclean hands, first breach, failure to exhaust administrative remedies, federal preemption, and the inclusion of an arbitration provision in some borrowers' mortgage contracts.  (*See, e.g.,* D.E. 11, 12, 13, 29, 32, 33, 36, 38, 39, 43, 93, 94, 95, 111, 112, and 114; Scott Decl. ¶¶ 11, 16.)  Although Plaintiffs and Class Counsel maintain that these defenses lack merit, had litigation continued, Plaintiffs and class members would have faced the risk of not prevailing on their claims.  (Scott. Decl. ¶¶ 11, 16, 24, 25.)  Indeed, this Court commented at the May 16, 2013 hearing on Defendants' motions to dismiss that the defendants had "ma[de] some very good arguments" that could have ended some or all of the case on summary judgment.  *See Hall*, No. 12-cv-22700 (D.E. 225 at 12:23-25, 21:17-21, 92:2-3, 74:4-9, 92:21-23); *see also, e.g Kunzelmann*, 2013 WL 139913 (noting obstacles created by filed-rate doctrine and application of multistate law, among other things).  Further, this Court in *Saccoccio* noted the "headwinds created by" the Eleventh Circuit in *Feaz v. Wells Fargo,* 2014 WL 503149 (11th Cir. 2014) and the Seventh Circuit in *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 611 (7th Cir. 2013).  *See Saccoccio* Order at 11.

Approval of the parties' settlement would save Plaintiffs and the proposed class from facing these obstacles, and eliminate the very real risk that they would recover nothing at all after several more years of litigation and appeal.  As such, the settlement should be viewed as a fair compromise.  *See, e.g., Bennett*, 96 F.R.D. at 349-50 (plaintiffs faced a "myriad of factual and legal problems" that led to "great uncertainty as to the fact and the amount of damage," making it

"unwise [for plaintiffs] to risk the substantial benefits which the settlement confer[red] … to the vagaries of a trial"), *aff'd*, 737 F.2d 982 (11th Cir. 1984); *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 248 (S.D. Ohio 1991) (noting "very real potential that the [c]lass could come away from a long expensive trial with nothing," and rejecting notion "that the Class should get more").

### E. The Benefits Provided by the Settlement Are Fair, Reasonable, and Adequate When Considered Against the Possible Range of Recovery.

As explained above, the settlement offers over $515 million in benefits to the class, as well as separately paid attorneys' fees.  This will provide 50%-100% recovery of claimants' actual monetary damages, which far exceeds the standards established by this and other courts. (Scott Decl. ¶ 13; Joint Decl. ¶¶ 61, 65); *see, e.g., Behrens*, 118 F.R.D. at 542 ("the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair and inadequate … A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery[.]"); *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("the very essence of settlement is … a yielding of absolutes and an abandoning of highest hopes") (internal quotations and citation omitted).

For example, in *Saccoccio*, this Court approved an identically structured settlement with payments to the class amounting to 12.5% of the net premium charged to them.  *See Saccoccio* Order at 12-13.  The Court noted that the alleged illegal commissions charged to class members were 12.5% of the net premium and that "the maximum rate premium would fall without the 'commissions' between Assurant and Chase is 12.5%."  *Id.*  The Court therefore reasoned that "the Class recovery is 50-100% of the damages."  *Id.*  The same reasoning applies here.

Similarly, in *LiPuma v. American Express Co.,* 406 F. Supp. 2d 1298 (S.D. Fla. 2005), this Court found that a settlement that recovered 8.1% of the possible damages was fair, adequate, and reasonable.  When valuing the total recovery obtained, this Court included the cash fund, the proposed value of the injunctive relief, and the costs of notice and administration. *Id.* at 1322.  The Court focused on "the possible recovery at trial" and evaluated the settlement in its "totality" and not on a "claim-by-claim" or "dollar-by-dollar" basis.  *Id.*  Further, the presence of "strong defenses to the claims" makes lower recoveries more reasonable, *id*; *see also Checking Account Overdraft Litig.*, 2011 WL 5873389, at *10 ("standing alone, nine percent or

higher constitutes a fair settlement even absent the risks associated with prosecuting these claims."),[10] and "when settlement assures immediate payment of substantial amounts to class members, even if it means sacrificing speculative payment of a hypothetically larger amount years down the road, settlement is reasonable[.]" *Johnson v. Brennan*, No. 10-cv-4712, 2011 WL 4357376, at *12 (S.D.N.Y. Sept. 16, 2011) (citation and internal quotations omitted).

Here, the settlement class fares far better than in *LiPuma*. In this matter, the commissions charged to the class were 11% of the net written premium. (D.E. 97 and 98 at 2-3.)  These commissions ceased on March 24, 2012.  *Id.* at n. 6.  Under the settlement, class members will receive an amount equal to 11% of the Net Premium charged to the Settlement Class Member if the charge occurred prior to March 24, 2012, and an amount equal to 7% of the Net Premium if the charge occurred after March 24, 2012.  (D.E. 158-1 at ¶ 4.5.3)  These amounts will be of the entire premium charged, some of which legitimately went to purchasing insurance coverage to which Wells Fargo was entitled to protect its interest in the borrower's property—*not* 11% or 7% of the premium charged in excess of the actual or competitive cost of coverage.  (*Id.*)  Moreover, all class members who submit a valid claim form will recover their respective percentage of the net premium charged regardless of whether the class members paid any portion of that premium to Wells Fargo.  (*Id.* ¶¶ 2.32, 4.5.2, 4.5.3.)  Thus, a mortgagor who paid premiums for four months of a given year will receive an amount equal to 11% or 7% of the net written premium without any deduction for the amount paid.  (Joint Decl. ¶ 23; Scott Decl. ¶ 27.)

The 11% made available to class members charged prior to March 24, 2012 is roughly the amount of the unwarranted "commission" or kickback paid by borrowers subject to other lenders' force-placed insurance schemes with Assurant.  *See, e.g.,* (D.E. 139-6 at 3, 25) (citing evidence that Wells Fargo and Assurant charged an 11% "commission"); *Kunzelmann*, No. 11-cv-81373 (D.E. 115 at 2) (same).

---

[10] *See also Bennett*, 737 F.2d at 986 (holding a 5.6% recovery was fair and adequate in view of the risks of further litigation and litigation objectives); *Sunbeam Sec. Litig.*, 176 F. Supp. 2d at 1331-32 (recovery of 10.7% of "plaintiffs' 'best case' scenario" fell "well within the range of what is fair, adequate, and reasonable"); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (noting that since 1995, class action settlements have typically "recovered between 5.5% and 6.2% of the class members' estimated losses").

Importantly, the percentage of the premium returned to class members in this settlement is very close to the maximum percentage approved (12.5%) as a reasonable rate reduction by more than forty-five state regulators of a new lender-placed product.  (Joint Decl. ¶ 62.)  These regulators have approved as reasonable a new lender-placed hazard insurance product developed by Assurant that would reduce the rates used to calculate the premiums charged to lenders (and then passed on to borrowers) by *up to* 12.5% if the lender agrees to forego the commissions (or reinsurance premiums) that are the subject of this lawsuit.  (*Id.*; *see Saccoccio,* (D.E. 108 at Exhibit D at 16:2-18:5)  This Settlement provides 88% of the full savings from this new, approved product.  State regulators' approval of this product with regard to both straight commission and reinsurance lender-placed hazard programs supports a finding of reasonableness here.

The settlement will also provide valuable injunctive relief to the class.  (Joint Decl. ¶¶ 24-25; Scott Decl. ¶¶ 28-30); *see* pp. 6-8, *supra.*  The Settlement Agreement effectively prohibits the Wells Fargo and Assurant Defendants from continuing to implement the practices challenged in the Complaint, which reaped approximately $234 million in revenues for the Defendants during the class period.  (Joint Decl. ¶¶ 24-25, 64.)  Certain of these practices were proscribed by a settlement with New York state regulators before the parties here settled the class claims, but the New York injunctions apply only to New York borrowers and bind only the Assurant and QBE Defendants, leaving the Wells Fargo Defendants free to continue their practices with another insurer. *See* Consent Order, *In the Matter of Am. Sec. Ins. Co., et al.* (N.Y.D.F.S. 2012), available at http://www.dfs.ny.gov/about/press2013/assur-order-130321.pdf and Consent Order, *In the Matter of QBE Fin. Institution Risk Servs., Inc., QBE Ins. Corp., & QBE Holdings Inc.* (N.Y.D.F.S. 2013), available at http://www.dfs.ny.gov/about/ea/ea_201304181_qbe.pdf (collectively "NYDFS Consent Orders").  There can be no question that this result is more than reasonable.

The fact that the parties agreed to a "claims-made" settlement does not render its terms unreasonable. *See, e.g., Saccoccio* Order at 18-19 (overruling objections to the claims made process of a lender placed insurance class action and stating that "[t]here is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment.") (citing to *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 593 (N.D. Ill. 2011)); *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997) (discussing claims-made

18

settlement and affirming contingency fee award based on total possible recovery); *Shames v. Hertz Corp.*, 07-CV-2174-MMA WMC, 2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) (approving claims-made settlement over objections because "there is nothing inherently objectionable with a claims-submission process, as class action settlements often include this process, and courts routinely approve claims-made settlements") (citations omitted); *Lemus v. H & R Block Enters. LLC,* 2012 U.S. Dist. LEXIS 119026, 2012 WL 3638550 (N.D. Cal. Aug. 22, 2012) (approving claims-made settlement where unclaimed funds reverted to the defendants); *Atkinson v. Wal-Mart Stores, Inc.*, No. 8:08-CV-691-T-30TBM, 2011 WL 6846747, at *5 (M.D. Fla. Dec. 29, 2011) (approving claims-made settlement with full reversion).  The parties agreed to a "claims-made" process because Wells Fargo cannot, on a system-wide basis, determine the precise amount paid or currently owed by a borrower. (Joint Decl. ¶¶ 34-38.)

Discovery taken by Plaintiffs' counsel over the past two and a half years regarding the MSP system used by Wells Fargo has confirmed MSP's limited capabilities with regard to system-wide queries.  In *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233-RNS (S.D Fla.), sworn testimony showed that "[w]ithout a borrower-by-borrower manual examination of each loan file, [the MSP system] cannot accurately determine the universe of borrowers who were 'charged' for lender placed insurance, those who 'paid' for lender placed insurance, those who still owe Wells Fargo Bank for lender placed insurance premiums, and those who may have entered into loan modification, short sale, refinance, or other agreements with Wells Fargo Bank."  *See Williams,* (D.E. 307 Exhibit A at 2).  Wells Fargo's Rule 30(b)(6) representative testified that the review could range from "maybe a few hours" to "four to five hours" per loan. *See Williams,* (D.E. 307 at Exhibit B at 46:16-19) (If the loan was still active and that information is readily available on our system, I would say review would take maybe a few hours. If it is an older loan that is no longer viewable on our system, then that review process would probably double up to probably four to five hours because we would be working off of paper to calculate those dollar amounts as well as retrieving archived documents in order to complete our review.").  Accordingly, any manual review of 1,340,157 Wells Fargo borrower files (accounting for over 2.5 million insurance policies) would take a significant amount of time and manpower.

In other words, Wells Fargo's MSP system does not differentiate among borrower payments made to an escrow account for taxes, insurance, or other escrows. *See Williams,* (D.E.

307 Exhibit A at 2).    This renders it impossible to determine on a system-wide basis which borrowers have paid lender-placed insurance or the amount of any such payment.   (*Id.*) Similarly, the MSP system cannot determine on a system-wide or bulk basis which consumers still owe premiums for lender-placed insurance or the amount of any arrearages.  (*Id.*)  Since the MSP system cannot determine such information on a class-wide basis, a manual review of each of the 1,340,157 class members' borrower files would be required to determine who paid, how much they paid, and who currently owes premiums for lender placed insurance.   (*Id.*)  Notably, Assurant and QBE's settlement with New York state regulators was also a claims-made settlement.  *See* NYDFS Consent Orders.

Plaintiff and the class faced significant hurdles in litigating their claims to resolution. Each class member stands to recover hundreds, if not thousands, of dollars as a result of the settlement.  These results fall well within the range of reasonableness.

### F. The Opinions of Class Counsel, the Class Representative, and Absent Class Members Strongly Favor Settlement Approval.

A court should give "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation." *Warren v. Tampa,* 693 F. Supp. 1051, 1060 (M.D. Fla. 1988).  This Court has already found that Class Counsel and Plaintiffs will adequately represent the class in this action, and its conclusion was warranted.  (D.E. 168 at 5(e)) ("Plaintiffs are capable of fairly and adequately protecting the interests of the members of the Settlement Class, in connection with the Settlement Agreement.").  Class Counsel have been investigating force-placed insurance practices for more than three years, and fully support the Settlement.  They obtained certification of the first force-placed hazard insurance class in Florida in *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla. Feb 21, 2012), litigated the motion for class certification in *Kunzelmann*, briefed and argued two motions to centralize force-placed insurance litigation in a nationwide MDL, and are currently litigating eleven additional cases against major mortgage lenders in the Southern District of Florida.  *See Saccoccio*, No. 13-cv-21107 (J. Moreno) (Court granted final approval of parties' settlement on February 28, 2014); *Diaz v. HSBC Bank (USA), N.A.*, No. 13-cv-21104 (J. Moreno) (Court granted preliminary approval of settlement, denied motions to intervene, and final approval is scheduled for September 18, 2014);; *Hamilton v. SunTrust Mortgage, Inc.*, No. 13-cv-60749 (J. Cohn) (parties reached settlement and submitted motion for preliminary approval on May 9, 2014); *Hall v. Bank*

*of Am., N.A.*, No. 12-cv-22700 (J. Moreno) (parties reached settlement and submitted motion for preliminary approval on April 8, 2014); *Braynen v. Nationstar Mortgage LLC*, No. 14-cv-20726 (J. Lenard) (parties reached tentative settlement and will submit their motion for preliminary approval within next month); *Circeo-Loudon v. Green Tree Servicing, LLC*, No. 14-cv-21384 (J. Moreno) (filed on April 17, 2014); *Lee v. Ocwen Loan Servicing LLC*, No. 14-cv-60649 (J. Lenard ) (filed on March 14, 2014); *Jackson v. U.S. Bank, N.A.*, No. 14-cv-21252 (J. Moreno) (filed on April 8, 2014); *Wilson v. Everbank, N.A.*, No. 14-cv-22264 (J. Bloom) (filed on June 18, 2014); *Soler v. IndyMac Mortgage*, No. 14-cv-22541 (J. Cooke) (filed on July 9, 2014) and *Almanzar v. Select Portfolio Servicing, Inc.* No. 14-cv-22586 (J. Moreno) (filed on July 11, 2014).

      Based on this experience, and decades of experience litigating consumer class action lawsuits, it is Class Counsel's informed opinion that the Settlement is fair, reasonable, adequate, and in the best interests of the Class.  (Joint Decl. ¶¶ 4, 43, 63, 93; Scott Decl. ¶¶ 10, 45.)

      As of the date of this filing, of the 1,340,157 class members, only one has objected (.000075% of the class) and 76 have validly opted out (.0056%).  This overwhelming class support for the settlement is evidence of its fairness.  *See, e.g., Saccoccio* Order at 14 (opposition to the settlement amounting to .018% of the settlement class was termed as "low resistance to the settlement" and weighed "in favor of approving the settlement."); *Churchill Village LLC v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming settlement with 45 objections out of 90,000 notices sent); *Boone v. City of Phila.*, 668 F. Supp. 2d 693, 712 (E.D. Pa. 2009) ("A low number of objectors compared to the number of potential class members creates a strong presumption in favor of approving the settlement."); *LiPuma,* 406 F. Supp. 2d at 1324 ("[A] low percentage of objections points to the reasonableness of a proposed settlement and supports its approval."); *In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173, 2008 WL 1956267, at *6 (S.D.N.Y. May 1, 2008) ("Of approximately 175,000 class members, only 22 (0.0126%) have chosen to opt out of the class, and only 45 have voiced objections. The small number of opt-outs and objections relative to the size of the class in this case supports approval of the Settlement.").

      Viewed either independently or taken together, the above factors confirm that the settlement is fair, reasonable, and adequate.

II.   **CLASS COUNSEL SHOULD BE AWARDED REASONABLE FEES AND COSTS AND PLAINTIFFS THE REQUESTED SERVICE AWARD.**

For their extensive work prior to the filing of the complaint and throughout the pre-trial and settlement phases of this litigation, Class Counsel seek $19 million in attorneys' fees and expenses, equaling only 6.8% of the $281 million in monetary settlement benefits provided to the class, and only 3.7% of the $515 million combined value of monetary and injunctive relief. A service award of $5,000 to each Class Representative or each married set of Class Representatives is also appropriate.

   A.   **The Court Should Award the Requested Attorney's Fees and Expenses.**

Class counsel is entitled to an attorney's fee for the benefit obtained in a class settlement. *See Saccoccio* Order at 15-17 ("The attorneys' fees in a class action can be determined based upon the total fund, not just the actual payout to the class."); *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 676 (1980); *see David v. Am. Suzuki Motor Corp.*, No. 08–CV–22278, 2010 WL 1628362 (S.D. Fla. Apr. 15, 2010) (settlement with ascertainable benefits may be treated as a common fund to which a percentage fee may be awarded, even if the fee is separately paid by the defendant). In the Eleventh Circuit, "attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Camden I Condo. Ass'n v. Dunkle,* 946 F.2d 768, 774 (11th Cir. 1991); *see also Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1339 (S.D. Fla. 2007); *In re Sunbeam Sec. Litig.,* 176 F. Supp. 2d 1323, 1333 (S.D. Fla. 2001). The percentage applies to the total benefits provided, even where the actual payments to the class following a claims process is lower. *See Saccoccio* Order at 15; *Waters v. Int'l Precious Metals Corp.,* 190 F.3d 1291, 1295-96 (11th Cir. 1999). "[F]ederal district courts across the country have, in the class action settlement context, *routinely* awarded class counsel fees in excess of the 25 percent 'benchmark,' even in so-called 'mega-fund' cases." *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1210 (S.D. Fla. 2006) (emphasis added; awarding fees of 31½% of settlement fund). Here, the requested percentage is easily within the range provided by the Eleventh Circuit. *See Camden I,* 946 F. 2d at 774 (20%–50% of the value provided); *David*, 2010 WL 1628362 at *8 n.15 (20%-50% of common fund is "the customary fee in class actions that result in substantial benefits").

The Eleventh Circuit's factors for evaluating the reasonable percentage to award class-action counsel are (1) the time and labor required; (2) the novelty and difficulty of the questions

involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the client; and (12) awards in similar cases. *See Camden I,* 946 F.2d at 772 n.3. The Court may also consider the time required to reach settlement, the existence of substantial objections from class members, the existence of non-monetary benefits of the settlement, and the economics involved in prosecuting a class action. *Id.* at 775. As explained below, the factors set forth in *Camden I* support the full award requested in this case.

### 1. The Contingent Nature of the Fee, the Financial Burden Carried by Counsel, and the Economics of Prosecuting a Class Action Support the 6.8% Award.

A determination of a fair fee for Class Counsel must include consideration of the contingent nature of the fee, the outlay of out-of-pocket expenses by Class Counsel, and the fact that the risks of failure and nonpayment in a class action are extremely high. *See Pinto,* 513 F. Supp. 2d at 1339. Class Counsel's risk is the "foremost factor" in determining an appropriate fee award. *See id.* In *Behrens,* the court noted:

> Generally, the contingency retainment must be promoted to assure representation when a person could not otherwise afford the services of a lawyer. . . .
>
> A contingency fee arrangement often justifies an increase in the award of attorneys' fees. This rule helps assure that the contingency fee arrangement endures. If this "bonus" methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing.

118 F.R.D. at 548 (citations omitted).

These factors weigh in favor of awarding Class Counsel 6.8% of the cash and 3.7% of the overall benefits obtained. Class Counsel have received no compensation during the course of this litigation and have incurred substantial expenses litigating on behalf of the Class, which they risked losing had Defendants prevailed. (Joint Decl. ¶¶ 95-100; Scott Decl. ¶ 40.) From the time Class Counsel filed suit, there existed a real possibility that they would achieve no recovery and hence no compensation. (Joint Decl. ¶¶ 95-100; Scott Decl. ¶¶ 32, 40, 41.) The degree of risk in an action is determined from the time the action begins, and not at the time it settles. *See Pinto,* 513 F. Supp. 2d at 1340. Class Counsel's investment of time and expenses has always

been at risk and wholly contingent on the result they achieved.  *See Saccoccio* Order at 16.  The financial risks borne by Class Counsel fully support the fee requested.

> **2.  The Requested Fees Reflect the Market Rate in Complex, Contingent Litigation.**

A fee of 6.8% of the cash and 3.7% of overall value is modest, if not low, when compared to the market.  *See Saccoccio* Order at 16 (a nearly identical 6.7% attorney's fee percentage was "well below the range of 20-30% fee that is customary in common fund cases."). "The percentage method of awarding fees in class actions is consistent with, and is intended to mirror, practice in the private marketplace where attorneys typically negotiate percentage fee arrangements with their clients." *Pinto*, 513 F. Supp. 2d at 1340.  In private litigation, attorneys regularly contract for contingent fees between 30% and 40% directly with their clients.  (Scott Decl. ¶ 39.)  These percentages are the prevailing market rates throughout the United States for contingent representation.  *See id.* at 1341 (citing, *inter alia*, *Kirchoff v. Flynn*, 786 F.2d 320, 323 (7th Cir. 1986)).  In making a determination of what constitutes a fair percentage fee, this Court should be guided by such awards.  As the Eleventh Circuit stated in *Camden I*: "[A]n upper limit of 50% of the fund may be stated as a general rule, although even larger percentages have been awarded."  946 F.2d at 774-75.  The fee requested here, 6.8% of cash and 3.7% of overall benefit, is thus well in line with the bulk of the fee awards in class action litigation.  *See, e.g.,* Saccoccio Order (awarding nearly identical 6.7% of total fund available to be claimed); *Allapattah*, 454 F. Supp. 2d at 1210 (awarding fees of 31-1/3%); *Terazosin Hydrochloride Antitrust Litig.,* No. 99–1317–MDL–Seitz (S.D. Fla. Apr. 19, 2005) (awarding fees of 33-1/3 %); *In re Managed Care Litig. v. Aetna,* MDL No. 1334, 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003) (35.5% of settlement).[11]

> **3.  The Novelty and Difficulty of the Questions at Issue.**

This case presents novel questions of law and complex issues of fact.  Class action matters are generally complex, but this one is particularly so, involving:

- The filed-rate doctrine and related insurance issues such as analyzing loss ratios, calculation of premiums, and identifying costs permissibly charged to the borrower;

---

[11] *See also, e.g., Gutter v. E.I. Dupont De Nemours & Co.,* 95–2152–Civ–Gold (S.D. Fla. May 30, 2003) (33-1/3 %); *Waters,* 190 F.3d 1291 (affirming 33-1/3 %); *Tapken v. Brown,* Case No. 90-0691-CIV, 1992 WL 178984, Fed. Sec. L. Rep. P 96805 (S.D. Fla. 1995) (33%); *In re Home Shopping Network Sec. Litig.,* Case No. 87-428-T-13(A) (M.D. Fla. 1991) (33%).

- Three complex federal claims, for violations of TILA based on the failure to disclose impermissible charges when FPI was placed, violations of the BHCA, challenging Wells Fargo's illegal tying of payment of commissions, and RICO violations;

- Defenses that go to the conduct of the borrower in allowing voluntary coverage to lapse (first breach, unclean hands);

- "Consent" defenses involving payment/maintenance of FPI after disclosures that coverage would be expensive and cover a commission, *e.g.,* voluntary payment, waiver, estoppel;

- The complexity of the scheme – how the money and benefits were passed among the Wells Fargo, QBE and Assurant entities;  and

- Issues of proof regarding whether/to what extent Defendants earned "commissions" or reinsurance profits.

The difficulty of mastering and litigating these issues amply supports the full award requested.  (Scott. Decl. ¶ 24, 25, 34, 44.)

### 4.   The Skill, Experience, and Reputation of Class Counsel.

Class Counsel have established their skill, experience, and reputation in the record, and in repeated cases before this court.  (Joint Decl. ¶¶ 86-88.)  Indeed, this Court stated that "class counsel has been at the forefront of lender-placed insurance litigation."  *See Saccoccio* Order at 17.  Beyond that, Class Counsel's reputation, diligence, expertise, and skill are reflected in the results they have achieved.  They resolved this dispute efficiently despite the potential hurdles presented them and the arguments raised by Defendants detailed above.  (Scott Decl. ¶¶ 17, 32.)  The quality of Class Counsel and their achievement in this case is equally shown by the strength of their opponents, Carlton Fields Jorden Burt, P.A., Severson & Werson, Buckley Sandler LLP, and Holland & Knight LLP, four of the finest defense firms in the country.  This factor thus also favors awarding the requested fee.

### 5.   The Result Achieved for the Class.

The result here is extraordinary, and perhaps best establishes the propriety of the requested fee award.  The result achieved is a major factor to consider in making a fee award.  *See Hensley v. Eckerhart,* 461 U.S. 424, 436, (1983) ("critical factor is the degree of success obtained"); *Pinto*, 513 F. Supp. 2d at 1342; *Behrens,* 118 F.R.D. at 547-48 ("The quality of work performed in a case that settles before trial is best measured by the benefit obtained.").  In considering the results, courts examine the value of *both* monetary and injunctive relief.  *See Staton v. Boeing Co.,* 327 F.3d 938, 974 (9th Cir.2003) ("[C]ourts should consider the value of

the injunctive relief obtained as a relevant circumstance in determining what percentage of the common fund class counsel should receive as attorneys' fees.") (internal quotation and citation omitted); *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360 (S.D. Fla. 2007); *LiPuma,* 406 F. Supp. 2d at 1323; *In re Managed Care Litig.*, 2003 WL 228500700, at *6 (S.D. Fla. Oct. 24, 2003).

   The results here, $281 million in cash and an additional $230 million in injunctive relief value to the class, are excellent. [12]   (Scott Decl. ¶¶ 13, 26, 30, 37.)  Defendants are mandated to cease the key practices which are the gravamen of the Complaint.  These results are powerful evidence supporting the fee award.

   **6.   The Time and Labor of Class Counsel.**

   Prosecuting and settling the claims here demanded considerable time and labor. (Joint Decl. ¶¶ 76-85.)  The complexity of this case required organization by Class Counsel, including assignment of work and daily meetings and conference calls to ensure coordinated, productive work efforts to maximize efficiency and minimize duplication of effort.  (*Id.*) Class Counsel spent many hours investigating the claims of many of the potential plaintiffs against Defendants in this action.  (*Id.*)  Class Counsel interviewed Wells Fargo borrowers and potential plaintiffs to gather information about Defendants' conduct and its impact upon consumers; obtained, reviewed, sorted, and analyzed Wells Fargo mortgages, Assurant and QBE vendor agreements, rate filings, and other discovery; deposed key witnesses before, during, and after the formal mediation; and fought off furious efforts of outside lawyers who sought to blunt, hamper, and end settlement negotiations.  (*Id.*)  Class Counsel also faced a significant hurdle in responding to various dispositive motions.  (*Id.*)

   Class Counsel reviewed millions of pages of discovery in order to prepare their class certification motion and in November 2013, Plaintiffs moved for class certification and submitted an expert report in support of same.  (D.E. 97 and 98)  Further, Defendants renewed their efforts to dismiss this action with prejudice.  This matter was heavily litigated prior to settlement.

---

[12] The number of policies issued by Assurant and QBE Defendants was 2,548,182.  (Joint Decl. ¶ 58).  Commissions ceased being paid to Wells Fargo on March 24, 2012.  (*Id.* at ¶58).  As of the date of settlement, approximately 76% of those policies were issued prior to March 24, 2012 and approximately 24% were issued after that date.  (*Id.* at ¶¶59-60.)

In late November, 2013, Settlement Class Counsel began preliminary settlement discussions with Defendants' counsel. (Joint Decl. ¶ 83.) After formal mediation sessions in December 2013 and January 2014, counsel prepared for and participated in many meetings and conference calls in an attempt to settle the action. (*Id.*) After the parties executed the MOU, Settlement Class Counsel engaged in protracted discussions over and drafting of the terms of the Settlement Agreement, Notice, and claim forms. (*Id.*) In addition, Class Counsel oversaw post-MOU confirmatory discovery, including depositions, as well as regular conference calls, pending final approval of the Settlement. (*Id.*)

Further, the Settlement requires a continuing role for Settlement Class Counsel after final approval, in reviewing the payments made to Class Members, as well as information on denied claims and reasons for denial. Class Counsel have negotiated a procedure to resolve any disagreements with Defendants regarding denied claims and will not involve the Court unless those procedures fail to result in a mutually agreeable solution. (*Id.* ¶ 84.) Class Counsel have responded to many hundreds of Class Member calls and written inquiries concerning the Settlement and will continue to do so. (*Id.*) Finally, Class Counsel will be responsible for responding to any appeals that may be filed and for handling all other post-approval proceedings. (*Id.*) These substantial efforts justify awarding Class Counsel the requested fee.

### 7. The Reaction of the Class.

As of the date of this filing, there has been only one possible objection to the settlement (it is not clear if in fact this is an "objection" to the Settlement). This individual represents .000075% of the 1,340,157 class members served. That this sizeable class has asserted only one objection supports the fee request. *See Pinto*, 513 F. Supp. 2d at 1343; (Scott Decl. ¶ 43.).

### B. A Service Award of $5,000 Is Appropriate.

The Court should approve a service award of $5,000 for the Representative Plaintiffs. The detailed notice advised class members that the Representative Plaintiffs and Plaintiff couples would apply for a service award of $5,000 each, and no class member has objected to this reasonable request. *See Saccoccio* Order at 17 (granting $5,000 service award). In instituting this litigation, the Representative Plaintiffs have acted as private attorney generals seeking a remedy for what appeared to be a public wrong. *See Pinto,* 513 F. Supp. 2d at 1344. The Class Representatives aided in the investigation of these claims, discovery requests, and settlement. (Joint Decl. ¶ 69-73.) Private class action suits are a primary weapon in the enforcement of laws

designed for the protection of the public. *See Pinto,* 513 F. Supp. 2d at 1344.  Approval of this award is warranted as a matter of policy and is appropriate under applicable precedents.

**CONCLUSION**

Plaintiffs respectfully request the Court enter an order granting final approval of the settlement, as well as the applications for Class Counsel's fees and expenses and a $5,000 service award to each of the Class Representatives and Class Representative couples.

Respectfully submitted this 4th day of August 2014.

By: */s/ Adam M. Moskowitz*

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>amm@kttlaw.com<br>Harley S. Tropin, Esq.<br>hst@kttlaw.com<br>Tucker Ronzetti, Esq.<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>rn@kttlaw.com<br>**KOZYAK, TROPIN, &**<br>**THROCKMORTON**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br>*Counsel for Plaintiffs* | Aaron S. Podhurst, Esq.<br>apodhurst@podhurst.com<br>Peter Prieto, Esq.<br>pprieto@podhurst.com<br>John Gravante, III, Esq.<br>jgravante@podhurst.com<br>Matthew Weinshall<br>mweinshall@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, Florida 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Counsel for Plaintiffs* |
| Lance A. Harke, P.A.<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, Florida 33138<br>Telephone:     (305) 536-8220<br>Facsimile:     (305) 536-8229<br>*Counsel for Plaintiffs* | |

28

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on August 4, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: *_/s/ Adam M. Moskowitz_*