IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 0:13-cv-60721 MORENO/GARBER

IRA MARC FLADELL, SARAH CROUCH,
GREG OLSON, MARGARET
ZAWISTOWSKI, TILENA ALI, DANNY
LANE and BEVERLY LANE on behalf of
themselves and all others similarly situated,

    Plaintiffs,

v.

WELLS FARGO BANK, N.A.; WELLS
FARGO INSURANCE, INC.; ASSURANT,
INC.; AMERICAN SECURITY INSURANCE
COMPANY; VOYAGER INDEMNITY
INSURANCE COMPANY, STANDARD
GUARANTY INSURANCE CO.; QBE
SPECIALTY INSURANCE COMPANY; QBE
INSURANCE CORPORATION; QBE FIRST
INSURANCE AGENCY, INC.; QBE
FINANCIAL INSTITUTION RISK SERVICES,
INC.; and PRAETORIAN INSURANCE
COMPANY,

    Defendants.

**OBJECTION OF JAMES H. KIRBY IV TO PROPOSED SETTLEMENT AND
NOTICE OF INTENT TO APPEAR**

## **TABLE OF CONTENTS**

I.  INTRODUCTION ……………………………………………………………….  1

    A.  Summary of the Action and the Settlement ………………………………….  1

    B.  The Standard for Approving a Proposed Class Action Settlement ………….  1

II.  ARGUMENT AND OBJECTIONS ……………………………………………..  3

    A.  The Settlement Consideration is Unclear ……………………………………  3

        1.  *The Value of the Settlement to Individual Class Members* ………….  3

        2.  *The Aggregate Value of the Settlement is Unclear* ………………….  5

        3.  *The Claims Process Appears Unduly Burdensome* ………………….  6

    B.  The Attorney's Fees …………………………………………………………  8

III.  JOINDER IN OTHER OBJECTIONS ……………………………………………. 12

IV.  CONCLUSIONS ……………………………………………………………….  12

## **TABLE OF AUTHORITIES**

### **CASES**

*Bennett v. Behring Corp.*
737 F.2d 982, 986 (11th Cir. 1984) ……………………………………………………… 2

*Boeing v. Van Gemert*
444 U.S. 572 (1980) …………………………………………………………………… 8, 9, 10

*Bowling v. Pfizer, Inc.*
922 F. Supp. 1261, 1283-84 (S.D. Ohio 1996) …………………………………………. 10

*Bowling v. Pfizer, Inc.*
102 F.3d 777 (6th Cir. 1996) …………………………………………………………. 10

*Duhaime v. John Hancock Mut. Life Ins. Co.*
989 F. Supp. 375, 380 (D. Mass. 1997) ………………………………………………. 10

*Eubank v. Pella Corp.*
2014 WL 2444388, --- F.3d ---- (2014) ……………………………………… 7, 8, 10, 11, 12

*Figueroa v. Sharper Image Corp.*
517 F. Supp. 2d 1292, 1320 (S.D. Fla. 2007) …………………………………………. 2

*Foster v. Boise-Cascade, Inc*.
420 F. Supp. 674, 686 (S.D. Tex. 1976), aff'd 577 F.2d 335 (5th Cir. 1978) ……………. 2

*Grant v. Bethlehem Steel Corp. v. Bethlehem Steel Corporation*
823 F.2d 20, 23 (2d Cir. 1987) ………………………………………………………. 1

*Holmes v. Cont'l Can Co*.
706 F.2d 1144, 1147 (11th Cir. 1983) ………………………………………………… 1, 2

*In re Baby Prods. Antitrust Litig.*
708 F.3d 163, 179 (3d Cir. 2013) ……………………………………………………… 9, 10

*In re Dry Max Pampers Litig.*
724 F.3d 713, 718 (6th Cir. 2013) ……………………………………………………. 2, 10

*In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*
55 F.3d 768, 786-807 (3d Cir. 1995) …………………………………………………. 2

*Leverso v. Southtrust Bank*
18 F.3d 1527, 1530-31 (11th Cir. 1994) ………………………………………………. 2

*Michel v. Wm Healthcare Solutions*
2014 U.S. Dist. LEXIS 15606 (S.D. Ohio Feb. 7, 2014) ……………………………… 10

*Mirfashi v. Fleet Mortgage Corp.*
356 F.3d 781, 785 (7th Cir. 2004) ……………………………………………………………  1

*Pearson v. Nbty, Inc.*
No. 11-cv-7972, 2014 U.S. Dist. LEXIS 357, at *21-*27 (N.D. Ill. Jan. 3, 2014) ……….10

*Pettway v. Am. Cast Iron Pipe Co.*
576 F.2d 1157, 1169 (5th Cir. 1978) …………………………………………………… 2, 3

*Piambino v. Bailey*
757 F.2d 1112, 1139 (11th Cir. 1985) …………………………………………………… 2, 3

*Saccoccio v. JPMorgan Chase Bank, N.A.*
No. 13-cv-21107 (S.D. Fla.) ………………………………………………………………  8

*Strong v. BellSouth Telcoms.*
137 F.3d 844, 852 (5th Cir. 1998) ……………………………………………………  10, 11

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*
463 F.3d 646, 652 (7th Cir. 2006) ……………………………………………………….  2

*Tarlecki v. Bebe Stores, Inc.*
No. C 05-1777 MHP, 2009 U.S. Dist. LEXIS 102531 (N.D. Cal. Nov. 3, 2009) ………. 10

*U.S. v. City of Miami*
614 F.2d 1322, 1331 (5th Cir. 1980) modified on other grounds,
664 F.2d 435 (5th Cir. 1981) (*en banc*) ……………………………………………………  1

*Waters v. Int'l Precious Metals Corp.*
190 F.3d 1291, 1295-96 (11th Cir. 1999), cert. denied 530 U.S. 1223 (2000) …  8, 9, 10, 11

*Williams v. Wells Fargo Bank, N.A.*
No. 11-cv-21233-RNS (S.D Fla.) …………………………………………………………  6

*Wise v. Popoff*
835 F. Supp. 977, 982 (E.D. Mich. 1993) …………………………………………………… 11

## STATUTES AND OTHER AUTHORITY

15 U.S.C. § 40                            ……………………………………………………………  5
18 U.S.C. § 1961–1968                     ……………………………………………………………  5
28 U.S.C. §1711 et seq.                   ……………………………………………………………  9
28 U.S.C. §1712(a)                        ……………………………………………………………  9

Federal Rules of Civil Procedure
    23                                    ……………………………………………………………  9
        23(e)(1)                          ……………………………………………………………  3
        23(e)(2)                          ……………………………………………………………  1

23(h) ……………………………………………………………………… 9, 11
    Notes of Advisory Committee on 2003 Amendments to Rule 23(h) …………… 9
30(b)(6) ……………………………………………………………………… 6

Am. Law Institute, Principles of the Law of Aggregate Litig.
§ 3.05(c) (2010) ("ALI Principles") ……………………………………………… 2

Federal Judicial Center, Manual for Complex Litigation
§ 21.71 (4th ed. 2004) …………………………………………………………. 10

The Governance Problem in Aggregate Litigation
Samuel Isaacharoff, 81 FORDHAM L. REV. 3165, 3171-72 (2013) …………………… 9

I.      INTRODUCTION

Objector James H. Kirby, IV is a class member as documented in his declaration.

A.  Summary of the Action and the Settlement

Plaintiffs allege Wells Fargo took out force-placed insurance in connection with residential mortgages, when a homeowner's policy lapsed or the bank decided the borrower didn't have enough coverage.  Plaintiffs alleged that Wells Fargo (and related entities) achieved a financial windfall by cutting deals with insurance companies and over-charging borrowers for the coverage.  The Settlement consolidates several actions and precedes certification.  Class Members will be compensated for a percentage of the amount they were charged for the insurance policies, either in cash if they paid the premiums, or as a credit if the amounts are still owed.  Class Counsel ask for fees and costs of $19 million.

B.  The Standard for Approving a Proposed Class Action Settlement

The district court has a duty to ensure the settlement is "fair, reasonable, and adequate." Fed. R. Civ. Proc. 23(e)(2)  Appellate courts accord considerable deference to the district court's "knowledge of the litigants and of the strengths and weaknesses of their contentions". . . . and recognize that the district court "is in the best position to evaluate whether the settlement constitutes a reasonable compromise." *Grant v. Bethlehem Steel Corp. v. Bethlehem Steel Corporation*, 823 F.2d 20, 23 (2d Cir. 1987).   "Because class actions are rife with potential conflicts of interest between class counsel and Class Members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole."  *Mirfashi v. Fleet Mortgage Corp.,* 356 F.3d 781, 785 (7th Cir. 2004).

"Careful scrutiny by the court is 'necessary to guard against settlements that may benefit the class representatives or their attorneys at the expense of the absent class members.'" *Holmes v. Cont'l Can Co*., 706 F.2d 1144, 1147 (11th Cir. 1983) (quoting *U.S. v. City of Miami*, 614 F.2d 1322, 1331 (5th Cir. 1980), modified on other grounds, 664 F.2d 435 (5th Cir. 1981) (*en banc*)). "[T]he district judge has a heavy duty to ensure that any settlement is 'fair, reasonable, and adequate' and that the fee awarded plaintiffs' counsel is

1

entirely appropriate." *Piambino v. Bailey*, 757 F.2d 1112, 1139 (11th Cir. 1985). This duty is "akin to the high duty of care that the law requires of fiduciaries." *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1320 (S.D. Fla. 2007) (quoting *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652 (7th Cir. 2006))

Claiming a settlement is at "arm's length" without express collusion is not sufficient. Due to the defendants' indifference as to the allocation of funds between the class, the named representatives, and class counsel, it is enough that the settlement evinces "subtle signs that class counsel have allowed pursuit of their own self-interest and that of certain class members to infect the negotiations." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 718 (6th Cir. 2013). *Accord., Piambino*, 757 F.2d at 1143 (noting defendants are "uninterested in what portion of the total payment will go to the class and what percentage will go to the class attorney.") (quoting *Foster v. Boise-Cascade, Inc.*, 420 F. Supp. 674, 686 (S.D. Tex. 1976), aff'd 577 F.2d 335 (5th Cir. 1978)).

"In reviewing a proposed settlement, a court should not apply any presumption that the settlement is fair and reasonable." Am. Law Institute, Principles of the Law of Aggregate Litig. § 3.05(c) (2010) ("ALI Principles"). "The burden of proving the fairness of the settlement is on the proponents." *Pampers*, 724 F.3d at 718 (compiling cases and authorities); see also *Holmes*, 706 F.2d at 1147.

A higher level of scrutiny is necessary when a settlement is proposed before class certification. *See In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 786-807 (3d Cir. 1995) ("GM Trucks"). The Court should be mindful that "the class settlement process is 'more susceptible than adversarial adjudications to certain types of abuse.'" *Holmes*, 706 F.2d at 1147 (quoting *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1169 (5th Cir. 1978)).

The six-factor test in *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984), while often considered a guide to evaluation of class action settlements, is not exhaustive and does not provide an exclusive list of reasons to reject a settlement. *See Leverso v. Southtrust Bank,* 18 F.3d 1527, 1530-31 (11th Cir. 1994) (concluding the district court abused its discretion despite "thoroughly address[ing]" all six factors and concluding that each weighed

2

in favor of approval). This Circuit requires that district courts "always consider the possibility that that an agreement reached by the class attorney is not in the best interest of the class," and beware of settlements that enrich class counsel more than the class. *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1215-16 (5th Cir. 1978). See also *Piambino*, 757 F.2d at 1140 ("The district court should have rejected the settlement as unfair because it was accomplished at the expense of the minority members of the plaintiff-class, primarily to provide Lead Counsel an attorney's fee.").

Courts may refuse to approve a settlement if insufficient notice is provided to Class Members to protect their due process rights. Fed. R. Civ. Proc. 23(e)(1) specifies that "direct notice" of a proposed settlement must be provided "in a reasonable manner to all Class Members who would be bound by the proposal."

## II.   ARGUMENT AND OBJECTIONS

### A.  The Settlement Consideration is Unclear

In describing the benefits of the Settlement, Class Counsel's Motion for Final Approval and Application for Attorneys' Fees states:

> "This settlement resolves claims of 1,340,157 American homeowners by making available just over $515 million in benefits. The monetary award will provide the settlement class more than $281 million in monetary relief, which constitutes 50% to 100% of the best-case scenario damages recoverable by the class had the parties proceeded to trial. The injunctive portion mandates an end to force-placed insurance practices which is valued at more than $234 million."

Dkt. 182, page 2.  These sweeping claims wither upon closer scrutiny.

#### 1.  *The Value of the Settlement to Individual Class Members*

Class Notice informs us that individual class members may receive either cash or a credit on an outstanding bill for 11% of the net premium charged for lender-purchased (or forced) insurance if applied prior to March 24, 2012, or 7% of the net premium charged after March 24, 2012, but before March 17, 2014 (the end of the Class Period).  For most states the class period stretches forward from January 1, 2008, but started earlier in a handful of other states, with the Ohio class period beginning the earliest, in 1998.  To qualify to receive either the cash or credit, the insurance premium must either have been paid or still be outstanding,

and cannot have been discharged through a foreclosure, settlement or bankruptcy.

11% of the premium (or 7% for the later period) is not a good result for individual class members. Although Class Counsel claim the aggregate consideration is 50% to 100% of damages recoverable at trial, review of the First Amended Complaint undermines their claim.

The First Amended Complaint alleges Mr. Fladell was billed several thousand dollars, frequently, for insurance premiums he did not owe, for the $191,000 mortgage he obtained on his home from World Savings Bank in January of 2007 (which eventually became part of Wells Fargo). He was billed for this forced insurance even though he maintained hazard and flood insurance as required by the mortgage contract at all times.

Beginning in October of 2007 Fladell received notices saying his insurance was insufficient, and eventually was charged $2,561.29 for force-placed insurance. After Mr. Fladell submitted proof he had the proper insurance, the force-placed policy was cancelled and the notices ceased – for a few months anyway. In late 2008, he received similar notices again. In December of 2009, Wells Fargo force-placed a hazard insurance policy with a $2,542.59 premium, which was backdated to August 2009 and covered a one-year period. Although Mr. Fladell had continued to maintain the flood insurance, in April 2009, he received notices from Wells Fargo indicating he did not have sufficient flood insurance as required by his mortgage. Again, in March of 2012, Mr. Fladell received a notice indicating a sixty-day flood insurance binder had been force-placed on his home. This force-placed policy was backdated to February 11, 2012, and covered the sixty-day period ending on April 11, 2012. The premium for this policy was $2,301.75. FAC, Dkt 147, ¶¶ 50 – 56.

Class Representative Sarah Crouch's experience was similar. She received several threatening notices frequently, and was billed even higher premiums, often retroactively for periods that had already passed -- including $4,671.61 in 2012. FAC, Dkt 147, ¶¶ 59-73. Both Mr. Fladell and Ms. Crouch had at least some of the charges reversed. So the first question becomes, what about those homeowners who were able – after much frustration and extensive correspondence – to have their charges reversed? These individuals should be compensated for the harassment and distress Wells Fargo's policies caused.

Class Counsel claim the 11% refund or credit class members will receive adequately compensates them for the excessive costs of the insurance premium; it is not. "Wells Fargo never disclosed that the premium's excessive price included costs for kickbacks and unearned commissions, or administrative costs performed by the vendor." FAC, Dkt 147, ¶ 57. In the Motion for Final Approval Class Counsel state that the illegal commissions charged was 11%. Dkt. 182, page 18. Not that the 11% constitutes full damages as the policies may <u>not</u> have been competitive with market pricing and there may have been additional undisclosed expense associated with these policies. These policies may also have been unnecessary, in which case the entire premium should fairly be calculated as damages.

The class information does not advise as to the statutory value of individual class members' claims. The allegations include breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, breach of fiduciary duty, tortious interference with a business relationship, and violations of Florida's Deceptive and Unfair Trade Practices Act, the national Truth in Lending Act, the Bank Holding Company Act, and the federal RICO statute. Class members are not informed that certain violations of TILA may entitle them to statutory minimum damages, and that RICO violations may entitle them to treble damages. See 15 U.S.C. § 40; 18 U.S.C. § 1961–1968. Although the amount individual class members, or the class may obtain is speculative, class members should at least be informed as to these basic facts regarding the allegations and potential damages.

### 2. *The Aggregate Value of the Settlement is Unclear*

The aggregate settlement value is unknown. The Class Notice and Settlement Agreement provide general conclusory information about the monetary value of the Settlement. The Notice states "The total cash benefit available to Settlement Class Members exceeds $250 million." Notice, Page 5, Section 7). The phrasing here is careful -- "available to" the Class, does not mean the Class will get $250 million.

The large theoretical benefits mean nothing. Class Counsel claim the settlement will provide $281 million in monetary relief, this is wildly optimistic. This is a "claims-made" settlement, and the Class will only benefit to the extent Class Members can substantiate their

5

claims to the satisfaction of the Settlement Administrator.

Information provided by Wells Fargo indicates they really have little sense of how much is at stake even if all class members submitted valid claims. The Final Approval Motion explains that Wells Fargo's systems do not differentiate among borrower payments made to an escrow account for taxes, insurance, or other escrows, so there is no easy way to determine how much individual class members may claim under the terms.[1] Class Counsel have not done sufficient work to determine how much individual claims are worth. The class has approximately 1,340,157 members. Wells Fargo apparently provided 2,548,182 names and addresses of 2,548,182 potential class members to the settlement administrator; after de-duping and checking national change of address databases, the administrator mailed the notice packets to 1,340,157 class members. See Declaration of Jennifer Keough, Garden City Group, Dkt. 182-2. Although the Declaration includes information on the number of requests for exclusion received (76 valid exclusion requests had been received as of July 30; and 7 invalid exclusion requests), the Declaration is silent how many class members have submitted claims thus far. This lack of information underscores the uncertainty as to the total benefit the Settlement will provide to the Class

### 3. *The Claims Process Appears Unduly Burdensome*

The uncertainty as to the amount the class will receive is exacerbated by what appears to be an onerous claims process. Individuals who believe they are members of the Class can

---

[1] Specifically, the Motion for Final Approval States: "Discovery taken by Plaintiffs' counsel over the past two and a half years regarding the MSP system used by Wells Fargo has confirmed MSP's limited capabilities with regard to system-wide queries. In *Williams v. Wells Fargo Bank, N.A.,* No. 11-cv-21233-RNS (S.D Fla.), sworn testimony showed that "[w]ithout a borrower-by-borrower manual examination of each loan file, [the MSP system] cannot accurately determine the universe of borrowers who were 'charged' for lender placed insurance, those who 'paid' for lender placed insurance, those who still owe Wells Fargo Bank for lender placed insurance premiums, and those who may have entered into loan modification, short sale, refinance, or other agreements with Wells Fargo Bank." See *Williams*, (D.E. 307 Exhibit A at 2). Wells Fargo's Rule 30(b)(6) representative testified that the review could range from "maybe a few hours" to "four to five hours" per loan. *See Williams*, (D.E. 307 at Exhibit B at 46:16-19) (If the loan was still active and that information is readily available on our system, I would say review would take maybe a few hours. If it is an older loan that is no longer viewable on our system, then that review process would probably double up to probably four to five hours because we would be working off of paper to calculate those dollar amounts as well as retrieving archived documents in order to complete our review."). Accordingly, any manual review of 1,340,157 Wells Fargo borrower files (accounting for over 2.5 million insurance policies) would take a significant amount of time and manpower." Dkt. 182, page 20.

not download a blank claim form from the settlement website; instead, they must submit personal identifying information and wait for this information to be processed.  See *https://cert.tgcginc.com/wfi/pocdownload.php*.

The website implies that if you did not receive a claim form in the mail you cannot submit a claim form.  The Claim Form page on the website includes this instruction regarding acquiring a claim form:

> If you received a Claim Form by mail and need another copy of a Claim Form to submit:
>
> - **Click here to download and view a Personalized Claim Form**
>
> Click here to review a copy of the Claim Form Instructions you received in the Notice Packet sent by mail.

This implies all class members received notices through the mail; notwithstanding the parties' best efforts to contact class members, this cannot possibly be true given the size of the class and the large number of foreclosures that occurred during the class period.  The claims submission process also seems burdensome given it requires that regarding proof of identity, even extending to requiring signatures of a notary in certain instances.  This is not typical in Class Action settlements, and indicates an attempt to burden, and limit valid claims.  It cannot be stressed enough, in a claims made settlement, the defendant has a very strong interest in limiting the number of claims.  This is not established that will be paid to the class; any moneys not paid to the Class will remain with the Defendant.

A burdensome claims process was one of the problematic features of the settlement recently overturned in *Eubank v. Pella Corp.,* 2014 WL 2444388, --- F.3d ---- (2014).  There class counsel claimed the value of the settlement to the class was $90 million.  When claims were accounted for, but the value of the settlement for the class was between $1.5 million and $8.5 million – a fraction of class counsel's representations to the court as to the settlement's value.  As in many class action settlements, the claims rate in *Eubank* was extremely low.  In part this was due to a difficult claims process.  The court noted, "The settlement strews obstacles in the path of any owner of a defective Proline Series casement window [the product at issue in that case]."  Among the "obstacles" the court discussed were confusing claim forms requiring claimants "submit a slew of arcane data" and "claim forms . . . so

7

complicated that Pella could reject many because the claimant had not filled out the form completely and correctly. And that's assuming class members even attempt to file claims." *Eubank*, at *7-9. The obstacles here are similar, and suggest that the court that the court should be skeptical about the total value of the Settlement to the Class.

Class Counsel rely heavily on this court's final approval of the settlement in *Saccoccio v. JPMorgan Chase Bank, N.A.*, No. 13-cv-21107 (S.D. Fla.). That decision is on appeal and approval of the Settlement may be reversed. As in *Saccoccio*, Class Counsel have not provided sufficient information to evaluate this Settlement. Without knowing the number of valid claims submitted the court cannot make a determination about the fairness of the Settlement. Class members must be provided with all material information, including the total value. The court should defer approval and the award of attorneys' fees until after the claims submission deadline.

### B.  The Attorney's Fees

$19 million in fees is excessive. Class Counsel claim this fee "would amount to only 6.8% of the monetary recovery and less than 3.7% of the overall benefits to the class, and is well within the parameters established by the Eleventh Circuit." Dkt. 182, page 3. This statement is misleading. Despite Class Counsel's claims that the settlement offers over $515 million benefits to the class (including the value of the injunctive relief), at this point, we have no information enabling us to determine the monetary benefit the class will receive. $19 million will not be between 3.7% and 6.8% of the class' total monetary recovery. $19 million will likely exceed class recovery and the fee application must be delayed until the court reviews all actual claims data.

It is unfair to base fees on a theoretical fund, class counsel cite the Approval Order in the *Saccoccio* case, *supra* (noting "The attorneys' fees in a class action can be determined based upon the total fund, not just the actual payout to the class."), and *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 676 (1980). Some courts awarding fees on a percentage-of-recovery basis have based the award on an entire fund, not just the fund claimed by the class. E.g., *Boeing v. Van Gemert*, 444 U.S. 572 (1980) and *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1295-96 (11th Cir. 1999), cert. denied 530 U.S. 1223 (2000). There is not

8

even a fund.

The rule enunciated in *Boeing* and in this Circuit's holding in *Waters* needs to be evaluated in light of recent changes to the Federal Rules of Civil Procedure and the enactment of the Class Action Fairness Act in 2005 (28 U.S.C. §1711 et seq.). In 2003 Congress amended Rule 23 with the creation of Rule 23(h). The new rules reflect a common-sense approach: attorneys' fees should be tied directly to what clients <u>receive</u> not potential benefits.

A fee award must be attuned to the result achieved for the class, to the money the settlement puts in class members' hands. See, e.g., *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 179 (3d Cir. 2013); *cf.* 28 U.S.C. §1712(a). The Advisory Committee Notes explicitly state that:

> "In a class action, the district court must ensure that the amount and mode of payment of attorney fees are fair and proper whether the fees come from a common fund or are otherwise paid. Even in the absence of objections, the court bears this responsibility.
>
> Courts discharging this responsibility have looked to a variety of factors. **One fundamental focus is the result actually achieved for class members, a basic consideration** in any case in which fees are sought on the basis of a benefit achieved for class members."

Notes of Advisory Committee on 2003 Amendments to Rule 23(h). The notes advise courts to exercise caution in awarding fees, even to the extent of deferring the award of fees until class recovery can be determined:

> In many instances, the court may need to proceed with care in assessing the value conferred on class members. Settlement regimes that provide for future payments, for example, may not result in significant actual payments to class members. In this connection, the court may need to scrutinize the manner and operation of any applicable claims procedure. In some cases, it may be appropriate to defer some portion of the fee award until actual payouts to class members are known.

*Id.*; *accord Baby Prods.*, 708 F.3d at 179.

The continuing validity of *Boeing* and *Waters* is questionable. See, e.g., Samuel Isaacharoff, The Governance Problem in Aggregate Litigation, 81 FORDHAM L. REV. 3165, 3171-72 (2013) (describing *Boeing* as marking an "older line of cases" that eventually

"prompted legislative rejection of compensating lawyers on the face value of the settlement, regardless of the take-up rate of the benefits by class members").

Even before Rule 23(h), *Boeing* and *Waters* did not apply where "no money was paid into escrow or any other account" and each member of the class has no claim to a set piece of the "lump-sum judgment." *Strong v. BellSouth Telcoms.,* 137 F.3d 844, 852 (5th Cir. 1998); *Waters*, 190 F.3d at 1296 ("[U]nlike the case at bar, Strong never established a "common fund" from which money would be drawn. The parties here established that $ 40 million was the fund upon which the individual claimants' awards would be based.") As there is no real common fund established, even before Rule 23(h) *Boeing* and *Waters* would not have supported the approach adopted here.

Long before the adoption of Rule 23(h), courts deferred or staggered fees to account for success or failure of the claims process. E.g., *Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F. Supp. 375, 380 (D. Mass. 1997); *Bowling v. Pfizer, Inc.,* 922 F. Supp. 1261, 1283-84 (S.D. Ohio 1996), *aff'd Bowling v. Pfizer, Inc.*, 102 F.3d 777 (6th Cir. 1996).

Speculative, maximized estimates are not the appropriate measure of benefit. *Baby Prods.*, 708 F.3d at 179 n.13 ("[T]he actual benefit provided to the class is an important consideration when determining attorneys' fees."); Federal Judicial Center, Manual for Complex Litigation § 21.71 (4th ed. 2004) ("In cases involving a claims procedure…, the court should not base the attorney fee award on the amount of money set aside to satisfy potential claims. Rather the fee should be based only on the benefits actually delivered."); see also *Pampers*, 724 F.3d at 721 (rejecting settlement-value "assumptions…premised upon a fictive world").

Where claims rates are especially low, courts have often adjusted fees downwards. See, e.g., *Pearson v. Nbty, Inc.*, No. 11-cv-7972, 2014 U.S. Dist. LEXIS 357, at *21-*27 (N.D. Ill. Jan. 3, 2014) (reducing 25% benchmark to 9.6% based on low claims rates); *Michel v. Wm Healthcare Solutions*, 2014 U.S. Dist. LEXIS 15606 (S.D. Ohio Feb. 7, 2014) (reducing from 33.3% request to 15% where claims rate was only 3.9%); *Tarlecki v. Bebe Stores, Inc.*, No. C 05-1777 MHP, 2009 U.S. Dist. LEXIS 102531, at *12 (N.D. Cal. Nov. 3, 2009) (reducing fee request to less than 13%). Alternatively, a trial court can determine that

"a more reasonable fee results from calculating a percentage of the actual recovery." *Wise v. Popoff*, 835 F. Supp. 977, 982 (E.D. Mich. 1993); *Waters*, 190 F.3d at 1296 (reciting the holding of *Strong v. BellSouth Telecomms.*, Inc., 137 F.3d 844 (5th Cir. 1998)).

The recent *Eubank v. Pella* is prescient. In that case, class counsel claimed the value of the settlement to the class was $90 million, but when claims were accounted for the settlement value was more between $1.5 and $8.5 million. The trial court had accepted class counsel's representations about the aggregate value of the settlement, and awarded attorney's fees well in excess of the recovery achieved by the class. Justice Posner remarked:

> "Not only did the settlement agreement not quantify the benefits to the class members, but the judge approved it before the deadline for filing claims. He made no attempt to estimate how many claims were likely to be filed, though without such an estimate no responsible prediction of the value of the settlement to the members of the class could be made."

*Eubank*, at *6. The court should be concerned as to the fairness of the fees requested where Counsel have not submitted lodestar information for the court's review. This Circuit may follow a percentage of the fund method in common fund cases, but where there is no "fund" the court should require substantiation of the attorney's work. The court should not just rubber stamp an award of $19 million in attorneys' fees based on Class Counsel's representations this represents only a small percentage of the benefits obtained for the class. Those benefits have yet to be determined.

The settlement under review in *Eubank v. Pella Corp*., compensated class counsel and class representatives but left the compensation of the class unclear. In *Eubank*, Justice Posner highlighted the important role that objectors play in appealing inequitable settlements:

> "In this case, despite the presence of objectors, the district court approved a class action settlement that is inequitable—even scandalous. The case underscores the importance both of objectors (for they are the appellants in this case—without them there would have been no appellate challenge to the settlement) and of intense judicial scrutiny of proposed class action settlements."

*Eubank*, at *3.

11

In *Eubank*, Justice Posner concluded: "Class counsel sold out the class." *Eubank*, at *10. The Court should keep the inherent conflict between the interests of class counsel and class members in mind in evaluating the Settlement.

### III.  JOINDER IN OTHER OBJECTIONS

Objector joins in and adopts the Jabrani objection (Doc 190) as though fully set forth here, and all other well-founded and meritorious objections.

### IV.  CONCLUSIONS

For the foregoing reasons and all others to be presented at oral argument, these objectors request that the court sustain their objections and grant the following relief:

- Upon proper hearing, sustain these Objections.
- Upon proper hearing, enter such Orders as are necessary and just to alleviate the inherent unfairness, inadequacies and unreasonableness of the Settlement.

Dated: August 19, 2014                SWEENEY LEGAL GROUP, S.C.

By: /s/ Patrick Sweeney_____
Patrick Sweeney (FL Bar No. 593486)
Sweeney Legal Group, S.C.
750 South Dixie Highway
Boca Raton, FL 33432
Phone: (561) 395-0000
Fax: (561) 395-9093
Email: Patrick@sweeneylegalgroup.com
Attorney for Objector James H. Kirby IV

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2014, I electronically filed the foregoing with the Clerk of the Court of the United States District Court for the Southern District of Florida by using the USDC CM/ECF system.

I certify that participants in the case who are registered CM/ECF users that service will be accomplished by the USDC CM/ECF system, including, but not limited to:

**CLASS COUNSEL**
Adam M. Moskowitz
Email: AMM@kttlaw.com

**COUNSEL FOR THE WELLS FARGO DEFENDANTS**
Michael J. Steiner
Email: mjs@severson.com

**COUNSEL FOR ASSURANT DEFENDANTS**
Frank G. Burt
Email: fburt@cfjblaw.com
Farrokh Jhabvala
Email: fjhabvala@cfjblaw.com

I further certify that the following participant was served via U.S. Mail, postage prepaid:

**COUNSEL FOR QBE DEFENDANTS**
Robyn C. Quattrone
BuckleySandler LLP
1250 24th Street, NW, Suite 700
Washington, DC 20037

           ___/s/ Patrick Sweeney
           Patrick Sweeney