## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 13-60721-CIV-MORENO/OTAZO-REYES

IRA MARC FLADELL, *et al.*,
on behalf of themselves and all
others similarly situated,

      Plaintiffs,

v.

WELLS FARGO BANK, N.A., *et al.*,

      Defendants.

_____/

### DEFENDANTS' JOINT RESPONSE IN OPPOSITION
### TO OBJECTIONS TO THE CLASS ACTION SETTLEMENT

SEVERSON & WERSON
A Professional Corporation
Michael J. Steiner (*pro hac vice*)
mjs@severson.com
Mark D. Lonergan (*pro hac vice*)
mdl@severson.com
One Embarcadero Center, Suite 2600
San Francisco, California 94111
Telephone: (415) 677-5611
Facsimile: (415) 956-0439

*Attorneys for Defendants Wells Fargo Bank,*
*N.A., and Wells Fargo Insurance, Inc.*

BUCKLEYSANDLER LLP
Robyn C. Quattrone (*pro hac vice*)
rquattrone@buckleysandler.com
Amanda M. Raines (*pro hac vice*)
araines@buckleysandler.com
1250 24th Street NW, Suite 700
Washington, DC 20037
Telephone: (202) 349-8000
Facsimile: (202) 349-8080

*Attorneys for Defendants QBE Specialty*
*Insurance Company, QBE Insurance*
*Corporation, QBE First Insurance Agency,*
*Inc., QBE Financial Institution Risk Services,*
*Inc., Praetorian Insurance Company*

CARLTON FIELDS JORDEN BURT, P.A.
Frank G. Burt (Fla. Bar No. 197963)
fburt@cfjblaw.com
Farrokh Jhabvala (Fla. Bar No. 765155)
fjhabvala@cfjblaw.com
Landon K. Clayman (Fla. Bar No. 283576)
lclayman@cfjblaw.com
100 S.E. Second Street
Miami Tower, Suite 4200
Miami, Florida 33131-2113
Telephone: (305) 530-0050
Facsimile: (305) 530-0055

*Attorneys for Defendants Assurant, Inc.,*
*American Security Insurance Company,*
*Voyager Indemnity Insurance Company, and*
*Standard Guaranty Insurance Company*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

OVERVIEW OF THE OBJECTORS ................................................................................2

APPLICABLE LEGAL STANDARD ..............................................................................6

RESPONSE TO OBJECTIONS ........................................................................................7

I.    The Settlement's Claims Process Is Not Only Necessary To Distribute Monetary Relief To Class Members, It Is Superior To The Objectors' Preferred Alternative ...............................................................................................7

    A.    The Preoccupation With A Single Facet Of The Settlement Is Misguided ......................................................................................................7

    B.    A Claims Process Is The Only Practicable Means Of Offering Relief .............................................................................................................9

        1.    Defendants Cannot Systematically Identify Settlement Class Members Who Paid A Portion Of Their LPI Charges ...........9

        2.    The Claim Form Helps Ensure That Only Aggrieved Individuals Receive Monetary Relief Under The Settlement ........14

        3.    Defendants Cannot Systematically Identify Settlement Class Members Whose Claims Belong To Their Bankruptcy Estates.........................................................................15

        4.    The Claims Process Reduces Fraud, Waste, And Abuse..............15

    C.    The Claims Process Gives Every Class Member The Opportunity To Receive A Near-Complete (Or Better) Recovery.................................17

    D.    The Settlement's Claim Participation Rate Is Neither Final Nor Necessary To Evaluate The Settlement's Fairness ....................................17

II.    The Settlement Provides Valuable Injunctive Relief.............................................19

    A.    The Nationwide Injunction Imposed By This Settlement Is Further Reaching In Scope And Certainty Than Any Regulatory Action.............19

    B.    Professor Levitin's Legal Conclusions Are Inadmissible.........................21

III.    Objections Regarding "Clear-Sailing" And "Kicker" Provisions Are Unfounded..............................................................................................................22

IV.    Neither The Claim Form Nor Class Notice Are "Deficient" Or "Burdensome"........................................................................................................24

V.    The Settlement Properly Releases Claims Related To Wind Insurance ...............27

VI.    To Be Approved, The Settlement Need Not Consider Every Conceivable
       Way In Which Defendants Were Supposedly Unjustly Enriched .........................29

VII.   The Other Objections Are Meritless ......................................................................31

VIII.  The Seventh Circuit's *Eubank* Decision Is Distinguishable ..................................34

CONCLUSION .........................................................................................................................35

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Association For Disabled Americans, Inc. v. Amoco Oil Co.*,
    211 F.R.D. 457 (S.D. Fla. 2002) ...................................................................6

*Behrens v. Wometco Enterprises*, 118 F.R.D. 534 (S.D. Fla. 1988)..............................31

*Blessing v. Sirius XM Radio Inc.*, 507 F. App'x 1 (2d Cir. 2012) ...................................5

*Casey v. Citibank, N.A.*, No. 12-820-CIV,
    2014 WL 4120599 (N.D.N.Y. Aug. 21, 2014)............................................ *passim*

*Casey v. Citibank, N.A.*, No. 12-820-CIV
    (N.D.N.Y. Aug. 21, 2014) (ECF No. 222) ...........................................................3

*In re Checking Account Overdraft Litigation*,
    830 F. Supp. 2d 1330 (S.D. Fla. 2011)..........................................................5, 32

*Circeo-Loudon v. Green Tree Servicing LLC*, No. 14-21384-CIV,
    2014 WL 4219587 (S.D. Fla. Aug. 25, 2014) .....................................................8

*Cochran-May v. Wells Fargo Bank, N.A.*,
    No. 12-240-CIV (S.D. Tex. May 21, 2014) (ECF No. 145) .................................3

*Cohen v. American Security Insurance Co.*, 735 F.3d 601 (7th Cir. 2013)..................2, 8

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*,
    402 F.3d 1092 (11th Cir. 2005) ........................................................................22

*In re Corrugated Container Antitrust Litigation*, 643 F.2d 195 (5th Cir. 1981) ..........28

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977)................................................6, 30, 33

*Date v. Sony Electronics, Inc.*,
    No. 07-15474-CIV, 2013 WL 3945981 (E.D. Mich. July 31, 2013) ..................18

*Decambaliza v. QBE Holdings, Inc.*,
    No. 13-286-CIV, 2013 WL 5777294 (W.D. Wis. Oct. 25, 2013).........................9

*De Leon v. Bank of America, N.A.*,
    No. 09-1251-CIV, 2012 WL 2568142 (M.D. Fla. Apr. 20, 2012).......................18

*In re Dennis Greenman Securities Litigation*, 622 F. Supp. 1430 (S.D. Fla. 1985)......................31

*Diaz v. HSBC Bank USA, N.A.*,
    No. 13-21104-CIV, 2014 WL 1218701 (S.D. Fla. Mar. 24, 2014).......................3

*In re Diet Drugs Products Liability Litigation*, 93 F. App'x 338 (3d Cir. 2004).........13

*In re Domestic Air Transportation Antitrust Litigation*,
    148 F.R.D. 297 (N.D. Ga. 1993) .................................................................31, 32

*In re Educational Testing Service Praxis Principles of Learning & Teaching*,
MDL No. 1643, 2006 WL 3332829 (E.D. La. Nov. 15, 2006) ...........................................16

*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014) .............................................................34, 35

*Fallick v. Nationwide Mutual Insurance Co.*, 162 F.3d 410 (6th Cir. 1998) ...............................28

*Faught v. American Home Shield Corp.*, 668 F.3d 1233 (11th Cir. 2011) ............................26, 27

*Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098 (11th Cir. 2014) ...............................................2, 8

*Ferrington v. McAfee, Inc.*,
No. 10-1455-CIV, 2012 WL 1156399 (N.D. Cal. Apr. 6, 2012) ........................................18

*Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292 (S.D. Fla. 2007) ...................................5

*Gascho v. Global Fitness Holdings, LLC*,
No. 11-436-CIV, 2014 WL 1350509 (S.D. Ohio Apr. 4, 2014) ................................. *passim*

*Gascho v. Global Fitness Holdings, LLC*,
No. 11-436-CIV, 2014 WL 3543819 (S.D. Ohio July 16, 2014) .............................4, 23, 24

*In re General American Life Insurance Co. Sales Practices Litigation*,
357 F.3d 800 (8th Cir. 2004) ................................................................................................30

*Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529 (C.D. Cal. 2013) .................10, 14

*Hainey v. Parrott*, 617 F. Supp. 2d 668 (S.D. Ohio 2007) ...........................................................23

*Hall v. Midland Group*, No. 99-3108-CIV,
2000 WL 1725238 (E.D. Pa. Nov. 20, 2000) ........................................................................7

*Ingram v. Coca-Cola Co.*, 200 F.R.D. 685 (N.D. Ga. 2001) .........................................................23

*Johnson v. Bush*, No. 00-3542-CIV, 2002 WL 34355953 (S.D. Fla. Apr. 19, 2002) ..................22

*In re JP Morgan Chase Hazard LPI Litigation*,
No. 11-3058-CIV, 2013 WL 3829271 (N.D. Cal. July 23, 2013) .........................................3

*Kunzelmann v. Wells Fargo Bank, N.A.*,
No. 11-81373-CIV, 2013 WL 139913 (S.D. Fla. Jan. 10, 2013) ...........................10, 12, 13

*Larsen v. Trader Joe's Co.*,
No. 11-5188-CIV, 2014 WL 3404531 (N.D. Cal. July 11, 2014) .........................................5

*In re Lawnmower Engine Horsepower Marketing & Sales Practices Litigation*,
733 F. Supp. 2d 997 (E.D. Wis. 2010) ..........................................................................15, 16

*In re Law Office of Jonathan E. Fortman, LLC*,
No. 13-42-CIV, 2013 WL 414476 (E.D. Mo. Feb. 1, 2013) .................................................3

*Lee v. Ocwen Loan Servicing*, No. 14-60649-CIV (S.D. Fla. June 13, 2013) .................................3

iv

*In re Lender Force-Placed Insurance Litigation*,
   895 F. Supp. 2d 1352 (J.P.M.L. 2012) ................................................................29

*Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005) ......................30, 31, 33

*Lonardo v. Travelers Indemnity Co.*, 706 F. Supp. 2d 766 (N.D. Ohio 2010) ............................14

*In re Managed Care Litigation*,
   MDL No. 1334, 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003) ............................................6

*Mangone v. First USA Bank*, 206 F.R.D. 222 (S.D. Ill. 2001) ...................................16, 24, 25, 26

*Marcus v. BMW of North America*, 687 F.3d 583 (3d Cir. 2012) .................................................28

*Matsushita Electric Industrial Co. v. Epstein*, 516 U.S. 367 (1996) ............................................28

*Miller v. Republic National Life Insurance Co.*, 559 F.2d 426 (5th Cir. 1977)............................33

*Montoya v. PNC Bank, N.A.*,
   No. 14-20474-CIV, 2014 WL 4248208 (S.D. Fla. Aug. 27, 2014)............................2, 8, 14

*In re Nissan Motor Corp. Antitrust Litigation*, 552 F.2d 1088 (5th Cir. 1977)............................26

*Parker v. Wendy's International, Inc.*, 365 F.3d 1268 (11th Cir. 2004)........................................15

*Pelletz v. Weyerhaeuser Co.*, 255 F.R.D. 537 (W.D. Wash. 2009) .............................................25

*Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360 (S.D. Fla. 2007) ....................................................6

*In re Pet Food Products Liability Litigation*, 629 F.3d 333 (3d Cir. 2010) .................................34

*In re Prudential Insurance Co. America Sales Practice Litigation*,
   148 F.3d 283 (3d Cir. 1998) ..............................................................................................23

*In re Remeron End-Payor Antitrust Litigation*,
   No. 02-2007-CIV, 2005 WL 2230314 (D.N.J. Sept. 13, 2005) ...........................................16

*Roberts v. Wells Fargo Bank, N.A.*,
   No. 12-200-CIV, 2013 WL 1233268 (N.D. Ga. Mar. 27, 2013)............................................9

*Rothstein v. GMAC Mortgage, LLC*,
   No. 12-3412-CIV, 2014 WL 1329132 (S.D.N.Y. Apr. 3, 2014)............................................9

*Rubin v. Assicurazioni Generali S.P.A.*, 290 F. App'x 376 (2d Cir. 2008) ..................................33

*Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180 (10th Cir. 2002)................................32

*Saccoccio v. JP Morgan Chase Bank, N.A.*,
   No. 13-21107-CIV, 2014 WL 3738013 (S.D. Fla. July 28, 2014)................................18, 32

*Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683 (S.D. Fla. 2014) .................... *passim*

*Saccoccio v. JP Morgan Chase Bank, N.A.*,
   No. 13-21107-CIV, 2013 WL 5585230 (S.D. Fla. Oct. 9, 2013)............................................3

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011)........................................ *passim*

*Shames v. Hertz Corp.*, No. 07-2174-CIV, 2012 WL 5392159
(S.D. Cal. Nov. 5, 2012) ..........................................................................................18, 23

*Singleton v. Wells Fargo Bank, N.A.*,
No. 12-216-CIV, 2013 WL 5423917 (N.D. Miss. Sept. 26, 2013) .......................................9

*In re Skinner Group, Inc.*, 206 B.R. 252 (Bankr. N.D. Ga. 1997) .................................................24

*Spencer v. Hartford Financial Services Group, Inc.*,
256 F.R.D. 284 (D. Conn. 2009) ....................................................................................34

*Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011) ...................................................18

*In re Terazosin Hydrochloride Antitrust Litigation*,
MDL No. 1317, 2005 WL 2451960 (S.D. Fla. July 8, 2005) ...............................................6

*Thomas v. Blue Cross & Blue Shield Association*, 333 F. App'x 414 (11th Cir. 2009)...............28

*Trombley v. National City Bank*, 826 F. Supp. 2d 179 (D.D.C. 2011) ..............................8, 13, 15

*Uhl v. Thoroughbred Technology & Telecommunications, Inc.*,
309 F.3d 978 (7th Cir. 2002)...........................................................................................8

*Ursomano v. Wells Fargo Bank, N.A.*,
No. 13-4381-CIV, 2014 WL 644340 (N.D. Cal. Feb. 19, 2014) .........................................3

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ......................................30

*Waters v. International Precious Metals Corp.*, 190 F.3d 1291 (11th Cir. 1999)........................23

*Williams v. Wells Fargo, N.A.*,
No. 11-21233-CIV (S.D. Fla. Sept. 11, 2013) (ECF No. 356)..............................................7

*Williams v. Wells Fargo Bank, N.A.*, 280 F.R.D. 665 (S.D. Fla. 2012).......................................10

*Zimmer Paper Products, Inc. v. Berger & Montague, P.C.*,
758 F.2d 86 (3d Cir. 1985) ............................................................................................18

**Statutes, Rules, And Regulations**

11 U.S.C. § 541 ............................................................................................................15

12 C.F.R. § 1024.17 ......................................................................................................21

12 C.F.R. § 1024.37 ......................................................................................................21

Fed. R. Civ. P. 23, 2003 advisory comm. note ...................................................22, 24

Fla. R. of Prof'l Conduct 4-8.4 ......................................................................................4

Fla. Stat. § 627.712(1)..................................................................................................27

**Miscellaneous**

*Manual for Complex Litigation (Fourth)* § 21.643 (2004) ............................................................3

Douglas E. Abrams, *Plagiarism in Lawyers' Advocacy: Imposing Discipline for Conduct Prejudicial to the Administration of Justice*, 47 Wake Forest L. Rev. 921 (2012) ...............4

Lender Placed Insurance, Terms and Conditions, 78 Fed. Reg. 19,263-01 (Mar. 29, 2013) ........20

2 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 6:18 (10th ed. 2014) ........................32

Defendants herein jointly submit the following response in opposition to the objections to the Settlement in the above-captioned class action.[1]

## INTRODUCTION

This Settlement has met with near-universal approval.  The Settlement Class consists of 1,340,157 persons whose properties were covered during the Class Period by hazard, flood, flood gap, or wind-only lender-placed insurance ("LPI") policies issued by certain of the Assurant and QBE Defendants and purchased by certain of the Wells Fargo Defendants.  ECF No. 182-2 ¶ 8. In *any* class of this size, it would be no surprise if a settlement produced numerous objections. Yet here, only 148 Class Members have excluded themselves from the Settlement and only 12 objections were filed by 21 Class Members – about 0.0016% of the Class.  Tellingly, 15 objectors are represented by lawyers who seek to gain personally by frustrating the Settlement. Neither the United States Attorney General, the Director of the Consumer Financial Protection Bureau, nor a single state attorney general or insurance commissioner objected, although they were notified of the opportunity to do so.  These are powerful indicia that the Settlement is fair, reasonable, and adequate and deserves final approval.

Moreover, the Settlement is extremely generous, providing relief rivaling a trial win and, in many cases, better than a trial win.  In LPI class actions like this, plaintiffs have not challenged the right to place LPI or sought the return of the entire LPI charge, seeking only the portion of the charge allegedly "inflated" by Defendants' commission payments.  Here, until spring 2012, the commissions that supposedly "inflated" the charges were 11% of the net written premium; no commissions were paid after spring 2012.  ECF No. 108-3 ¶ 9; ECF No. 182 at 17. The Settlement provides eligible Class Members with monetary relief equaling (i) 11% of the net written premium if the LPI charge occurred prior to March 24, 2012; or (ii) 7% of the amount if the LPI charge occurred after that date.  For example, Named Plaintiff Greg Olson alleges that in 2010 he was charged and paid $5,395.46 for hazard LPI.  ECF No. 155-1 ¶¶ 80-82.  Under the Settlement's terms, Mr. Olson may recover $593.50, essentially *all* of the amount to which he would otherwise have to prove entitlement at trial.  In addition, Defendants agree not to engage in certain business practices for at least five years after the Final Settlement Date.

---

[1] Unless otherwise indicated, all capitalized terms used herein have the same defined meaning assigned to them in the Stipulation and Settlement Agreement.  *See* ECF No. 182-1 ¶¶ 2.1-2.34.

Even if a Class Member did not pay any part of the charged premium, that Class Member is nevertheless entitled to participate in the Settlement's monetary benefits, the only difference being the manner in which relief is provided.  Those who paid less than the full amount – or even none – of their LPI charges thus stand to receive *more* than they could receive through a verdict. Class Members are eligible to receive monetary relief merely by submitting a streamlined Claim Form and confirming their identity in one of four ways.  Detailed information – like coverage periods, total charges, or amounts paid – need not be supplied.  To the contrary, although Defendants reserve the right to sample audit for fraud, the Parties will simply accept as truth a Class Member's affirmation as to whether they were charged for LPI or paid an LPI charge.

Notably, every Class Member has a right to participate in the Settlement's monetary benefits despite the federal courts' sharp disagreement as to whether the underlying theory of liability even states a valid claim.  Indeed, there is "no doubt that recent federal appellate decisions have changed the climate for Plaintiffs' class action attorneys pursuing force-placed insurance claims."  *Montoya v. PNC Bank, N.A.*, No. 14-20474-CIV, 2014 WL 4248208, *2 (S.D. Fla. Aug. 27, 2014).  Both the Seventh and Eleventh Circuits have rejected "kickback" claims very similar to ones alleged here.  *See Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 604 (7th Cir. 2013); *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1110-1111 (11th Cir. 2014).  In addition, the Settlement allows for recovery to borrowers in those states that, under prior court rulings, could have received nothing because of the filed rate defense.

Against this backdrop, it is difficult to fathom the objectors' expressed concerns, although their retained counsels' interest in lodging the objections is self-evident.  Nor do the objectors explain why the Court should disavow its prior rulings in the comparable JP Morgan LPI class settlement approved in *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683 (S.D. Fla. 2014).  They instead recycle the same tired objections the Court overruled in *Saccoccio* as "laughable," "meritless," "misplaced," "specious," and "without the slightest hint of merit." 297 F.R.D. at 696-98.  Defendants thus respectfully request that the Court (again) overrule the objections and grant final approval of the Settlement.

## OVERVIEW OF THE OBJECTORS

***Cochran-May and Biddison Objectors.***  "[W]hen assessing the merits of an objection to a class action settlement, courts consider the background and intent of objectors and their counsel, particularly when indicative of a motive other than putting the interest of the class

members first." *In re Law Office of Jonathan E. Fortman, LLC*, No. 13-42-CIV, 2013 WL 414476, at *1 (E.D. Mo. Feb. 1, 2013).  "Objections may be motivated by self-interest rather than a desire to win significant improvements in the class settlement." *Manual for Complex Litigation (Fourth)* § 21.643 (2004).  The dual filings by Kessler Topaz Meltzer & Check, LLP on behalf of Tamara Cochran-May, ECF No. 194, and Mark Biddison, Thomas Butler, Kimberly Butler, Giovanni Canonico, and Denise Leska, ECF No. 217, exemplify such objections.

Disappointed by their failure to participate in the settlement of this and other LPI cases, Kessler Topaz now seeks to hold up LPI class settlements under the pretense of "improving" them.  The law firm has repeatedly attempted to subvert class settlements involving the Assurant Defendants and their servicer co-defendants, seeking to intervene in cases that are settling,[2] opposing the stay of settled cases,[3] filing lengthy objections,[4] and demanding settlement-related discovery.[5]  These efforts have been entirely in vain.  Indeed, this Court overruled Kessler Topaz's clients' identical objections to the JP Morgan LPI class settlement, including an objection to that settlement's use of a claims process, their principal objection here.  *Saccoccio*, 297 F.R.D. at 696-98.  Their clients' identical objections to the comparable Citibank LPI class settlement were likewise recently overruled and their demands for discovery denied.  *See Casey v. Citibank, N.A.*, No. 12-820-CIV, 2014 WL 4120599, at *2-3 (N.D.N.Y. Aug. 21, 2014).

To burnish their discredited arguments, the objectors rely on the conjecture of a law professor, Adam Levitin, who opines (among other things) it is "reasonable to assume" that Defendants can determine "with relative ease" which Class Members were charged and paid LPI charges and, thus, qualify for monetary relief under the Settlement's claims process.  ECF No. 217-1 ¶ 85.  Whatever his legal qualifications may be, Professor Levitin neither claims nor demonstrates familiarity with the electronic records system of *any* servicer, including the Wells

---

[2] *See, e.g.*, *Saccoccio v. JP Morgan Chase Bank, N.A.*, No. 13-21107-CIV, 2013 WL 5585230 (S.D. Fla. Oct. 9, 2013); *Diaz v. HSBC Bank USA, N.A.*, No. 13-21104-CIV, 2014 WL 1218701 (S.D. Fla. Mar. 24, 2014); *Lee v. Ocwen Loan Servicing*, No. 14-60649-CIV (S.D. Fla. June 13, 2013) (*Lee* ECF No. 75).

[3] *See, e.g.*, *Ursomano v. Wells Fargo Bank, N.A.*, No. 13-4381-CIV, 2014 WL 644340 (N.D. Cal. Feb. 19, 2014); *In re JP Morgan Chase Hazard LPI Litig.*, No. 11-3058-CIV, 2013 WL 3829271 (N.D. Cal. July 23, 2013); *Cochran-May v. Wells Fargo Bank, N.A.*, No. 12-240-CIV (S.D. Tex. May 21, 2014) (*Cochran-May* ECF No. 145).

[4] *See, e.g.*, *Saccoccio*, 297 F.R.D. 683; *Casey v. Citibank, N.A.*, No. 12-820-CIV (N.D.N.Y. Aug. 21, 2014) (*Casey* ECF No. 222).

[5] *See Casey v. Citibank, N.A.*, No. 12-820-CIV, 2014 WL 4120599 (N.D.N.Y. Aug. 21, 2014).

Fargo Defendants' unique electronic records system. He is nonetheless being compensated at the eye-popping rate of $800 an hour to speculate about Defendants' capabilities. *Id.* ¶ 19. If he testifies at the Final Approval Hearing, Professor Levitin will collect a $10,000 fee. *Id.*

Ms. Cochran-May and the Biddison objectors also rely on the conjecture of two other declarants, Arthur Olsen (a "data management expert," ECF No. 217-2 ¶ 1) and Rebecca Walzak (an "expert in the operations of mortgage loan originators and servicers," ECF No. 217-3 ¶ 1). Like Professor Levitin, neither Mr. Olsen nor Ms. Walzak demonstrate or claim familiarity with the Wells Fargo Defendants' capabilities or electronic records systems. *See generally* ECF No. 217-2 ¶¶ 1-11; ECF No. 217-3 ¶¶ 1-23. Like Professor Levitin, these "experts" nonetheless opine that Defendants can systematically distinguish between Class Members who actually paid for LPI and Class Members who were only charged. As shown below, they are mistaken.

***Jabrani Objectors.*** The objection filed on behalf of Amarili and Janet Jabrani is suspect not only for its questionable goal of disrupting the Settlement but for the means by which they hope to accomplish this. Much of their filing, ECF No. 222, is an extensive, verbatim cut-and-paste of at least two briefs written by another lawyer and filed in unrelated class settlements. *See Gascho v. Global Fitness Holdings, LLC*, No. 11-436-CIV (S.D. Ohio filed Dec. 27, 2013) (*Gascho* ECF No. 122); *Richardson v. L'Oreal USA, Inc.*, No. 13-508-CIV (*Richardson* ECF No. 19). Compare Exhibits B, C, and D to the Declaration of Frank G. Burt dated September 5, 2014 ("Burt Decl."), filed herewith. This is unfortunate, as "courts have labeled lawyers' plagiarism in court filings as 'reprehensible,' 'intolerable,' 'completely unacceptable,' and 'unprofessional.'" Douglas E. Abrams, *Plagiarism in Lawyers' Advocacy: Imposing Discipline for Conduct Prejudicial to the Administration of Justice*, 47 Wake Forest L. Rev. 921, 922 (2012). "Once massive copying of a public or private source appears," as it has here, "courts have found intentional 'dishonesty, fraud, deceit or misrepresentation' in violation of Model Rule 8.4(c)." *Id.* at 922; *cf.* Fla. R. of Prof'l Conduct 4-8.4(c). Moreover, "a lawyers' plagiarism in a submission to the court violates Model Rule 8.4(d) as conduct 'prejudicial to the administration of justice.'" 47 Wake Forest L. Rev. at 928; *cf.* Fla. R. of Prof'l Conduct 4-8.4(d). The Jabranis' appropriation is especially ironic given that the objection they most heavily copied was overruled by the court to which it was originally submitted. *See Gascho v. Global Fitness Holdings, LLC*, No. 11-436-CIV, 2014 WL 1350509, at *20-37 (S.D. Ohio Apr. 4, 2014), *report and recommendation adopted*, 2014 WL 3543819 (S.D. Ohio July 16, 2014).

***Vanskyock Objectors.***  "Peggy Pearson, Ashley Swain, Julie Vanskyock, and Melissa Yoho are plaintiffs in similar class actions against Wells Fargo in different states around the country: Washington, Ohio, Indiana, and Pennsylvania."  ECF No. 193 at 2.  As such they are among "the small and vocal minority of class members who have objected[,] fueled by would-be class counsel in competing lawsuits, so their objections are suspect."  *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1315 (S.D. Fla. 2007).  The Vanskyock objectors raise a scattershot of (repetitive) objections although they, like the Biddison objectors, principally take issue with the Settlement's claims process.  *See* ECF No. 193 at 2-8.

***Hinjosa.***  N. Albert Bacharach, Jr. represents objector Jennifer Hinjosa f/k/a Jennifer Deachin.  Mr. Bacharach has objected to a multitude of class settlements around the country, *see* Burt Decl. ¶ 12, including having elsewhere represented Ms. Hinjosa as an objector.  *See Blessing v. Sirius XM Radio Inc.*, 507 F. App'x 1 (2d Cir. 2012).  Objections by "professional objectors" like Mr. Bacharach are "motivated by things other than a concern for the welfare of the Settlement Class" – their "sole purpose is to obtain a fee by objecting to whatever aspects of the Settlement they can latch onto."  *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1362 n.30 (S.D. Fla. 2011).  "Professional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors.  Literally nothing is gained from the cost: Settlements are not restructured and the class, on whose benefit the appeal is purportedly raised, gains nothing."  *Id.* (internal quotation marks omitted).  Compounding this deadweight loss, most of Ms. Hinjosa's objections are entirely conclusory; others are simply unintelligible.  *See, e.g.*, ECF No. 198 ¶ 4.

***Kirby.***  Objector James Kirby is represented by lawyer Patrick Sweeney.  Like Mr. Bacharach, "Patrick Sweeney also has a long history of representing objectors in class action proceedings," *Larsen v. Trader Joe's Co.*, No. 11-5188-CIV, 2014 WL 3404531, at *7 n.4 (N.D. Cal. July 11, 2014); *see also* Burt Decl. ¶ 11, and has been branded a "professional objector."  *Id.* at *5.  Mr. Kirby's objections relate primarily to the Settlement's value and the claims process.

***Curry.***  James Curry's objection, ECF No. 191, never explains *why* he believes the Settlement's terms are unfair, inadequate, or unreasonable.  Mr. Curry briefly outlines his personal grievance with Defendants, *see id.* ¶¶ 9, 10, but makes no objection to the Settlement itself that transcends meaningless recitations.  *See, e.g.*, *id.* ¶ 1 ("The Settlement is not fair, reasonable, or adequate."); ¶ 5 ("The Release is overbroad, unfair, and unreasonable."); ¶ 6

("The Notice Program is deficient and violates Settlement Class members' rights to due process").  The Court previously overruled identical objections filed by Mr. Curry's counsel, David Dishman, in the JP Morgan LPI class settlement.  *See Saccoccio*, 297 F.R.D. at 699 ("Despite being represented by counsel, the Stout Objectors provide no reasoning behind their objections.  Rather, they provide cursory objections in list form.").

*Pro Se Objectors.*  Only six *pro se* Class Members objected – Susan Frank, ECF No. 178, Jeff Lane, ECF No. 186, Jeffrey Nadeau, ECF No. 210, Isaac and Villira Johnson, ECF No. 211, and Joyce Cotrone, ECF No 218.  Ms. Frank and Mr. Lane each object that the Settlement's monetary benefits are "too low," Mr. Nadeau complains that Class Members "simply get a 7 to 11% refund on the money paid," and Ms. Cotrone writes that 11% "doesn't come close to what [she] lost."  These are not proper objections, but a generic desire to receive "more" money or "better" results.  *See Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1382 (S.D. Fla. 2007) (overruling objections of class members who "desired to 'have a better deal'").  The Johnsons do not clearly articulate their objections, although it appears they have coverage-related claims on their LPI policy.  The Johnsons' (and the others') "objections lack merit because the objectors can simply opt out if they have concerns about releasing their claims."  *In re Managed Care Litig.*, MDL No. 1334, 2003 WL 22850070, at *5 (S.D. Fla. Oct. 24, 2003).[6]

## APPLICABLE LEGAL STANDARD

"When a court becomes aware of the existence of objectors to a class settlement, it need not 'open to question and debate every provision of the proposed compromise.  The growing rule is that the trial courts may limit its proceeding to whatever is necessary to aid it in reaching an informed, just and reasoned decision.'"  *In re Terazosin Hydrochloride Antitrust Litig.*, MDL No. 1317, 2005 WL 2451960, at *5 (S.D. Fla. July 8, 2005) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)).  "Moreover, where the settlement previously has been preliminarily approved, the settlement is presumptively reasonable and an objector must overcome a heavy burden to demonstrate its unreasonableness."  *Id.*

---

[6] Former Settlement Class Member Robert Webb purported to object to the Settlement in general terms, but simultaneously demanded to be excluded from the Settlement Class.  *See* ECF No. 203. Having timely excluded himself, Mr. Webb is not a Class Member, will not be bound or aggrieved by a final judgment, and thus may not object.  "Under Fed. R. Civ. P. 23(e), non-class members are not permitted to assert objections to a class action settlement."  *Ass'n For Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 473 (S.D. Fla. 2002).

## RESPONSE TO OBJECTIONS

**I.    The Settlement's Claims Process Is Not Only Necessary To Distribute Monetary Relief To Class Members, It Is Superior To The Objectors' Preferred Alternative.**

### A.    The Preoccupation With A Single Facet Of The Settlement Is Misguided.

None of the few objections lodged overcomes this hard-won Settlement's presumptive reasonableness.  The principal objection – to the Settlement's claims process – rests on faulty and incomplete assumptions drawn about its purpose.  To be eligible to receive monetary relief, a Settlement Class Member need only submit a simple Claim Form confirming basic biographical information.  *See* ECF No. 182-1 ¶ 4.5; ECF No. 182-2 Ex. B.  Contrary to what some objectors assert, claims-made class settlements like this are neither "disfavored," ECF No. 217 at 7, nor "under significant fire," ECF No. 193 at 5.  Rather, use of claim forms and claims processes in consumer class settlements are extremely common.  *See* Decl. of Robert Taylor-Manning dated Sept. 3, 2014 ("Taylor-Manning Decl."), ¶¶ 5, 8-17, filed herewith.  Some objectors' counsel, including Kessler Topaz, regularly use claims processes in their own class settlements.  *See id.* ¶¶ 14-16.  Here, the Settlement offers a valuable package of relief comparable to other class settlements approved in similar LPI litigation.  *See Saccoccio*, 297 F.R.D. at 696; *Casey* ECF No. 222; *Williams v. Wells Fargo, N.A.*, No. 11-21233-CIV (S.D. Fla. Sept. 11, 2013) (*Williams* ECF No. 356); *Hall v. Midland Group*, No. 99-3108-CIV, 2000 WL 1725238, at *2 n.3 (E.D. Pa. Nov. 20, 2000).  "'There is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment.'"  *Saccoccio*, 297 F.R.D. at 696 (quoting *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 593 (N.D. Ill. 2011)).  "In a class of this size, the use of such forms is not unusual or inappropriate." *Hall*, 2000 WL 1725238, at *2 n.3.

Several objectors nonetheless concentrate on the claims-made structure, urging the direct distribution of benefits to Settlement Class Members.  *See* ECF No. 197 at 5-8; ECF No. 217 at 3-10; ECF No. 194 at 6-12; ECF No. 193 at 2-9; ECF No. 191 ¶ 4.  Consumer class settlements that directly distribute benefits to class members are extremely uncommon.  *See* Taylor-Manning Decl. ¶¶ 5, 8-17.  Moreover, "a direct-distribution of settlement benefits . . . is not a panacea." *Schulte*, 805 F. Supp. 2d at 594.  As explained below, a direct-distribution approach was considered and rejected in the negotiations as too costly, impracticable to implement, and ultimately unfavorable to interested Class Members.

As a threshold matter, however, it is the Settlement's *overall* merit that requires rejecting these objectors' blinkered critique, which touches on a single aspect of the Settlement.  As Judge

David Hurd recently held in approving the Citibank LPI class settlement, "criticism of the claims-made structure" does "not impact the fairness, reasonableness, or adequacy of the proposed settlement." *Casey*, 2014 WL 4120599, at *2. "Perhaps there could have been an even more creative settlement or, alternatively, one that is more traditional. But that is not the question we must resolve." *Uhl v. Thoroughbred Tech. & Telecommc'ns, Inc.*, 309 F.3d 978, 987 (7th Cir. 2002). An objector "must do more than just argue that she would have preferred a different settlement structure" since an "inquiry into the settlement structure is limited to whether the settlement is lawful, fair, reasonable and adequate." *Id.* Consequently, that an objector "believes that one or a few terms could have been improved," including with respect to the use of a claims process, "is an insufficient grounds for rejection." *Schulte*, 805 F. Supp. 2d at 592. "This Court does not have the authority to impose a preferred payment structure upon the settling parties." *Casey*, 2014 WL 4120599, at *3.[7]

The overall merit of this Settlement must be analyzed against the plain fact that it was increasingly unlikely that Plaintiffs' claims would survive to trial. As mentioned above, this Court has explained that "recent federal appellate decisions have changed the climate for Plaintiffs' class action attorneys pursuing force-placed insurance claims." *Montoya*, 2014 WL 4248208 at *2. Specifically, the Seventh Circuit in the *Cohen* case and the Eleventh Circuit in the *Feaz* case have both rejected, without equivocation, the theory that the commissions paid on LPI premiums were wrongful kickbacks. *See* 735 F.3d at 604; 745 F.3d at 1110-11. While some courts have distinguished *Cohen* and *Feaz*, others have followed the approach adopted by the only United States Courts of Appeals to have address the issue. *Montoya*, 2014 WL 4248208 at *2; *Circeo-Loudon v. Green Tree Servicing LLC,* No. 14-21384-CIV, 2014 WL 4219587, at *2-3 (S.D. Fla. Aug. 25, 2014). At the very least, *Cohen and Feaz* would have presented obstacles to recovery – obstacles the Settlement eliminates.

Another dispositive issue prominent in recent LPI case law is the filed rate doctrine. While some courts have rejected the defense, many have not: federal courts in Wisconsin and

---

[7] *See, e.g.*, *Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 201 (D.D.C. 2011) (rejecting "objections to the proposed settlement premised on the use of a claims process" where "the claims process was a directly negotiated aspect of the settlement, which, the Court concludes, is fair as a whole"); *Schulte*, 805 F. Supp. 2d at 593 (overruling objection to "the very need for a claims process" because, "most importantly, the claims process is a negotiated facet of this settlement, which, as the Court explained above, is fair as a whole").

Mississippi have dismissed claims asserted by LPI class action plaintiffs based on this doctrine. *See Decambaliza v. QBE Holdings, Inc.*, No. 13-286-CIV, 2013 WL 5777294, at *6-9 (W.D. Wis. Oct. 25, 2013); *Singleton v. Wells Fargo Bank, N.A.*, No. 12-216-CIV, 2013 WL 5423917, at *2-3 (N.D. Miss. Sept. 26, 2013).   A similar fate might have befallen Class Members from Georgia, where a federal court found merit to the filed rate defense and certified the question to the Georgia Supreme Court.   *Roberts v. Wells Fargo Bank, N.A.*, No. 12-200-CIV, 2013 WL 1233268, at *2 (N.D. Ga. Mar. 27, 2013).   The case was voluntarily dismissed soon thereafter. Borrowers in these states would have been practically barred from recovering anything for their core claims asserted here.   Under the Settlement, however, they are entitled to recover.

In addition, the filed rate doctrine defense is now being presented to the Second Circuit in an appeal from a denial of a motion to dismiss an LPI class action.   Recognizing that courts have been split on the issue, a New York federal district court certified the issue for interlocutory review, *Rothstein v. GMAC Mortg., LLC*, No. 12-3412-CIV, 2014 WL 1329132, at *1-3 (S.D.N.Y. Apr. 3, 2014), which the Second Circuit allowed on June 25, 2014.   If the Second Circuit rules against plaintiffs on the question, borrowers in more states will lose any viable claims and the filed rate defense will gain momentum.   In approving the Citibank LPI class settlement, Judge Hurd observed that "it is entirely possible that the United States Court of Appeals for the Second Circuit may, in the near future, join other Circuits and determine that the underlying claims in this case are not actionable."   *Casey*, 2014 WL 4120599 at *2.   Thus, the very real possibility exists that the Settlement Class would lose any potential right to recover if this case were litigated further.   Any analysis of the merits of the Settlement must take these dispositive issues into account – but objectors are entirely silent about them.

**B.     A Claims Process Is The Only Practicable Means Of Offering Relief.**

**1.     Defendants Cannot Systematically Identify Settlement Class Members Who Paid A Portion Of Their LPI Charges.**

Several objectors believe that the Settlement should not require Class Members to submit a Claim Form.   This is wishful thinking given that, even if it were feasible, Defendants would never agree to such an approach without radically altering the Settlement's other terms and benefits.   These objectors nonetheless reason that a claims process is "unnecessary" and thus "unfair" because federal law requires servicers to maintain records describing the amount paid from a mortgage escrow account for LPI charges and, further, that Defendants were able to

identify Class Members to allow the Class Notices to be mailed.  *See, e.g.*, ECF No. 217 at 5-7; ECF No. 194 at 8-10; ECF No. 193 at 8-9; ECF No. 191 ¶ 4.

This reasoning is facile and disregards facts explained at the class certification stage, ECF No. 108-4 ¶¶ 9-10, in the Named Plaintiffs' motion for final approval, ECF No. 182 at 19-20, and in both the JP Morgan and Citibank LPI class settlements, *see Saccoccio*, 297 F.R.D. at 696; *Casey*, 2014 WL 4120599, at *3 n.3.  The Settlement offers cash relief to Class Members who actually paid a portion of LPI charges assessed to their mortgage escrow accounts.  *See* ECF No. 182-1 ¶¶ 4.5.1, 4.5.3.  For various reasons, however, many borrowers have not paid, and will never pay, those charges.  *See Saccoccio*, 297 F.R.D. at 696 (approving LPI settlement that "provides relief to class members who actually paid or who were charged and still owe some portion" of the LPI charge); *Williams v. Wells Fargo Bank, N.A.*, 280 F.R.D. 665, 675-76 (S.D. Fla. 2012) (narrowing class definition to exclude borrowers who had been reimbursed for or were unlikely to pay LPI charges).  Why should Class Members receive money – a cash refund of a portion of their LPI charge – when they never paid that charge in the first place?  *See Kunzelmann v. Wells Fargo Bank, N.A.*, No. 11-81373-CIV, 2013 WL 139913, at *9 (S.D. Fla. Jan. 10, 2013) ("I question whether that borrower has conferred a direct benefit on the defendant by being charged a premium that he or she never intends to pay."); *Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529, 549 (C.D. Cal. 2013) ("if class members did not pay for FPI, then no benefit was conferred").  While the Settlement generously provides all Class Members the opportunity to recover settlement relief, even those who never paid any of their LPI charges, it does not require a cash payment to uninjured Class Members.  The Settlement instead allows Defendants to credit uninjured Class Members' escrow accounts.  *See* ECF No. 182-1 ¶ 4.5.2.  It is thus necessary to distinguish between those who paid for LPI and those who were charged and have not paid.  The simple Claim Form employed in this Settlement is the easiest and most cost-effective way – indeed, the only practical way – to make that determination.

The objectors observe, correctly, that Defendants record LPI charges and payments made to Class Members' escrow accounts, as well as Class Members' names and addresses.  But they fail to apprehend – or stubbornly refuse to accept – that LPI payments cannot be queried, filtered, or compiled *systematically* across the Settlement Class.  That is, without individualized, manual escrow analyses, there is no readily available way for Defendants to determine if money a Class

Member may have paid was for LPI or if the Class Member still owes an LPI charge. *See* ECF No. 108-4 ¶ 9; Decl. of Ronald Wilson dated Aug. 11, 2014, ¶¶ 7-9, filed herewith.

Payment records in escrow accounts often are quite complex. For borrowers whose escrow accounts contain funds insufficient to renew their voluntary insurance policy to avoid LPI, Wells Fargo will advance its own funds to pay for LPI. ECF No. 108-4 ¶ 5. The advance is charged against the escrow account, usually resulting in a negative balance. *Id.* Some borrowers do not have escrow accounts at the time Wells Fargo pays an LPI premium. *Id.* ¶ 4. For those borrowers, Wells Fargo will establish an escrow account. *Id.* This escrow account would hold a negative balance reflecting the amount Wells Fargo paid for the LPI premium. *Id.* Wells Fargo then attempts to collect this premium from the borrower by adding one-twelfth of the annual premium to each month's installment of principal and interest due on the loan. *Id.* The escrow accounts which reflect advances for LPI also reflect advances and, where applicable, borrower payments for other items. *Id.* ¶ 9. Borrowers who allow their voluntary insurance to lapse also may fail to pay real estate taxes with the result that Wells Fargo advances payment of real estate taxes to protect its lien position. *Id.* Real estate tax advances also are reflected in the escrow account. *Id.* If a particular borrower had an escrow account for payment of the borrower's voluntary insurance, such insurance payments (both by Wells Fargo to the insurance carrier and the borrower to Wells Fargo) also would be reflected in the escrow account. *Id.* Determining how much any particular borrower within a large group may have paid for LPI would require a time-intensive audit of the account records for each escrow account from the first time LPI appears. *Id.*; *see also id.* ¶ 10; ECF No. 108-3 ¶¶ 10, 12.

A claims process is thus an essential component of this massive Settlement. An identical objection was overruled in the class settlement approved in the JP Morgan LPI litigation:

> Defendants admit that the Varnes objectors are correct in their assertion that Defendants record lender-placed insurance charges and payments made by class members to the class members escrow accounts. Defendants also have class members loan information. Nevertheless, Defendants have presented evidence that they cannot, on a systemwide basis, determine which class members paid the lender-placed insurance premium or what they paid or what portion of the lender-placed insurance premium was paid without going individually through each of the 762,390 files. Each escrow account includes different items such as voluntary insurance and taxes, as well as the lender-placed insurance premium. The Defendants presented evidence that, had they been required to manually review all files, "it would take a thousand people to do that every month."

*Saccoccio*, 297 F.R.D. at 696.  Likewise, in this case, determining whether Class Members paid any amount for the hundreds of thousands of LPI policies at issue, or still owe charges for those policies, would require a costly, time-intensive, manual review of each escrow account.

Nor can Defendants assume, as do the Biddison objectors' "experts" (Professor Levitin and Ms. Walzak), that "[i]f an escrow account ever ceased to have a deficiency following the payment of the last FPI premium, then the borrower would necessarily have paid for the FPI premium because the deficiency in the escrow account created by the advancing of the premiums by the servicer would have been covered by the borrower's subsequent payments to the escrow account."  ECF No. 217-1 ¶ 98; *see also* ECF No. 217-3 ¶ 20.[8]  There are several common situations in which a borrower was charged for, but never actually paid, for LPI, which Defendants are incapable of systematically identifying.  Some include:

- *Payoffs.*  Many borrowers paid off their mortgage loans during the loans' terms.  It cannot be assumed that a payoff represents payment of *all* escrow items.  For a variety of reasons, Wells Fargo may specifically charge off an LPI charge in connection with a payoff.  In that event, Wells Fargo will reflect a zero balance even though the borrower never paid (or remains responsible for paying) any part of the charge.

- *Loan Modifications.*  Many borrowers have received loan modifications, including an abatement of LPI charges.  Like payoffs, this can be handled as a charge-off or capitalization of LPI charges that cannot be distinguished from a borrower payment.

- *Hardest Hit Fund.*  Borrowers may have had all or part of their LPI charges paid by the United States Treasury's Hardest Hit Fund.  The Wells Fargo Defendants work with participating states to make sure borrowers have access to mortgage assistance administered under the Fund.  Without a file-by-file manual review, Defendants cannot identify borrowers who have received assistance through a Hardest Hit Fund program where that assistance was used to satisfy an LPI charge.[9]

- *Short Sales/Deeds in Lieu of Foreclosure.*  A short sale generally occurs when a borrower sells his or her home to a third party for less than the total debt remaining on the mortgage.  A deed in lieu of foreclosure is generally a transaction where the borrower voluntarily transfers title to the property to the lender in exchange for a release from the mortgage obligation.  In either circumstance, an LPI charge is posted, but the borrower never actually paid the charge.  Instead, Wells Fargo internalizes the cost.

*See Kunzelmann*, 2013 WL 139913, at *2 (many borrowers, who cannot be determined without "a file-by-file manual review," are charged for LPI but "subsequently enter into some sort of

---

[8] Another "expert," Arthur Olsen, offers only the single-sentence conclusory opinion that if "the data produced is consistent with data I have reviewed in the past, I can formulaically and objectively quantify the charges paid for force-placed insurance by at least certain subsets of class members."  ECF No. 217-2 ¶ 11.  Mr. Olsen does not explain the logical or factual basis for his opinion nor explain which "subsets of class members" he can supposedly identify.  The Court should not credit such speculative and self-serving "expert" opinion testimony.

[9] https://www.wellsfargo.com/mortgage/manage-account/payment-help/hardest-hit-funds.

short sale, foreclosure, loan modification, bankruptcy, refinance, payoff, settlement agreement, government-sponsored program, or other agreement"); *Kunzelmann* ECF No. 70-11 ¶ 4; ECF No. 108-4 ¶ 10; ECF No. 108-3 ¶ 12.  It does not follow that if an escrow account ceased to have a deficiency after an LPI charge was posted it can be assumed the borrower paid the charge.

Ms. Cochran-May argues that the "infeasibility of conducting a claims-paid settlement is even weaker with respect to the members of the Settlement Class who had force-placed wind insurance policies with Wells Fargo given that this is but a fraction of the overall Settlement Class."  ECF No. 194 at 10.  While it is true that the "infeasibility of conducting a claims-paid settlement" decreases, and the feasibility of conducting a file-by-file manual review increases, with any smaller pool of Class Members, there is no principled reason for preferentially treating arbitrary subsets of this large Settlement Class.  Indeed, "a class action settlement cannot arbitrarily prefer one group of plaintiffs over another – because such a rule would be inimical to the very principle of class advocacy."  *In re Diet Drugs Prods. Liab. Litig.*, 93 F. App'x 338, 343 (3d Cir. 2004).  Ms. Cochran-May might just as easily have advocated conducting a file-by-file manual review for the smaller "fraction" of Class Members whose last names are hyphenated.

While it may be theoretically *possible* to spend months trying to determine which Class Members paid or still owe LPI charges, it is not commercially *practicable* to do so, and Defendants properly declined to undertake such a Herculean labor in their settlement calculus.[10] This alone distinguishes the Settlement, with its 1.3 million-strong Settlement Class, from the LPI lawsuits featuring dramatically smaller settlement classes.  *See Saccoccio*, 297 F.R.D. at 696 (noting that "the size of the class contrasts sharply with the cases cited by Varnes objectors where a file-by-file review was possible").  Instead, Defendants take Class Members at their word on the Claim Form's simple affirmation.  Defendants will pay the applicable relief percentage on the entire net written premium, not merely the amount actually paid.  Perversely, some objectors appear to assert that Defendants should ask Class Members for *more* information on the Claim Form.  *See* ECF No. 193 at 9.

---

[10] *See, e.g.*, *Schulte*, 805 F. Supp. 2d at 593-94 (approving claims-made settlement where there would "be costs associated with investigating how much is owed to each Class Member under the settlement and distributing payments.  Had the onus of that process been placed on Defendant, there may have been less money available to pay claims."); *Trombley*, 826 F. Supp. 2d at 198 (approving claims-made class settlement, noting that "the case might not have settled if a condition of the agreement required PNC to mine" its "computer systems for such data").

### 2. The Claim Form Helps Ensure That Only Aggrieved Individuals Receive Monetary Relief Under The Settlement.

The Claim Form is needed for other reasons. Class notices and claim forms are not simply intended to inform class members that they can recover settlement benefits, but to allow class members to decide for themselves what actions, if any, they want to take, including electing not to participate in the recovery without affirmatively excluding themselves from the class. *See* Taylor-Manning Decl. ¶ 36. Beyond indifference, there are a number of reasons a class member may not wish to participate in a claims-made consumer class settlement, *e.g.*, a desire not to be involved in litigation, disillusionment or ideological disagreement with the justice system, or sympathy for the defendant. *Id.* ¶ 35. Some Class Members may even have rationally preferred LPI to their alternatives. Consider:

- LPI is sometimes *less* expensive, depending on risk factors associated with the borrower and property, *see Montoya*, 2014 WL 4248208, at *2 (stating that "the LPI premiums Montoya paid were actually lower than the ones he purchased himself on the open market"); *Gustafson*, 294 F.R.D. at 549 ("Borrowers may have paid less in FPI coverage than they would have for other coverage due to individual risk factors.");

- LPI covers risks that may not be covered by voluntary insurance, *e.g.*, mudslides;

- LPI may not decline a claim due to borrower negligence or intentional damage, or where the property is deemed to be unmaintained, whereas voluntary insurance could deny coverage, require loss mitigation measures be undertaken, or deny claims; and

- Voluntary insurance is otherwise unavailable, as where, for example, residents in communities not participating in or suspended from the National Flood Insurance Program become ineligible to purchase flood insurance in the voluntary market.

Class Member Joneen Nielsen's letter regarding this Settlement proves the point. ECF No. 207. Ms. Nielsen was "thankful and appreciative to Wells Fargo for offering an alternative." *Id.* She made "numerous calls to insurance companies requesting quotes, if they did return my call, the quote came in higher than what Wells Fargo offered, for the same coverage." *Id.* If Class Members preferred the LPI placements to their available alternatives, they should not receive monetary relief. Defendants thus properly negotiated for a claims process that avoids compensating unaggrieved Class Members.[11]

---

[11] *See, e.g.*, *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 784 (N.D. Ohio 2010) (rejecting objection that claim form "is unnecessary because it does not provide [defendant] with any information they do not already have" because "the claim form and opt-in procedure are negotiated components of the settlement that [defendant] insisted upon in order to force Settlement Class Members to affirm that they would have purchased a lower-priced policy had it been offered"); *Schulte*, 805 F. Supp. 2d at 594 (using a claims process "gives customers who were aware of and assented to Defendant's re-sequencing policies the ability to opt out of receiving a payment that they feel they do not deserve").

### 3. Defendants Cannot Systematically Identify Settlement Class Members Whose Claims Belong To Their Bankruptcy Estates.

The Claim Form also serves to weed out Class Members whose causes of action have been extinguished by operation of their bankruptcy status. Defendants cannot readily know whether, after an LPI charge was posted, a Settlement Class Member filed a petition under Chapter 7 of the Bankruptcy Code or whether a Class Member's indebtedness has been compromised or discharged in bankruptcy. The Claim Form therefore asks Class Members to verify exactly this. *See* ECF No. 182-2 Ex. B. Doing so prejudices nobody, contrary to what some objectors argue. *See* ECF No. 217 at 17; ECF No. 193 at 15-16. Any causes of action they had against Defendants no longer belong to the Class Members, but to their bankruptcy estates. "Generally speaking, a pre-petition cause of action is the property of the Chapter 7 bankruptcy estate, and only the trustee in bankruptcy has standing to pursue it." *Parker v. Wendy's Int'l, Inc.*, 365 F.3d 1268, 1272 (11th Cir. 2004); *see also* 11 U.S.C. § 541(a) (property of bankruptcy estate includes all potential causes of action extant at the time the petition is filed).

### 4. The Claims Process Reduces Fraud, Waste, And Abuse.

To mitigate fraud and mistake while lending administrative certainty to the distribution of monetary relief, the Claim Form asks Class Members to verify their identity, current address, and contact information. *See* ECF No. 182-2 Ex. B. Indeed, "a claims process is often used to ensure that money is fairly distributed for valid claims," *Trombley*, 826 F. Supp. 2d at 201, and "to strike a proper balance between, on the one hand, avoiding fraudulent claims and keeping administrative costs low, and on the other hand, allowing as many class members as possible to claim benefits." *In re Lawnmower Engine Horsepower Mkt'g & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1010 (E.D. Wis. 2010).

The objectors ignore the uncertainty, costs, and burden of the direct-distribution process they advocate. Sending unsolicited checks to unverified addresses and recipients increases the risk of misappropriation. *See* Taylor-Manning Decl. ¶ 37. Non-Class Members could endorse over to themselves misdirected settlement checks. Attempting to recover money from individuals who fraudulently cash checks is impracticable. *Id.* In addition, without the Claim Form, the risk of waste increases. Printing and mailing checks to hundreds of thousands of Settlement Class Members who never asked for them would greatly increase the cost of administering the Settlement. *Id.* ¶¶ 37-39. Unsolicited checks are likely to be discarded or set aside. *Id.* ¶ 37. This reality – on a massive scale – would create an accounting nightmare for the

Parties and the Claims Administrator alike.  "In such situations, administrators 'get to the point where you never close the case.'"  *In re Educational Testing Serv. Praxis Principles of Learning & Teaching*, MDL No. 1643, 2006 WL 3332829, at *2 (E.D. La. Nov. 15, 2006) (overruling objection that claims process is unneeded "because the names and addresses of [class members] are known," finding that a claims process prevents checks from being mailed to unverified and old addresses, thus reducing undeliverable mail and fraudulently cashed checks); *see also Schulte*, 805 F. Supp. 2d at 594 (same).  The Claim Form's verifications are thus the best chance at ensuring that the right persons receive the right payments at the right addresses.[12]

Responding to an objector's "suggestion to automatically distribute money to those who purchased" the defendant's product, one court noted in a claims-made class settlement *designed by Kessler Topaz attorneys* that "there are practical problems with the suggestion, including those associated with blindly sending checks to addresses that may be outdated."  *In re Remeron End-Payor Antitrust Litig.*, No. 02-2007-CIV, 2005 WL 2230314, at *18 (D.N.J. Sept. 13, 2005).  Addressing one objector's concern "that not enough consumers will file claims" and that "direct payments should be made to those class members without requiring them to file claims," Kessler Topaz attorneys argued that it "would be highly unusual  to distribute money to a class of this size without requiring the filing of claims" and that it "would be even more unusual to require some class members to file claims, while sending money to others without requiring claims[.]"  *Remeron* ECF No. 175 at 26-27.  These same attorneys noted that a direct-distribution class settlement "would become many times more expensive," including because "the number of uncashed checks and unclaimed funds would be orders of magnitude larger under [the

---

[12] *See, e.g.*, *Lawnmower Engine*, 733 F. Supp. 2d at 1010 ("I agree that allowing class members to file claims without providing serial numbers would encourage fraudulent claims, in that persons could falsely represent that they purchased a lawnmower in the past but no longer have it or any records of it.  Although the claims administrator could take steps to validate claims submitted without serial numbers in order to weed out fraudulent claims – such as comparing each incomplete claim to records in the defendants' possession or reviewing receipts and other paperwork submitted by class members – requiring the claims administrator to do so for a large number of claims would substantially increase administrative costs."); *Mangone v. First USA Bank*, 206 F.R.D. 222, 235 (S.D. Ill. 2001) ("The requirement of an affirmation on the claim form, under penalty of perjury, from the Settlement Class Member seeking reimbursement for an Eligible Late Fee was appropriate and not objectionable.  Notarization of claim forms is routinely required in class action settlements to assure that the fund is shared among proper and deserving claimants, and here only an affirmation was required from Class Members.") (internal quotation marks omitted).

objector's] method, as checks would be sent to addresses without verification that class members still live there or, for that matter, ever lived there." *Id.* at 27-28.

### C. The Claims Process Gives Every Class Member The Opportunity To Receive A Near-Complete (Or Better) Recovery.

Some objectors accuse the Parties of employing a claims process to suppress the Settlement's claim participation rate at Class Members' expense. *See* ECF No. 217 at 7-10; ECF No. 193 at 8-9; ECF No. 197 at 6-8. Nothing could be further from the truth. By guaranteeing a generous monetary payout to each Class Member submitting a valid Claim Form, the Parties have strongly *incentivized* participation in the Settlement. The Settlement is structured to offer every Class Member who submits a Claim Form the opportunity to receive a near-complete (or better) recovery. As the Court explained in approving the comparable JP Morgan LPI class settlement, "the settlement very likely exceeds what Plaintiffs could have won at trial." *Saccoccio*, 297 F.R.D. at 693. This Settlement is more than fair.

A hypothetical direct-distribution class settlement would be less fair. Generous terms like this would never be achieved if the only permissible settlement structure is one that pays every asserted claim. That would not be a settlement at all, but Defendants' total capitulation. As the *Casey* court stated in approving the Citibank LPI class settlement, "[w]hile a direct payment structure would obviously result in more, and possibly all, class members receiving a share of the $110 million settlement, there is no reason to believe the defendants would agree to such terms." 2014 WL 4120599, at *2. Rather, a direct-distribution approach would be negotiated to provide recovery for Settlement Class Members at a much lower percentage of their alleged losses. *Cf.* Taylor-Manning Decl. ¶ 40. Negotiating for a smaller amount to go to Class Members would, in effect, unfairly reward some Class Members for their own indifference at the expense of those who would take the minimal step of returning a simple Claim Form to receive the much larger amount. Class Members thus give up very little under this Settlement. They give up the opportunity to passively receive a lower percentage of their alleged losses for the ability to claim with minimal effort nearly all – or *more than* – those losses. And *every* Class Member has the opportunity to recover under the Settlement's generous terms.

### D. The Settlement's Claim Participation Rate Is Neither Final Nor Necessary To Evaluate The Settlement's Fairness.

A related objection is that the Court should not approve the Settlement until after the Claim Period closes so that the Court can know the final claim participation rate. *See* ECF No.

217 at 10; ECF No. 193 at 14; ECF No. 197 at 6.  But the Claim Deadline remains open until 60 days *after* the Judgment in this case becomes final, which will not be earlier than December 17, 2014 if no appeal is taken.  *See* ECF No. 182-1 ¶¶ 2.8, 2.24.  The Court will not know what the final rate is until the Settlement is final and all challenges have been resolved.

Nor is the final rate even necessary to evaluate the Settlement's fairness.  An LPI class settlement that offers significant monetary relief, "requiring only that class members submit a claim form," can be "fair and reasonable independent of the number of claims filed."  *Saccoccio v. JP Morgan Chase Bank, N.A.*, No. 13-21107-CIV, 2014 WL 3738013, at *1 (S.D. Fla. July 28, 2014) ("The Court has already rejected Objectors' argument that the Court should have considered the exact number of claims filed before approving the Settlement.").[13]  Indeed, "many factors affect response rates and this ratio should not be given great significance."  *Date v. Sony Elecs., Inc.*, No. 07-15474-CIV, 2013 WL 3945981, at *10 (E.D. Mich. July 31, 2013); *see also* Taylor-Manning Decl. ¶¶ 29-34.  A settlement's fairness is instead judged by the opportunity created for the class members, not by how many submit claims.  What matters is the Settlement's value to each Class Member – it is ultimately up to Class Members to participate or not.  That is why courts have concentrated on a settlement's overall fairness rather than fixating on claim rates, even if they were sometimes low.  *See Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (*en banc*); *Gascho*, 2014 WL 1350509, at *30; Taylor-Manning Decl. ¶¶ 29-34.  This Court has overruled the objection that an LPI class settlement cannot be approved "without assuring . . . that the claims rate is sufficiently high."  *Saccoccio*, 297 F.R.D. at 696.[14]

---

[13] *See also Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 92 (3d Cir. 1985) ("the 12% response rate does not appear to be determinative"); *Shames v. Hertz Corp.*, No. 07-2174-CIV, 2012 WL 5392159, at *14 (S.D. Cal. Nov. 5, 2012) (approving settlement prior to claim deadline because even if the claim participation rate were low, it is "otherwise fair and represents a recovery of a substantial percentage of actual estimated damages" and a low rate may merely "be the result of a variety of factors including procrastination or lack of interest," which "does not diminish the fairness of the settlement").

[14] Decisions the objectors rely upon in this regard are distinguishable on this basis.  *See, e.g.*, *De Leon v. Bank of Am., N.A.*, No. 09-1251-CIV, 2012 WL 2568142, at *19 (M.D. Fla. Apr. 20, 2012) (emphasizing that "few settlement class members will submit a claim form to obtain, at most, a $28.00 cash payment"); *Ferrington v. McAfee, Inc.*, No. 10-1455-CIV, 2012 WL 1156399, at *13 (N.D. Cal. Apr. 6, 2012) (denying approval of settlement involving an anticipated "low rate of claims participation," *and* "small claims pay out," *and* disproportionately large attorneys' fee award," *and* "a reversion clause").

## II.    The Settlement Provides Valuable Injunctive Relief.

### A.    The Nationwide Injunction Imposed By This Settlement Is Further Reaching In Scope And Certainty Than Any Regulatory Action.

The Biddison and Vanskyock objectors further contend that the Settlement's injunctive relief adds "no value" because, supposedly, "Wells Fargo and Assurant are already obligated by the terms of settlements they have previously entered with state attorneys general and insurance departments, new federal regulations and Fannie Mae Servicing Guides to refrain from the practices purportedly prohibited by this Settlement." ECF No. 217 at 14; *see also* ECF No. 193 at 13-14. This objection was overruled as lacking "the slightest hint of merit" in the JP Morgan LPI settlement. *Saccoccio*, 297 F.R.D. at 698. The objection has not improved with age.

As an initial matter, in light of the Settlement's delivery of significant monetary relief to the Class Members, the objectors' cavil about injunctive relief is of little moment. *See id.* ("[M]ost obviously, the Varnes Objectors conveniently ignore that, in addition to the injunctive relief, Class Counsel has *also* returned monetary relief in the approximate amount of $300 million."). And, if it is correct that regulatory actions have already ended defendants' challenged practices, then the Settlement hardly compromises Class Members' claims for prospective relief. The Court can and should approve the Settlement even if the injunctive relief is valueless.

But it is not valueless. The proscriptions Defendants agreed to in the Settlement are national in scope *and* legally guaranteed for a five-year period. *See* ECF No. 182-1 ¶¶ 4.2, 4.3. The same cannot be said for the various regulatory actions the objectors cite. With respect to the Assurant Defendants, the separate Consent Orders that defendant American Security Insurance Company entered into with the Florida Office of Insurance Regulation[15] and the New York Department of Financial Services[16] apply, by their terms, only to LPI written on Florida and New York properties. *See* ECF No. 217-1 ¶ 44. The Settlement is not so limited. Moreover, the proposed New York insurance regulations the Vanskyock objectors cite, ECF No. 193 at 13, are just that – proposed, and similarly limited to LPI written on New York properties.

With respect to the Wells Fargo Defendants, the Biddison objectors and their supporting witness, Professor Levitin, principally point to a Fannie Mae Servicing Guide Announcement[17]

---

[15] http://www.floir.com/siteDocuments/AmericanSecurity141841-13-CO.pdf.

[16] http://www.dfs.ny.gov/about/press2013/assur-order-130321.pdf.

[17] https://www.fanniemae.com/content/announcement/svc1327.pdf.

and Freddie Mac Single-Family Seller/Servicer Guide Bulletin,[18] both issued on December 18, 2013, requiring that LPI premiums charged to the borrower must exclude any LPI commission or payments earned or received by the servicer, or other entities or individuals affiliated with the servicer.  *See* ECF No. 217-1 ¶¶ 30-32.  But the Announcement and Bulletin apply only to Fannie Mae and Freddie Mac mortgages – which by Professor Levitin's own reckoning constitute just 75% of the market.  *See id.* ¶¶ 25, 33.

And unlike the Settlement which, when finally approved, will be judicially enforceable – ensuring it cannot be altered, waived, rescinded, or amended – the Announcement and Bulletin are not.  For example, the Servicing Guide's Forward states that "Fannie Mae may at any time alter or waive any of the requirements of its Guide, impose other additional requirements, or rescind or amend any and all material set forth in its Guide."[19]  The Guide "is amended periodically through the issuance of Announcements, Lender Letters, and Notices that introduce new or modified policies."[20]  In fact, LPI-related guidelines have changed before.  In March 2012, Fannie Mae issued a Servicing Guide Announcement purporting to prohibit payment of LPI-related commissions.[21]  That Announcement was superseded just two months later.[22]  As the Court stated in overruling this same objection to the JP Morgan LPI class settlement, any "voluntary termination of the practice could be reversed tomorrow, as could, at least in theory, rules propounded by outside regulators."  *Saccoccio*, 297 F.R.D. at 698.[23]

The Biddison and Vanskyock objectors also rely on Section VII.A.8 of the Wells Fargo Consent Judgment in the National Mortgage Servicing Settlement, which provides simply that a "force-placed insurance policy must be purchased for a commercially reasonable price."  ECF No. 217-1 ¶ 29; ECF No. 193 at 13.  The Consent Judgment does not define what constitutes a "commercially reasonable price," prohibit commissions, or regulate how insurers price LPI,

---

[18] http://www.freddiemac.com/singlefamily/guide/bulletins/pdf/bll1327.pdf.

[19] https://www.fanniemae.com/content/guide/svc031412.pdf.

[20] *Id.*

[21] https://www.fanniemae.com/content/announcement/svc1204.pdf.

[22] https://www.fanniemae.com/content/announcement/ntce052312.pdf.

[23] The Vanskyock objectors also cite Lender Placed Insurance, Terms and Conditions, 78 Fed. Reg. 19,263-01 (Mar. 29, 2013), a Federal Housing Finance Agency Notice, ECF No. 193 at 13, without acknowledging that the Notice merely advised the public of the Agency's views and invited further comment without imposing any legal or contractual obligations.

including what components of the insurer's pricing structure are permissible. This Settlement does. Indeed, whether the LPI charges at issue were "commercially reasonable" was a central question in the Litigation. Moreover, as Professor Levitin concedes, the Consent Judgment binds the Wells Fargo Defendants only until 2015, ECF No. 217-1 ¶¶ 29, 49 – once approved, this judicially enforceable Settlement will bind all Defendants until 2019, if the Final Settlement Date occurs this year. And the Consent Judgment applies only to hazard LPI, not flood LPI.

The Biddison objectors' reliance on 12 C.F.R. § 1024.37(h) is equally misplaced. *See id.* ¶ 28. That regulation merely requires that LPI charges be "bona fide and reasonable," not that commissions be eliminated. This Settlement does. Nor does the regulation apply to flood LPI. This Settlement does. With respect to the Settlement's coverage limitation and assumption of existing coverage provisions, reliance on 12 C.F.R. § 1024.17(k)(5)(i) and Section VII.A.5 of the Wells Fargo Consent Judgment is similarly misplaced. That regulation prohibits purchasing LPI "unless a servicer is unable to disburse funds from the borrower's escrow account." The Settlement goes a step further by requiring that such funds be *advanced* regardless of the escrow account's balance (subject to the borrower's ultimate responsibility for funds advanced). *See* ECF No. 182-1 ¶ 4.2.1(g). The regulation does not require that funds be advanced to maintain voluntary insurance. § 1024.17(k)(5)(i)-(ii). Moreover, neither regulation extends to flood LPI and, again, the Consent Judgment binds the Wells Fargo Defendants only until 2015.

Finally, the Biddison objectors openly (and the Vanskyock objectors implicitly) concede that two of the Settlement's injunctive provisions, relating to dual-interest policies and prompt recrediting of borrowers' accounts, ECF No. 182-1 ¶ 4.2.1(e), (h), are not already required by any regulatory provisions. *See* ECF No. 217 at 14 n.12. Professor Levitin dismisses these two provisions as "de minimis," but offers little reasoning for this characterization, which is false. ECF No. 217-1 ¶ 59. For example, whereas single-interest LPI covers only the lender's insurable interest, *id.* ¶ 55, dual-interest LPI provides protection for *both* the lender and borrower, who may *each* make claims under the policy. *See id.* This is extremely valuable to borrowers. The Settlement's injunctive relief is therefore not valueless and hardly "de minimis."

### B. Professor Levitin's Legal Conclusions Are Inadmissible.

The Biddison objectors' assertion that the injunctive relief provisions add "no value" to the Settlement is based on Professor Levitin's inadmissible legal conclusions. As noted, Professor Levitin opines that the Settlement's injunctive relief provisions "merely re-create pre-

existing legal duties and functional market requirements." *Id.* ¶ 24.   According to Professor Levitin, these "legal duties" – and the consequent "functional market requirements" that arise by operation of these "legal duties" – are the product of various federal regulations, the servicing guidelines of two government-sponsored enterprises (Fannie Mae and Freddie Mac) supervised by the Federal Housing Finance Agency, and Consent Orders and Judgments Defendants have entered into with state attorneys general and insurance commissioners.  *See id.* ¶¶ 21-59.   In other words, Professor Levitin's opinions about the value of the injunctive relief are based solely on his (incorrect) legal conclusion that the injunctive relief duplicates "pre-existing legal duties."

The Court should disregard these opinions.  Testifying experts, even law professors, may not offer legal conclusions.  *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1112 n.8 (11th Cir. 2005).  The Biddison objectors appear to have forgotten that each courtroom already "comes equipped with a 'legal expert,' called a judge." *Johnson v. Bush*, No. 00-3542-CIV, 2002 WL 34355953, at *1 n.1 (S.D. Fla. Apr. 19, 2002) (internal quotation marks omitted).  Accordingly, the Court should not credit as "expert" opinion Professor Levitin's legal analysis of whether "pre-existing legal duties" duplicate the Settlement's injunctive relief.

### III.   Objections Regarding "Clear-Sailing" And "Kicker" Provisions Are Unfounded.

The Jabrani and Biddison objectors argue that the inclusion of a "clear-sailing" provision taints the Settlement; the Jabaranis objectors separately argue that the Settlement also improperly includes a "kicker" provision.  *See* ECF No. 222 at 12-15; ECF No. 217 at 12.  According to the Jabrani objectors, a "clear sailing clause stipulates that attorney awards will not be contested by the defendant."  ECF No. 222 at 12.  A "kicker" provides "that any reduction in the fee award reverts to the defendant, rather than the class."  *Id.* at 13.

***Clear-Sailing Provision.***   While "a clear sailing provision could indicate that lawyers urged a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees," it "could just as easily be included for purposes of finality and risk avoidance."  *Gascho*, 2014 WL 1350509, at *24 (internal quotation marks omitted).  The latter reason was why this Settlement included a clear-sailing provision.  *See* ECF No. 182-1 ¶ 15.2.

That does not somehow call the Settlement into question.  Courts have "given weight to agreements among the parties regarding the fee motion, and to agreements between class counsel and others about the fees claimed by the motion."  Fed. R. Civ. P. 23(h), 2003 advisory comm. note.  The presence of a clear-sailing provision is immaterial where the district court factually

finds that there was no collusion among the parties. *See Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1293 n.4 (11th Cir. 1999) ("Significantly, the district court here made a factual finding that there had not been any collusion among the parties."); *Shames*, 2012 WL 5392159, at *13 (rejecting objection to inclusion of clear-sailing provision in class settlement since there was "no evidence of collusion in the settlement process").

Here, the Court has already found that the Settlement "has been negotiated at arm's length." ECF No. 168 at 3. The mediator under whose auspices this Settlement manifested, Rodney Max, likewise confirmed that "the settlement process was conducted at arm's-length and, while professionally conducted, was quite adversarial." ECF No. 188-1 ¶ 17. "These lengthy negotiations were exhausting, and at times frustrating, for the parties and their counsel." *Id.* Mr. Max "was retained by counsel for the parties in this matter on November 17, 2013, for the specific purpose of mediating the case and to assist in reaching a global resolution, if possible." *Id.* ¶ 10. "Parties colluding in a settlement would hardly need the services of a neutral third party to broker their deal." *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001). Indeed, the "participation of an independent mediator in the settlement negotiations virtually insures that the negotiations were conducted at arm's length and without collusion between the parties." *Hainey v. Parrott*, 617 F. Supp. 2d 668, 673 (S.D. Ohio 2007). And the Settlement's generous monetary relief separately confirms the absence of collusion. *See Gascho*, 2014 WL 3543819, at *4 ("Because the Settlement Agreement provides for immediate and substantial cash payments to class members, the risk of collusion associated with a clear sailing provision is diminished.").

Furthermore, the Parties began negotiating attorneys' fees only *after* they had finished negotiating the Settlement itself. ECF No. 188-1 ¶ 17. This is an additional ground for overruling the objection to the clear-sailing provision. *See In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 335 (3d Cir. 1998) (rejecting objection to inclusion of clear-sailing provision in class action settlement since there was "no indication the parties began to negotiate attorneys' fees until after they had finished negotiating the settlement agreement"); *Gascho*, 2014 WL 1350509, at *25 (rejecting objection to inclusion of clear-sailing provision in class action settlement since "the parties negotiated the payment of attorneys' fees and costs after having reached agreement on the relief to the Class and Subclasses").

Most important, the Court will review for itself any fee request made in connection with the Settlement. An "agreement by a settling party not to oppose a fee application up to a certain amount" is "worthy of consideration, but the court remains responsible to determine a reasonable fee." Fed. R. Civ. P. 23(h), 2003 advisory comm. note. Thus, "inclusion of such a 'clear sailing' provision" within a class settlement agreement "merely justifies the Court's application of heightened scrutiny when evaluating the class counsel's ultimate fee request; it should not be read as an independent ground for withholding approval of the entire settlement." *In re Skinner Group, Inc.*, 206 B.R. 252, 262 n.14 (Bankr. N.D. Ga. 1997).

**Kicker Provision.** The Jabrani objectors' additional argument about the supposed inclusion of a "kicker" provision in the Settlement is equally misplaced. First, there is no such provision in this Settlement – the Jabranis' reference to a "kicker" provision appears to be a product of their blanket appropriation of objections in unrelated lawsuits. *Compare* Burt Decl. Ex. B *with* Ex. C *and* Ex. D. Second, even if there were such a provision in this Settlement, where "the parties negotiated reasonable attorneys' fees, the class will not be deprived of any benefit by the inclusion of a kicker provision." *Gascho*, 2014 WL 3543819, at *4.

## IV. Neither The Claim Form Nor Class Notice Are "Deficient" Or "Burdensome."

**Claim Form.** Another objection is that the Claim Form is "materially deficient and misleading," ECF No. 217 at 17, "onerous" and "burdensome," ECF No. 197 at 6-7, and "complex and redundant." ECF No. 193 at 16. The Biddison objectors, for example, argue that "because borrowers do not choose their force-placed insurance providers, and the class period dates back several years, a significant number of potential claimants certainly will not have copies of their policies available to verify such information and will not risk penalties of perjury to submit a claim when they are unsure of what is being asked." ECF No. 217 at 17.

A verbatim identical objection was overruled as "specious" in *Saccoccio*:

> The Objectors state that the information required on the claims form is something that many class members no longer have, and thus a bar to recovery. They argue that because borrowers do not choose their force-placed insurance providers, and because the class period goes back several years, "a significant number of Claimants certainly will not have copies of their policies available to verify such information and will not risk penalties of perjury to submit a claim when they are unsure of what is being asked." This argument is specious. The class members are asked to provide a very minimum amount of information. If they cannot immediately recall the answer, they are free to consult their escrow statements or other documents. As the Court in *Mangone v. First USA Bank* stated, "these objections ignore the rule that a plaintiff in a civil lawsuit bears the burden of proving liability and damages in his or her own case. Class action status does not

> alter this basic principle." *Mangone v. First USA Bank*, 206 F.R.D. 222, 234
> (S.D. Ill. 2001). In other words, the Varnes Objectors cannot derail a settlement
> because the members of the class are being asked to provide a tiny fraction of the
> information they would be required to prove at trial in a claims form.

297 F.R.D. at 699; *see also Pelletz v. Weyerhaeuser Co.*, 255 F.R.D. 537, 544 (W.D. Wash.

2009) ("[T]he claims process is reasonable, as it only requires that Class members answer two

reasonable claim forms and submit a total of 10 photographs of the mold spotting. This is far

less than the Class members would have to produce in order to pursue individual litigation").

So it is here. Not only is there no evidence that Settlement Class Members do not retain

their LPI policies, Class Members do not even need the policies' data to submit a Claim Form.

All Class Members receiving the Class Notice know they had LPI charges and LPI policies

placed by the Wells Fargo Defendants. Aside from basic biographical information, the only

material thing a Class Member is asked to verify on the Claim Form is whether or not they paid a

portion of or still owe the LPI charge. If some Class Members cannot immediately recall this,

they can access their mortgage escrow account statements to refresh their recollection. This is a

mild inconvenience compared to the much greater burden of proof Class Members would face if

this case were to go to trial or beyond. Not only would they be required to prove they paid

*something*, they would have to prove specifically how much and when.

Other objectors contend that the Claim Form's requirement that Class Members verify

their identity via one of four different options is a "hurdle" and "intimidating." ECF No. 193 at

17; ECF No. 197 at 7, ECF No. 222 at 9. But Class Members who paid no portion of their LPI

are not subject to the verification requirement. Moreover, the verification requirement is needed

to prevent fraud, waste, and abuse. *See* Argument Part I.B.4, *supra*; Taylor-Manning Decl. ¶¶

37-39. Nor is it difficult to satisfy this basic requirement – a Class Member need only: (i) have

an adult witness sign the Claim Form; (ii) provide a copy of a photographic identification; (iii)

provide *any* Wells Fargo Mortgage Statement; *or* (iv) obtain a notarization. *See* ECF No. 182-2

Ex. B. By one claims process expert's estimate, the Claim Form would take just 10 minutes for

the average Class Member to read and complete. Taylor-Manning Decl. ¶ 26. Again, this is far

less than the same Class Members would have to prove at or after trial.

Mr. Kirby separately objects that the Settlement Website suggests "that if you did not

receive a claim form in the mail you cannot submit a claim form" because the Website states that

if a Class Member "received a Claim Form by mail and need another copy of a Claim Form" the

Class Member can click to download and view a personalized Claim Form. ECF No. 197 at 7.

On this basis, Mr. Kirby argues that the Settlement Website "implies all class members received notices through the mail; notwithstanding the parties' best efforts to contact class members, this cannot possibly be true given the size of the class and the large number of foreclosures that occurred during the class period." *Id.*  This objection is meritless.  A copy of the Claim Form was included in every Class Notice packet mailed (or re-mailed) to the Class Members.  ECF No. 182-2 ¶¶ 8, 9.  While not every Class Member necessarily received the mailed Class Notice, on the very same page Mr. Kirby objects to, the Settlement Website makes it abundantly clear that a Class Member can either submit the Claim Form they were mailed *or* electronically submit a Claim via the Website.  Under the bolded heading "**Your Options**," the Website states:

> To participate in the Settlement, eligible Class Members must submit a completed Claim Form by mail (with a timely postmark and all necessary verifications) or upload a completed Claim Form (with all necessary verifications) no later than 60 days after the Final Settlement Date.[24]

Mr. Kirby also fails to appreciate that the Settlement Website further notifies Class Members that, if they have questions, they can contact Class Counsel (at a listed address and telephone number) or the Settlement Administrator at a toll-free telephone number "to help you determine whether you are eligible for relief from this Settlement."[25]

*Class Notice.*  Ms. Hinjosa objects to the Class Notice itself, contending that it does not describe "regarding the aggregate estimated damages suffered by the class; the estimate average damages of individual class members; or the relationship, if any, of the chances of success at trial and the decision to accept a recovery of 7 cents to 11 cents on the dollar."  ECF No. 198 ¶ 1.  "However, none of the items complained of are required by the notice requirements set out in Fed. R. Civ. P. 23 or due process."  *Mangone*, 206 F.R.D. at 233.  A settlement class notice "need not include 'every material fact' or be 'overly detailed.'"  *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1239 (11th Cir. 2011).  A class notice thus need not describe such items as "the facts of the case, the size of the Settlement Class, the value of damages, the merits of the claims, the nature and amount of discovery, the maximum potential recovery for the Class, and the methodology for determining and calculating damages."  *Mangone*, 206 F.R.D. at 233.  Such "an overly detailed notice would not only be unduly expensive, but would also confuse class members and impermissibly encumber their rights to benefit from the action."  *In re Nissan*

---

[24] http://www.fladellsettlementinfo.com/claim.

[25] http://www.fladellsettlementinfo.com/faq#Q21.

*Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104 (5th Cir. 1977) (internal citation omitted). Indeed, the Notice likely *could not* include these items, as the Parties would inevitably dispute their description and a notice must convey only "objective, neutral information." *Id.* at 1105.

Here, Notice paragraph 11 directs Class Members to the Settlement for details of all "the legal claims that you give up if this Settlement is approved," including the Release's scope. ECF No. 182-2 Ex. B. "Further, the notice contains detailed information regarding claims covered by the settlement agreement and the proposed process for adjudicating claims. It also provides information regarding opt-out procedures and instructions for accessing a website established for the purpose of providing additional information regarding the proposed settlement." *Faught*, 668 F.3d at 1240 (affirming district court's approval of settlement notice that failed to advise class members why another court rejected a similar class settlement). The Notice sets forth the aggregate amount available to be paid to the Settlement Class, the percentages that may be recovered, the process for submitting a claim, and the Class Members' procedural rights and deadlines. That is more than sufficient to satisfy Fed. R. Civ. P. 23 and due process.

**V.     The Settlement Properly Releases Claims Related To Wind Insurance.**

Ms. Cochran-May argues that, because the Named Plaintiffs were not charged for wind insurance then, *ipso facto*, they have no "standing" to represent those borrowers who were. *See* ECF No. 194 at 3-5. That the alleged wrongdoing was precisely the same across insurance types, including the supposedly wrongful commission paid, is unmentioned. Instead, Ms. Cochran-May invokes "standing" as a sort of talisman – "different product, no standing."

Before proceeding to Ms. Cochran-May's fundamentally incorrect legal argument, there is first the question of a basic factual mistake. At least two of Named Plaintiffs, Ira Fladell and Sarah Crouch, *were* lender placed for wind insurance. Mr. Fladell's LPI policy explicitly states that it covers "windstorm" damage. *See* ECF No. 13-1 ¶ 9 & Ex. C at 22. Ms. Crouch's property also was placed with an LPI policy covering windstorm, hail, and hurricane damage. *See* ECF No. 13-2 ¶ 8 & Ex. B at 25. Both policies specifically included a "Windstorm, Hail, Hurricane Endorsement – Florida," indicating the deductible for losses under those perils. *See* ECF No. 13-1 ¶ 15 & Ex. H at 51; ECF No. 13-2 ¶ 8 & Ex. B at 25; *cf.* Fla. Stat. § 627.712(1) ("An insurer issuing a residential property insurance policy must provide windstorm coverage.")

Ms. Cochran-May also is legally mistaken that the Settlement cannot release wind insurance-related claims along with flood and hazard insurance-related claims. In this Circuit, as

elsewhere, "a court may release not only those claims alleged in the complaint and before the court, but also claims which could have been alleged by reason of or in connection with any matter or fact set forth or referred to in the complaint. And it has been held that *even when the court does not have power to adjudicate a claim*, it may still approve release of that claim as a condition of settlement of an action before it." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981) (internal quotation marks omitted; emphasis added); *see also Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 376-79 (1996); *Thomas v. Blue Cross & Blue Shield Ass'n*, 333 F. App'x 414, 420 (11th Cir. 2009) ("Given a broad enough settlement agreement . . . and provided that [a class member] had notice of it and an opportunity to opt out, it is perfectly acceptable for the [settling class] action to preclude his claims, *even if they could not have been part of that action itself*.") (emphasis added).[26]

The underlying "wrongs" alleged against Defendants do not differ depending on whether the insurance policy happened to be for hazards, floods, or wind. Rather, this Action involves general conduct transcending particular kinds of LPI. For example, the Named Plaintiffs were allegedly injured by the violation of the same federal statute, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*, that allegedly injured all other members of the Settlement Class, regardless of insurance type. Plaintiffs allege a conspiratorial "scheme" involving *all* LPI types – *e.g.*, hazard (including wind-only), flood, and flood gap – wherein Defendants agreed that the Assurant and QBE Defendants "would be WFB's exclusive provider of force-placed insurance and would extract artificially inflated premiums from WFB's customers" and also agreed to "pay WFB's affiliate, WFI, kickbacks." ECF No. 155-1 ¶ 223; *see also id.* ¶¶ 1, 2, 4, 40, 42, 48. Plaintiffs further posit a long-term criminal enterprise involving *all* types of LPI, the alleged "common purpose" of which was "to increase and maximize the revenue of Wells Fargo" by "forcing Plaintiffs Crouch and Fladell and members of the class to pay artificially inflated premiums for hazard insurance through a scheme that manipulated the premiums to cover kickbacks and expenses associated with monitoring Wells Fargo's entire loan portfolio." *Id.* ¶ 196. This Action thus concerns the same "exclusive

---

[26] The Wells Fargo Defendants separately emphasize that it makes sense for one settlement to cover different LPI products when the same alleged conduct is claimed to have occurred regardless of type of insurance. *See Marcus v. BMW of N. Am.*, 687 F.3d 583, 599 (3d Cir. 2012); *Fallick v. Nationwide Mut. Ins. Co.* 162 F.3d 410, 423 (6th Cir. 1998).

provider" program agreements, compensation arrangements, and placement procedures at issue in Ms. Cochran-May's wind-insurance action. The Named Plaintiffs thus do not make a broader release than that to which they are authorized by the terms of their class representation. Defendants' alleged decision to charge for purportedly "inflated," "unnecessary," and "duplicative" LPI – regardless of kind – arose from the same underlying collusive conduct.

The legal "support" to which Ms. Cochran-May points is actually a mischaracterization. *See* ECF No. 194 at 5. The Judicial Panel on Multidistrict Litigation did not endorse her analytical approach at all when it considered consolidating dozens of pending LPI class actions. Purporting to quote *In re Lender Force-Placed Insurance Litigation*, 895 F. Supp. 2d 1352, 1352-1354 (J.P.M.L. 2012), Ms. Cochran-May implies that the Panel addressed the question of whether a single class action could encompass hazard, flood, and wind insurance and rejected the idea. ECF No. 194 at 5 ("'. . . *different force-placed insurance program[s]*,' *i.e.* hazard, wind, flood or flood-gap, do not share 'sufficient [common] questions of fact to justify [centralization]") (alterations in Ms. Cochran-May's objection). Despite the creative use of ellipses, the Panel did nothing of the sort in that decision, answering only the question of whether to consolidate *all lenders and all insurers* into a single industrywide LPI proceeding. 895 F. Supp. 2d at 1352-1354. Ms. Cochran-May exercises poetic license in inserting language into the middle of a sentence the Panel never wrote. That sentence does not refer to the different kinds of insurance at all – it reads as follows: "Each action involves only one mortgage lender and a *different force placed insurance program* governed by a *lender-specific agreement negotiated with an insurance company*." *Id.* at 1353 (emphases added).

## VI.    To Be Approved, The Settlement Need Not Consider Every Conceivable Way In Which Defendants Were Supposedly Unjustly Enriched.

Arguing that the Settlement is "based on the amount of unfair commissions generated by Defendants," the Biddison objectors argue that the Settlement improperly releases claims based on "other means by which improper charges were passed on to the Settlement Class Members, such as below cost services and duplicative and unnecessary insurance." ECF No. 217 at 12. In the same vein, Mr. Kirby objects that "there may have been additional undisclosed expense associated with these policies" and that LPI coverage "also may have been unnecessary, in which case the entire premium should fairly be calculated as damages." ECF No. 197 at 5.

As an initial matter, the objectors are wrong on the facts. The Settlement provides relief to borrowers for allegations regarding alleged below-cost services by offering a refund of at least

7% even after the commissions ended in March 2012.  ECF No. 158-1 ¶¶ 4.5.3, 4.5.4.  The Settlement allows this recovery even though Florida[27] and New York[28] regulators specifically excluded tracking expenses from their prohibition on "below-cost outsourced services."

Furthermore, the objectors cite no legal authority for their position, which is contrary to the established view that class settlements "'may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the identical factual predicate as the settled content.'"  *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1317 (S.D. Fla. 2005) (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005)).  In *Lipuma*, objectors contended that class counsel failed to value certain claims the settlement released.  *Id*. at 1315.  The court nonetheless found that the "objection should not bar approval of the settlement" since the alleged harms were "transactionally related."  *Id*. at 1315-18.  "The Court's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation, but to evaluate the proposed settlement in its totality."  *Id.* at 1323.

Courts routinely accept class settlements that release claims and theories of recovery for which no separately stated consideration is paid.[29]  For example, Kessler Topaz-represented objectors to the JP Morgan LPI class settlement similarly argued that the reinsurance portion of the defendants' purported scheme was not redressed under the settlement.  *Saccoccio*, 297 F.R.D. at 697.  Relying on *Lipuma*, this Court found the objection "meritless."  *Id*.  As here, all the claims released "involved identical lender-placed insurance transactions."  *Id*.  There is no reason all potential theories or measures of recovery must be included in a settlement's relief model, particularly where, as here, the objectors have not shown that using a different theory of recovery could or would produce greater settlement benefits than those already being provided.  Indeed, a "settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single

---

[27] http://www.floir.com/siteDocuments/AmericanSecurity141841-13-CO.pdf.

[28] http://www.dfs.ny.gov/about/press2013/assur-order-130321.pdf.

[29] *See, e.g.*, *Wal-Mart*, 396 F.3d at 113 (rejecting objection that class settlement released all antitrust claims against credit card companies without providing separately stated compensation relating to additional antitrust theories raised in other litigation); *In re Gen. Am. Life Ins. Co. Sales Practices Litig.*, 357 F.3d 800, 805 (8th Cir. 2004) (rejecting class member's contention that class settlement did not provide separately stated compensation for her "modal billing" claims, which she argued were "given away for nothing"); *Cotton*, 559 F.2d at 1334 (rejecting as "meritless" the "objection that the compromise must fall for lack of a specified sum for the settlement of back pay claims").

percent of the potential recovery." *Behrens v. Wometco Enters.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988). "Moreover, the existence of strong defenses to the claims presented makes the possibility of a low recovery quite reasonable." *Lipuma*, 406 F. Supp. 2d at 1323.

Mr. Kirby persists, asserting that the Settlement also is improper because it releases claims that might be redressed by treble or statutory minimum damages. ECF No. 197 at 5. But "potential treble recovery (or, for the same reason, punitive recovery) should not be superimposed as a yardstick for measuring the adequacy of a settlement, lest the settlement negotiation process be derailed from the start." *In re Dennis Greenman Secs. Litig.*, 622 F. Supp. 1430, 1441 (S.D. Fla. 1985), *rev'd on other grounds*, 829 F.2d 1539 (11th Cir. 1987). "In analyzing the range of possible recoveries [in a class settlement], the Court will consider an estimate of single, rather than treble, damages." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 319 n.25, 325 (N.D. Ga. 1993) (approving class settlement that amounted to "approximately 12.7-15.3% of the estimated $2 billion minimum possible untrebled recovery").

## VII.   The Other Objections Are Meritless.

The sundry other objections raised are even less colorable.

***Reverse Auction.***   A recurring accusation is that the Settlement was the product of a reverse auction because "Wells Fargo was faced with multiple class actions, and apparently chose to settle with the most malleable class counsel." ECF No. 222 at 15; *see also* ECF No. 217 at 9; ECF No. 194 at 8. The accusation is baseless – there is no record support for the notion that Defendants pitted Class Counsel against other plaintiffs' lawyers with competing putative class actions. Indeed, if there was a reverse auction, the timing was odd. Meaningful settlement negotiations did not commence until after voluminous discovery already occurred, the Parties had briefed multiple dispositive motions, and Plaintiffs moved for class certification. *See* ECF No. 182-1 ¶¶ 1.3-1.11. Nor did meaningful settlement negotiations occur until after the Court *ordered* the Parties to engage in mediated negotiations or face sanctions. *See* ECF No. 63. Furthermore, no other class settlements were directly in prospect, so it cannot be said that any other potential settlement was bid down or rejected. And the total absence of collusive behavior by the Parties also refutes the "reverse auction" label. *See* Argument Part III, *supra*. In short, "Objectors' reverse auction argument would lead to the conclusion that no settlement could ever occur in the circumstances of parallel or multiple class actions – none of the competing cases

could settle without being accused by another of participating in a 'collusive reverse auction.'" *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1189 (10th Cir. 2002).

**Objector Discovery.**   Several objectors demand the right to conduct discovery regarding the Settlement and, in particular, the feasibility of employing a hypothetical direct-distribution structure.   *See* ECF No. 217 at 18; ECF No. 193 at 2-4.   "'Class members who object to a settlement of a class action do not have an absolute right to conduct discovery and presentation of evidence.'"   *Checking Account*, 830 F. Supp. 2d at 1337 n.6 (quoting *Domestic Air Transp.*, 144 F.R.D. at 424).   The Settlement has been preliminarily approved since March 17, 2014.   The objectors' demands – made for the very first time in the objections – are "untimely and would have unduly and unnecessarily disrupted the schedule this Court set for the Settlement-related proceedings."   *Id.*   More fundamentally, the requested discovery would be pointless.   Defendants "would not entertain a direct payment structure, even if such a procedure was, in fact, feasible to enact.   Thus, discovery regarding the feasibility of a payment structure that is not part of the proposed settlement is irrelevant."   *Casey*, 2014 WL 4120599, at *2 (denying objectors' demand for discovery in the Citibank LPI class settlement).   "[T]he sole purpose of any settlement-related discovery is to ensure the Court has sufficient information before it to enable the Court to determine whether to approve the Settlement."   *Checking Account*, 830 F. Supp. 2d at 1337 n.6. The Court and Class Counsel already have that information, so settlement-related discovery would serve no purpose here.   *See Saccoccio*, 2014 WL 3738013, at *1 (denying objectors' demand for discovery of material unrelated to class settlement's fairness).

**Exclusion/Objection Period.**   Citing no authority, the Vanskyock objectors contend that the Settlement "provides more than one million class members with only two months from the mailing of the Notice to opt out or object, a period that is far too short given the important rights that would be released[.]"   ECF No. 193 at 15.   That is nonsense.   Under the Settlement, not only will Class Members have two months to exclude themselves or object following mailing of the Notice, they will have an additional month to prepare for the Final Approval Hearing.   *See* ECF No. 182-1 ¶¶ 2.30, 2.34, 2.35, 12.2.   "Courts have consistently held that 30 to 60 days between the mailing (or other dissemination) of class notice and the last date to object or opt out, coupled with a few more weeks between the close of objections and the settlement hearing, affords class members an adequate opportunity to evaluate and, if desired, take action concerning a proposed settlement."   2 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 6:18 (10th ed. 2014); *see*

*also Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426, 429-30 (5th Cir. 1977) (rejecting as "without merit" objection "that the notices did not give sufficient time for class members to respond to the settlement agreement if they wished to object" since a period of "almost four weeks between the mailing of the notices and the settlement hearing" was adequate).

*Claimant-Only Release.* The Vanskyock objectors also demand that, "if the Court approves the settlement it should enter the release only against Class members who have been paid the Settlement proceeds." ECF No. 193 at 10. But the Settlement releases – *and benefits* – all Settlement Class Members, not merely those who submit claims that are paid. The Court is "not free to delete, modify or substitute certain provisions of the settlement. The settlement must stand or fall as a whole." *Cotton*, 559 F.2d at 1331-32. To modify the Settlement in this manner would effectively eliminate the use of claim forms altogether in class settlements. *See Rubin v. Assicurazioni Generali S.P.A.*, 290 F. App'x 376, 377 (2d Cir. 2008) (rejecting objection that settlement "releases claims held by class members who will not be compensated under the settlement because they have not filed claims").

*Pleading Amendments.* Another objection is that, after a settlement-in-principle had been reached, the pleadings were amended to add several claims, Defendants, and Named Plaintiffs. *See* ECF No. 193 at 10-11 & 12-13. But there was nothing improper about this. Courts in this District recognize that "defendants may properly insist upon amendments to the pleadings broadening the scope of the action prior to settlement, in an effort to cover everything and insure that the settlement will in fact result in an end to litigation." *Lipuma*, 406 F. Supp. 2d at 1316 (internal quotation marks omitted). Any such amendment "does not necessarily lead to a conclusion that there was collusion among the parties." *Id.* Here, the amendments simply consolidated claims and Named Plaintiffs from other LPI lawsuits that had been actively litigated since 2012. *See* ECF No. 182-1 ¶ 1.15; ECF No. 183 ¶¶ 2-12. The objection is meritless.

*Class Representation.* The Vanskyock objectors question the Settlement "because there was no Plaintiff who could adequately represent the Objectors and the proposed class of borrowers in their respective states" since "the claims by the Objecting Plaintiffs and the other borrowers in their states should not depend upon borrowers from Florida, Oklahoma, and Arkansas whose claims have no connection with Objecting Plaintiffs' states." ECF No. 193 at 11. But especially in a class settlement, "the potential for varying standards of proof under state law does not defeat adequacy: the plaintiffs are not rendered inadequate representatives of the

class simply because the standards of proof may vary." *Spencer v. Hartford Fin. Servs. Group, Inc.*, 256 F.R.D. 284, 293 (D. Conn. 2009).  "By contrast, subdividing plaintiffs by state and requiring each group to bring a separate suit could very well make suits infeasible and prevent plaintiffs from recovering at all." *Id.*; *see also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 348-49 (3d Cir. 2010) ("We disagree and find no merit in objectors' argument that state law differences created conflicts among class members that defeat adequacy of representation and preclude certification of a nationwide class.  Objectors fail to explain how the differences in state laws have created conflicts of interest between the named plaintiffs and absent class members in the context of adequacy of representation in this settlement class.").  Moreover, the Vanskyock objectors' (accurate) observation that courts "have recently refused to certify similar nationwide classes in force placed insurance cases," ECF No. 193 at 11, is an argument *favoring* approval, since by settling the Litigation now, the Named Plaintiffs have secured relief for the broadest possible set of individuals that would not otherwise be possible though contested litigation.

> **Amount Of Fee Request.**  Several objections characterize Class Counsels' fees request as disproportionate to the relief afforded Settlement Class Members.  Defendants express no opinion on the issue of the amount of fees requested.

## VIII.   The Seventh Circuit's *Eubank* Decision Is Distinguishable.

Many of the objectors rely heavily on *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014), interspersing their filings with comparisons to, and quotes from, that recent out-of-Circuit decision.  This Settlement is nothing like the class settlement rejected in *Eubank*.

The Seventh Circuit's reversal of the *Eubank* settlement approval hinged on the fact that, unlike this Settlement, "almost every danger sign in a class action settlement" was present in that case.  *Id.* at 728.  There were "grave conflict[s] of interest," including that the lead class counsel was the son-in-law of the lead class representative (Saltzman).  *Id.* at 721.  Early in the case, lead counsel added four additional named plaintiffs and then removed these four plaintiffs when they opposed preliminary approval of the settlement; "naturally their replacements joined Saltzman in supporting it."  *Id.* at 722.  The risk of a conflict was heightened by the fact that lead class counsel was subject to misappropriation lawsuits and bar disciplinary proceedings, indicating that counsel "may have been desperate to obtain a large attorney's fee in this case before his financial roof fell on him."  *Id.*  The financial needs of lead class counsel resulting from these lawsuits "drove the settlement of this case."  *Id.*  Moreover, the bar disciplinary proceedings

culminated in lead class counsel's suspension from practicing law for 30 months because of his misconduct. *Id.* Adding to these conflicts, the settlement "itself provided for incentive awards only to the representatives who supported the settlement." *Id.* at 723. "This created a conflict of interest: any class representative who opposed the settlement would expect to find himself without any compensation for his services as representative." *Id.*

Nor was that all. Unlike this Settlement, the *Eubank* settlement did not offer a near-complete (or better) recovery to class members, but imposed multiple caps on monetary relief. *Id.* at 724-25. The settlement "strew[] obstacles in the path" of every class member, imposing a convoluted claims process, requiring certain class members who submitted claims to arbitrate them and the submission of "a slew of arcane data." *Id.* The two claim forms used were 12 and 13 pages long. *Id.* at 725. For this, some claimants were entitled only to "coupons" – "discounts on *future* purchases of Pella windows, discounts that may be worth very little to current owners of Pella's defective windows" – "a warning sign of a questionable settlement." *Id.* Further, the settlement "ignore[d] the certification of the two classes and purport[ed] to bind a single nationwide class consisting of all owners of Pella Proline windows containing the defect, whether or not the owners have already replaced or repaired the windows." *Id.* at 721.

Not one of these "danger signs" is present here. The flawed *Eubank* settlement is simply not comparable to this Settlement, given that there are no conflicts of interest alleged here and the Settlement offers near-complete (or better) relief following a simple claims process requiring only basic biographical information readily known by the Class Members. The Claim Form itself, as noted, should take just 10 minutes for the average Class Member to read and complete. Taylor-Manning Decl. ¶ 26. Class Counsel are not subject to any lawsuits or bar disciplinary proceedings that have clouded their judgment. Nor are any incentive awards conditioned on the Named Plaintiffs' support for the Settlement. *Eubank* should not guide the Court's decision.

## CONCLUSION

The objectors have failed to meet their burden of showing that the presumptively fair, reasonable, and adequate Settlement should not be approved. Accordingly, for all the foregoing reasons, and for the reasons set forth in their joinders to the Named Plaintiffs' motion for final approval, ECF No. 188; ECF No. 192; ECF No. 199, Defendants respectfully request that the Court overrule the objections and grant final approval of the Settlement.

Dated: September 5, 2014

Respectfully submitted,

SEVERSON & WERSON

*/s/ Michael J. Steiner*
Michael J. Steiner (*pro hac vice*)
mjs@severson.com
Mark D. Lonergan (*pro hac vice*)
mdl@severson.com
One Embarcadero Center, Suite 2600
San Francisco, California 94111
Telephone: (415) 677-5611
Facsimile: (415) 956-0439

*Attorneys for Defendants Wells Fargo Bank,
N.A., and Wells Fargo Insurance, Inc.*

Respectfully submitted,

BUCKLEYSANDLER LLP

*/s/ Robyn C. Quattrone*
Robyn C. Quattrone (*pro hac vice*)
rquattrone@buckleysandler.com
Amanda M. Raines (*pro hac vice*)
araines@buckleysandler.com
1250 24th Street NW, Suite 700
Washington, DC 20037
Telephone: (202) 349-8000
Facsimile: (202) 349-8080

*Attorneys for Defendants QBE Specialty
Insurance Company, QBE Insurance
Corporation, QBE First Insurance Agency,
Inc., QBE Financial Institution Risk Services,
Inc., Praetorian Insurance Company*

Respectfully submitted,

CARLTON FIELDS JORDEN BURT, P.A.

*/s/ Frank G. Burt*
Frank G. Burt (Fla. Bar No. 197963)
fburt@cfjblaw.com
Farrokh Jhabvala (Fla. Bar No. 765155)
fjhabvala@cfjblaw.com
Landon K. Clayman (Fla. Bar No. 283576)
lclayman@cfjblaw.com
100 S.E. Second Street
Miami Tower, Suite 4200
Miami, Florida 33131-2113
Telephone: (305) 530-0050
Facsimile: (305) 530-0055

*Attorneys for Defendants Assurant, Inc.,
American Security Insurance Company,
Voyager Indemnity Insurance Company, and
Standard Guaranty Insurance Company*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing has been filed with the Court electronically on September 5, 2014.  Notice of this filing will be sent to all parties by operation of the Court's CM/ECF System.  Parties may access this filing through the Court's CM/ECF System.

/s/ Frank G. Burt
Frank G. Burt

36235500.5